**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
JOHN T. JASNOCH (281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
jjasnoch@scott-scott.com

***Attorney for Plaintiffs and the Class***

[Additional Counsel on Signature Page.]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

GERARDO ACEVES, THOMAS FAN, EDWIN MARTINEZ, TIFFANY SMOOT, EDOUARD CORDI, and BRETT MAGGARD, Individually, and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

COINBASE GLOBAL, INC., COINBASE, INC., COINBASE ASSET MANAGEMENT, LLC, and BRIAN ARMSTRONG,

Defendants.

**Case No. 3:24-cv-02663-MMC (Consolidated with Case No. 3:24-cv-03350)**

**CONSOLIDATED CLASS ACTION COMPLAINT**

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs Gerardo Aceves ("Aceves"), Thomas Fan ("Fan"), Edwin Martinez ("Martinez"), Tiffany Smoot ("Smoot"), Edouard Cordi ("Cordi"), Brett Maggard ("Maggard"), Mollijoy Carter ("Carter"), Bradley Barnes ("Barnes"), and Antonett Foy ("Foy") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint ("Complaint") against Defendants Coinbase Global, Inc. ("Coinbase Global"), Coinbase, Inc., (collectively "Coinbase") and Brian Armstrong (collectively "Defendants"). The following allegations are based upon personal knowledge as to Plaintiffs' own facts, upon investigation by Plaintiffs' counsel, and upon information and belief where facts are solely in possession of Defendants. Plaintiffs believe substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1. Plaintiffs pursue claims against Defendants under the laws of California and Florida. This is a nationwide class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired the Coinbase Digital Investments (including, but not limited to, Coinbase Earn, 1INCH, ACH, ADA, AMP, ALGO, ANKR, AUCTION, AVAX, AAVE, ABT, AIOZ, BLZ, BAL, BAT, BOND, CGLD, CHZ, CLV, CRO, COMP, CTSI, cbETH, DOGE, DASH, DOT, ENJ, EOS, FET, FLR, FORTH, GNO, GODS, GAL, GALA, GRT, IMX, JASMY, KEEP, LRC, LINK, MANA, MATIC, MCO2, MLN, NKN, NCT, NEAR, NMR, NU, OP, OGN, OMG, POLS, PLU, PRO, RNDR, RARI, REQ, RLY, SUI, SUKU, SAND, SHIB, SKL, SOL, SUSHI, USDC, USDT, UMA, UNI, VET, XCN, XRP, XLM, XTZ, YFI, ZEN, and ZRX) from January 1, 2017 through the commencement of this action (the "Class Period").

2. Defendant Coinbase purports to be "a trusted platform that makes it easy for people and institutions to engage with crypto assets, including for trading, staking, safekeeping, spending, and fast, free global transfers." Further, Defendant Coinbase states that "[to]gether with the crypto community, we also advocate for responsible rules to make the benefits of crypto available around the world." In fact, Coinbase has been a part of a shadowy crypto ecosystem operating just outside of the law since formed over 10 years ago. Its entire business model has been built upon a lie and

a dream: the lie is that "we do not sell securities," and the dream is that, knowing it would eventually be caught in the lie, "it is better to ask for forgiveness than permission."

3. Coinbase has knowingly, intentionally, and repeatedly violated state securities laws since it began doing business. Indeed, it admits in its User Agreement that is a "Securities Broker," that the Digital Asset Securities sold by Coinbase are "financial assets" (*i.e.*, investment contracts or other securities under CAL. COM. §8102), that Coinbase is a "securities intermediary" (*i.e.*, a clearing corporation or a broker other person that "maintains securities accounts for others and is acting in that capacity"), and that the Digital Asset Wallets custodially held by Coinbase are "securities account[s]."

4. When it filed with the states and the U.S. Securities and Exchange Commission ("SEC") to become a public company a few years ago, it disclosed that its business involved selling securities but that it was not registered to do so. In drafting its User Agreement with the investors and other customers, Coinbase specifically identifies the digital assets it sells as "securities." And yet, Coinbase has never registered itself, its people, or the digital securities it sells.

5. As a consequence, Plaintiffs seek their full recission, statutory damages under California and Florida state law, and, in addition, injunctive relief.

## PARTIES

### *Plaintiffs*

6. Plaintiff Gerardo Aceves is a resident and citizen of California, living in Yuba City, California. Plaintiff Aceves invested in the Coinbase Digital Investments, including SHIB, during the Class Period and suffered investment losses as a result of Defendants' conduct.

7. Plaintiff Thomas Fan is a resident and citizen of California, living in San Ramon, California. Plaintiff Fan invested in the Coinbase Digital Investments, including ALGO, MANA, and SHIB during the Class Period and suffered investment losses as a result of Defendants' conduct.

8. Plaintiff Edwin Martinez is a resident and citizen of California, living in La Quinta, California. Plaintiff Martinez invested in numerous of the Coinbase Digital Investments during the Class Period and suffered investment losses as a result of Defendants' conduct.

9. Plaintiff Tiffany Smoot is a resident and citizen of California, living in Morgan Hill, California. Plaintiff Smoot invested in numerous of the Coinbase Digital Investments, including Coinbase Earn, during the Class Period and suffered investment losses as a result of Defendants' conduct.

10. Plaintiff Edouard Cordi is a resident and citizen of California, living in Temecula, California. Plaintiff Cordi invested in numerous of the Coinbase Digital Investments, including Coinbase Earn, 1INCH, ACH, ADA, AMP, ALGO, ANKR, AUCTION, AVAX, BAL, BAT, BOND, CGLD, CHZ, CLV, COMP, CTSI, CRO, DOT, EOS, ENJ, FET, FLR, FORTH, GAL, GALA, GRT, IMX, LINK, MANA, MATIC, MCO2, NEAR, NMR, NU, OGN, OMG, PLU, PRO, RLY, SAND, SHIB, SKL, SOL, SUSHI, UMA, UNI, XLM, XRP, XTZ, ZEN, and ZRX during the Class Period and suffered investment losses as a result of Defendants' conduct.

11. Plaintiff Brett Maggard is a resident and citizen of Florida, living in Tampa, Florida. Plaintiff Maggard invested in Coinbase Digital Investments during the Class Period and suffered investment losses as a result of Defendants' conduct.

12. Plaintiff Mollijoy Carter is a resident and citizen of Jamestown, California. Plaintiff Carter invested in many Digital Asset Securities, including, but not limited to, Coinbase Earn, 00, AAVE, ABT, AIOZ, AMP, AVAX, BLZ, cbETH, DASH, DESO, GNO, GODS, GRT, LINK, MATIC, NCT, NEAR, OP, POLS, PRO, RARI, SHIB, SOL, SUI, SUKU, UNI, WBTC, XCN, XLM, YFI, and ZRX through Coinbase during the Class Period and suffered harm as a result of Defendants' actions and omissions.

13. Plaintiff Bradley Barnes is a resident and citizen of Santee, California. Plaintiff Barnes invested in many Digital Asset Securities, including, but not limited to, Coinbase Earn, ADA, AMP, ANKR, AUCTION, COMP, CLV, CTSI, FORTH, GRT, JASMY, LRC, MATIC, MLN, NEAR, NU, RNDR, SHIB, SKL, SOL, USDC, USDT, VET, and XLM through Coinbase during the Class Period and suffered harm as a result of Defendants' actions and omissions.

14. Plaintiff Antonett Foy is a resident and citizen of Port St. Lucie, Florida. Plaintiff Foy invested in many Digital Asset Securities, including but not limited to 1INCH, DOGE, ENJ,

FET, KEEP, NKN, NU, OGN, and SHIB through Coinbase during the Class Period and suffered harm as a result of Defendants' actions and omissions.

***Defendants***

15. Defendant Coinbase Global, Inc., is a business incorporated under the laws of the State of Delaware with its headquarters located at 1209 N Orange Street, Wilmington, DE 19801, and operates as a holding company for the various Coinbase-related subsidiaries.

16. Defendant Coinbase, Inc., is a subsidiary of Coinbase Global, Inc., incorporated in Delaware in 2009. Although the Company purports to have no physical headquarters, it leases significant office space in Mountain View, California.[1] It was previously headquartered in San Francisco, California. Coinbase, Inc., operates one of the largest crypto asset securities brokerage platforms in the U.S., with over 98 million users. Its securities are registered and publicly traded on the Nasdaq Stock Market under the symbol COIN, its market capitalization is over $17 billion and its revenues for the 12 months preceding February 2023 exceeded $5 billion. Although Coinbase, Inc., registered its own common stock with the SEC (thus showing it understands the legal requirements of registering securities prior to their sale and understood the likelihood that the Digital Asset Securities were securities even then), it has failed to register itself or the Digital Asset Securities offered and sold to the public, including Plaintiffs and members of the putative Class.

17. Defendant Brian Armstrong ("Armstrong") is the co-founder of Coinbase, and served as the Company's Chief Executive Officer ("CEO") and Chairman of the Coinbase Board of Directors ("Board"). On information and belief, Defendant Armstrong lives in the San Francisco Bay Area[2] and owns property in Los Angeles.[3]

---

[1] Joshua Bote, *After abandoning San Francisco HQ, Coinbase takes on new Bay Are office space*, SFGATE (July 20, 2023), https://www.sfgate.com/tech/article/coinbase-bay-area-office-space-18210992.php

[2] *Brian Armstrong*, FORBES, https://www.forbes.com/profile/brian-armstrong/ (Last visited 9/16/24)

[3] Katherine Clarke and E.B. Solomont, *Crypto CEO Brian Armstrong Buys Los Angeles Home for $133 Million*, THE WALL STREET JOURNAL (January 3, 2022)

**JURISDICTION AND VENUE**

18. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

19. This Court may exercise personal jurisdiction over Defendants because Coinbase maintains and has continuous and systematic contacts with this District, does substantial business in this State and within this District, and engages in unlawful practices in this District as described in this Complaint, so as to subject itself to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

20. Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. §1965 because Coinbase transacts business in, is found in, and/or has agents in this District. According to its website, Coinbase states that its headquarters was located in San Francisco from the company's inception until it closed its headquarters in 2022.[4] Since January 2020, approximately 70% of Coinbase's workforce were located in California, including the Coinbase CEO Brian Armstrong who lives on a $133 million estate in Bel Air, Los Angeles. Therefore, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District. Further, of all states, California has the highest population as well as the highest proportion of its population to trade in digital assets.[5] There is no District with closer ties to the misconduct.

---

https://www.wsj.com/articles/crypto-ceo-brian-armstrong-buys-los-angeles-home-for-133-million-11641249787

[4] Brian Armstrong, *Coinbase is a decentralized company, with no headquarters*, COINBASE (Feb. 24, 2021), https://www.coinbase.com/blog/coinbase-is-a-decentralized-company-with-no-headquarters.

[5] *See* https://www.coinbase.com/learn/community/united-states-of-crypto#:~:text=Key%20Findings%20From%20Coinbase%20Research&text=Crypto%20is%20becoming%20an%20increasingly,Alaska%2C%20Nevada%2C%20and%20Massachusetts.

21. Plaintiffs satisfy all conditions precedent for bringing the class action claims alleged herein in this District.

22. **Divisional Assignment**: This action should be assigned to the San Francisco Division of this Court under Local Rule 3-2(d), as Coinbase, Inc., was previously headquartered in San Francisco County, California, and a substantial part of the events or omissions giving rise to the claims discussed herein occurred within this county.

## FACTUAL BACKGROUND

### I. COINBASE OPERATIONS

23. Coinbase was founded in 2009. Throughout its history, Coinbase was headquartered in California and Defendant Armstrong resided in California. Coinbase operates in precisely the same fashion as other securities exchanges and broker/dealers and wholly owns at least two licensed securities broker/dealer. When Coinbase first launched, an affiliate was also launched as a licensed general securities broker/dealer, Coinbase Securities, Inc. ("Coinbase Securities"). Like Coinbase, Coinbase Securities is a subsidiary of Coinbase Global, Inc., incorporated in Delaware in 2009 and approved by the SEC in 2010. It is also registered as a securities broker/dealer with the Florida Office of Financial Regulation and the Financial Industry Regulatory Authority ("FINRA").[6]

24. Coinbase offers and sells investment securities to the public (including the Plaintiffs) in the form of the Digital Asset Securities. Coinbase operates two brokerage platforms: Coinbase (the "Coinbase Brokerage Platform") and Coinbase Pro (the "Coinbase Pro Brokerage Platform" and collectively with the Coinbase Brokerage Platform, the "Coinbase Digital Asset Brokerage Platforms").

25. Since its formation over 10 years ago, Coinbase has held itself out to the public and the Plaintiffs as a "broker" and a "trusted part" of a regulated financial industry. It boasts that it is "regulated," implying registration under state and federal securities laws. What Coinbase really

[6] The Coinbase Securities and Coinbase Capital Markets FINRA BrokerCheck Reports are attached hereto as Exhibits A and B, respectively.

means by claiming to be regulated is that it has "money transmitter licenses" in many states, just as Western Union and similar companies do. Coinbase has never been registered as a broker/dealer, bank, investment advisor, trust company, or any other regulated financial institution, but holds itself out as such.

26. As part of this effort to appear regulated like, for example, Morgan Stanley, Coinbase's written trading rules, protocols, ability to exercise discretion to maintain orderly markets, etc., are virtually identical to those of competing securities or crypto broker/dealers (*e.g.*, orders, limit orders, market orders, stop orders, order protections (including granting Coinbase discretion to "employ limit order controls to maintain market health"), market maker activities, etc.). In fact, Coinbase even operates as a prime broker, a paradigmatic example of Coinbase's deceptive practice of wrapping itself in the language of securities brokers, transactions, and registrations while complying with none of that: "Access Coinbase Exchange directly or multiple exchanges and liquidity venues through Coinbase Prime, our full-service *prime broker*."[7]

27. Consistent with those rules and protocols, Coinbase's User Agreement also uses the same securities jargon and protocol as used by other securities broker/dealers to successfully portray itself to the public and the customers as a trusted financial industry participant where it and the "investments" it offers are fully registered with and licensed by state and federal regulators. As discussed more thoroughly in the section below entitled "Legal Claims," this portrayal was false.

28. Coinbase also acts as a "Prime Broker" like other securities broker/dealers. A prime brokerage arrangement is much different than a traditional account relationship and is even more highly regulated. The SEC has issued a No-Action Letter dated January 25, 1994 (attached as Exhibit B) (which was adopted by the Exchange in Information Memo 94-6 dated February 28, 1994), which specifies conditions that *must* be met by prime brokers, executing brokers (including

[7] *The trusted bridge to crypto markets for institutions*, COINBASE, https://www.coinbase.com/institutional (last visited May 3, 2024) [emphasis added]. Unless otherwise noted, all emphasis is added.

Coinbase), and customers in prime brokerage arrangements. In that letter, the SEC described prime brokerage as follows:

> Prime brokerage is a system developed by full-service firms to facilitate the clearance and settlement of securities trades for substantial retail and institutional investors who are active market participants. ***Prime brokerage involves three distinct parties: the prime broker, the executing broker, and the customer***. The prime broker is a registered broker-dealer that clears and finances the customer trades executed by one or more other registered broker-dealers ("executing broker") at the behest of the customer. ***Each of the executing brokers receives a letter from the prime broker agreeing to clear and carry each trade placed by the customer with the executing broker where the customer directs delivery of money or securities to be made to or by the prime broker.***
>
> The customer maintains its funds and securities in an account with the prime broker. Orders placed with the executing broker are effected through an account with the executing broker in the name of a prime broker for the benefit of the customer.

Jeffrey C. Bernstein, SEC Staff No-Action Letter, [Jan. 25, 1994] p. 2.

29. Coinbase cannot act like a traditional broker/dealer and a traditional prime broker while at the same time pretending to be outside of the coverage of the Florida Securities and Investor Protection Act ("FSIPA") or the California Securities Act. Rather, Coinbase is required by state law to be registered in multiple securities capacities, and should today be held to the same standards of a registered broker/dealer and prime broker under Florida and California state securities laws.

30. Like other securities broker/dealers and registered persons, Coinbase typically acts as a broker (*i.e.*, serving as an agent of both buyer and seller in a securities transaction) in transactions with the customers but reserves the right to act as a dealer (*i.e.*, buying and selling securities from and for its own account) at its discretion and with no approvals from the customers. In addition, like a trust company or fiduciary, Coinbase retained discretion over most of the related activities.

31. Coinbase publicly solicited every purchase and sale of Digital Asset Securities by means of general solicitations including those on its website and in social media advertising, traditional advertising, and even Super Bowl commercials. At all times, Coinbase was soliciting the customers ***to invest*** in the Digital Asset Securities that it offered on its broker platform. No use case other than investing was ever offered by Coinbase to the Plaintiffs or the Class (there is

no other use case for them)[8] and Coinbase to this day continues to disseminate similar investment bulletins and updates to the Plaintiffs and Class Members. Indeed, the Coinbase website posts a "Weekly Market Commentary," and as of April 15, 2024, Coinbase still advises that "Investors have several ways to gain exposure to the [investment in crypto]."[9]

32. Prime brokerage is a system developed by full-service firms to facilitate the clearance and settlement of securities trades for substantial retail and institutional investors who are active market participants. ***Prime brokerage involves three distinct parties: the prime broker, the executing broker, and the customer.*** The prime broker is a registered broker-dealer that clears and finances the customer trades executed by one or more other registered broker-dealers ("executing broker") at the behest of the customer. ***Each of the executing brokers receives a letter from the prime broker agreeing to clear and carry each trade placed by the customer with the executing broker where the customer directs delivery of money or securities to be made to or by the prime broker.***

## II. "DIGITAL ASSET SECURITIES" ARE INVESTMENTS AND SECURITIES UNDER FLORIDA AND CALIFORNIA STATE LAW

33. Florida state law requires that every offer and sale of securities within the state and/or United States be registered with the Florida Office of Financial Regulation and/or the SEC, or qualify for an exemption from registration. The objective of the requirement is to ensure that the investing public receives complete and accurate information about securities being offered for sale before they purchase them.

---

8 "You know, we remember all the use cases for crypto as they kept changing over the past handful of years. It was going to be an alternative currency. It was gonna be a store of value. It was gonna be an inflation hedge. And at the end of the day, it was really just a speculative asset and speculative asset class and with an immense cost structure built around it. So the idea really was for the crypto, you know, community was how can we extract the most amount of fees from unsuspecting investors? And that's my view. I still hold to it." Joe Weisenthal and Tracy Alloway, *Transcript: Jim Chanos on the Tech Bust, Crypto, and Fraud*, BLOOMBERG (Nov. 23, 2022), https://www.bloomberg.com/news/articles/2022-11-23/transcript-jim-chanos-on-the-tech-bust-crypto-and-fraud ("*Chanos Bloomberg Interview*").

9 Weekly Market *Commentary*, COINBASE (Apr. 15, 2024), https://links.coinbase.com/e/evib?_t=3aca5637196741819225587 8e9689713&_m=d73fe94d3987491497b800f06b8fbbcc&_e=UftIy91Mc3woldZus-u6D4fP8x00JJEt5JQcmr7IVnb0WjK5S9NfXG8n0m7uAgJ6p6D_oTiI-b3p9llWd2XKXw%3D%3D.

34. The registration and disclosure regime imposed by state and federal law applies only to the non-exempt offer and sale of ***securities***. The term "security" is broadly defined under FLA. STAT. §517.021 and includes any of the following:

(a) A note.
(b) A stock.
(c) A treasury stock.
(d) A bond.
(e) A debenture.
(f) An evidence of indebtedness.
(g) A certificate of deposit.
(h) A certificate of deposit for a security.
(i) A certificate of interest or participation.
(j) A whiskey warehouse receipt or other commodity warehouse receipt.
(k) A certificate of interest in a profit-sharing agreement or the right to participate therein.
(l) A certificate of interest in an oil, gas, petroleum, mineral, or mining title or lease or the right to participate therein.
(m) A collateral trust certificate.
(n) A reorganization certificate.
(o) A preorganization subscription.
(p) A transferable share.
(q) An investment contract.
(r) A beneficial interest in title to property, profits, or earnings.
(s) An interest in or under a profit-sharing or participation agreement or scheme.
(t) An option contract that entitles the holder to purchase or sell a given amount of the underlying security at a fixed price within a specified period of time.
(u) Any other instrument commonly known as a security, including an interim or temporary bond, debenture, note, or certificate.
(v) A receipt for a security, or for subscription to a security, or a right to subscribe to or purchase any security.
(w) A viatical settlement investment.

35. The term "investment contract" included within the statutory definition of security is not defined within Florida state law. Notably, the Eleventh Circuit has interpreted the meaning of an "investment contract" as applied to digital assets and applied the test for distinguishing an investment contract from other commercial dealing set forth in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946). *See, e.g.*, *Fedance v. Harris*, 1 F.4th 1278, 1288 (11th Cir. 2021). In *Howey*, the U.S. Supreme Court found that an "investment contract" exists when there is (1) the investment of money; (2) in a common enterprise; with (3) a reasonable expectation of profits to be derived from the efforts of others.

36. This analysis (referred to as the "*Howey* test") "applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus

of the *Howey* test analysis is not only on the form and terms of the instrument itself [. . .] but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales)."[10]

37. Notably, Coinbase itself marketed and sold the Digital Asset Securities to Plaintiffs and the class as "investments." Indeed, Coinbase's marketing and general solicitation materials constantly remind its customers that the sole use case for Digital Asset Securities through Coinbase is for investment purposes. For example, the following Coinbase solicitation from October 2022 in a column entitled "Numbers to Know" compares investments in Digital Asset Securities with other traditional investment securities like stocks and bonds: "Wealthy ***investors*** ages 21 to 43 are 7.5 times more likely to hold crypto than those 43 and older, per a new survey by Bank of America [ ] that gauged the ***investing*** attitudes of Americans with over $3 million of ***investable assets***."[11]

38. Further, Coinbase admits that it is a "Securities Broker." In particular, in the Coinbase User Agreement, Defendants make clear that the Digital Asset Securities sold by Coinbase are "financial assets," (*i.e.*, investment contracts or other securities under CAL. COM. §8102), that it is a "securities intermediary" (*i.e.*, a clearing corporation or a broker other person that "maintains securities accounts for others and is acting in that capacity"), and the Digital Asset Securities Wallets custodially held by Coinbase are "securities account[s]."[12]

39. Moreover, Coinbase's own press release disclosed that the SEC believes that the Coinbase wallets are securities accounts that must be registered as such. Accordingly, both Coinbase and the SEC agree that the Digital Asset Securities described herein are "securities," the sale of which results in strict liability under Florida and California state securities laws based on both Coinbase's failure to register as a broker/dealer and its sale of unregistered Digital Asset Securities.

---

[10] *Framework for "Investment Contract" Analysis of Digital Assets*, U.S. SEC, AND EXCHANGE COMM. (Apr. 3, 2019).

[11] *Inside the Reddit NFT obsession*, COINBASE (Oct. 26, 2022), https://www.coinbase.com/bytes/archive/reddit-nft-cryptosnoo-obsession.

[12] Coinbase has and uses its ability to lock users' accounts and to sell their securities without their affirmative consent.

**III. REGULATION OF BROKER DEALERS**

40. States throughout the country regulate the offer and sale of securities and those who sell them, including broker-dealers.

41. For example, under Florida law, any person operating as a broker or dealer in U.S. securities markets must register with the state. FLA. STAT. §517.12(1). Further, in order for a dealer, associated person, or investment adviser to obtain registration, the applicant must file a written application with the State of Florida. *Id*.

42. Similarly, a "broker-dealer" under California state law is defined as an entity that is "engaged in the business of effecting transactions in securities in this state for the account of others[. . . .]" CAL. CORP. §25004(a).

43. Brokers typically operate "in the business" of assisting issuers seeking to conduct securities offerings and/or investors seeking to buy or sell securities during either an initial offering or on the secondary market – frequently in exchange for transaction-based compensation.

44. Under Florida law, a "money transmitter" is defined as an entity qualified to do business in the state which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services or other businesses that facilitate such transfer within this country, or to or from this country. FLA. STAT. §517.12.

45. In addition, the Florida Office of Financial Regulation has concluded that a business offering a service "where a Coinbase user sends fiat currency to another Coinbase user to buy bitcoins" was subject to money transmitter registration requirements under Florida law. *See In re Coinbase, Inc.*, Case No. 62670 (Fla. OFR Nov. 13, 2015) (available from the agency clerk); *see also* FLA. STAT. §560.105 (empowering the Office of Financial Regulation to regulate money services businesses).

## SUBSTANTIVE ALLEGATIONS

## I. COINBASE HAS OFFERED AND SOLD SECURITIES AND INVESTMENTS TO THE PLAINTIFFS AND CLASS

46. At all relevant times, Coinbase has offered and sold securities and investments to the Plaintiffs and the Class.

47. Coinbase has failed to register those persons offering and selling the Coinbase Digital Asset Securities as associated persons of a broker-dealer and has failed to register as a broker-dealer with the SEC, Florida, California, or any other state.

48. However, as explained below, analysis of the facts and circumstances surrounding many of the digital assets listed for trading on the Coinbase Digital Asset Platforms shows that many assets offered for trading by Coinbase are investments, investment contracts under *Howey*, and securities under other sections of Florida and California law, and are therefore securities.

### A. Digital Assets Listed on Coinbase Are Securities

49. Coinbase recognized early on the significant impact classifying digital assets as securities would have on the operation of the Coinbase Digital Asset Platforms and for this reason chose, or was willfully blind, to not register the securities, persons, or broker-dealers as required by state law. On December 7, 2016, Coinbase first published its *Securities Law Framework* in recognition that "US federal securities laws [. . .] pose the biggest risk for crowdsales of blockchain tokens."[13] Coinbase's (now deleted) *Securities Law Framework* therefore (1) set out to estimate how likely a particular token is to be a security under U.S. federal securities law; (2) sets out some best practices for crowdsales; and (3) set out a detailed securities law analysis.[14] The *Securities Law Framework* was given to issuers of digital assets seeking to be listed on the Coinbase Digital Asset Platforms.

---

[13] *Securities Law Framework*, WAYBACK MACHINE (Apr. 23, 2022), https://web.archive.org/web/20220423201226/www.coinbase.com/legal/securities-law-framework.pdf.

[14] *Id.*

50. Relatedly, in an effort to promote the sale of Digital Asset Securities on the Coinbase Platforms and obscure the regulatory status of the Digital Asset Securities sold on the Coinbase Platforms, Coinbase formed the Crypto Rating Council ("CRC") on September 30, 2019, and promoted the CRC as "a member-operated organization formed to assist market participants that trade or support crypto assets to comply with U.S. federal securities laws."[15] To analyze whether a digital asset was likely to be deemed a security, the CRC "distilled a set of yes or no questions which are designed to plainly address each of the four *Howey* test factors: whether crypto purchasers (i) invested money, (ii) in a 'common enterprise', (iii) with a reasonable expectation of profit, and (iv) based on the efforts of others."[16] The CRC gives each digital asset it reviews "a final rating between 1 and 5 [and] a score of 5 results when an asset appears to have many characteristics that are consistent with the *Howey*-test factors [and] a score of 1 results when an asset appears to have few characteristics that are consistent with the *Howey*-test factors."[17]

51. Coinbase's publication of the *Securities Law Framework*, together with the creation of the CRC, misleadingly suggested to Plaintiffs and the members of the Class that Coinbase would not list any digital assets that were securities on the Coinbase Platforms.

52. But when faced with a huge increase in the interest of buying and selling digital assets, Coinbase let its greed overrule its judgement when it began listing digital assets that qualify as investment contracts, and thus securities, in order to earn fees from Coinbase Digital Asset Platform user transactions. Coinbase listed these Digital Asset Securities despite early knowledge of the fact that there was a substantial likelihood that one or more of the digital assets were securities, and more recent knowledge that it is a certainty that the Digital Asset Securities are securities and doing business in them requires significant registrations and regulation.

---

[15] *Introducing the Crypto Rating Council*, COINBASE BLOG (Sept. 30, 2019), https://www.coinbase.com/blog/introducing-the-crypto-rating-council.

[16] *Frequently Asked Questions*, CRYPTO RATING COUNCIL, https://www.cryptoratingcouncil.com/copy-of-the-framework (last visited May 3, 2024).

[17] *Id.*

53. As of September 16, 2024, Coinbase listed 250 "assets" as "tradable" on the Coinbase Digital Asset Platforms. The following are a small sample of the tokens that constitute Digital Asset Securities that were listed on the Coinbase Digital Asset Platforms and traded by Plaintiffs and the Class during the Class Period:

**1. 00 Token (00)**

54. The 00 Token ("00") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

55. During the Class Period, members of the Class invested in 00 tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for 00 tokens and paid Coinbase a fee for executing the transaction. 00 token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their 00 tokens, which they expected to result predominantly, if not solely, from the efforts of 00's creator, developer, and issuer.

56. Upon information and belief, 00 was first offered on the Coinbase Digital Asset Platforms in October 2022.

**2. Coinbase Wrapped Staked ETH**

57. Coinbase Wrapped Staked ETH ("cbETH") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

58. During the Class Period, members of the Class invested in cbETH on the Coinbase Digital Asset Platforms by exchanging money or digital assets for cbETH and paid Coinbase a fee for executing the transaction. cbETH investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their cbETH, which they expected to result predominantly, if not solely, from the efforts of cbETH's creator, developer, and issuer (Coinbase).

59. Upon information and belief, cbETH was first offered on the Coinbase Digital Asset Platforms in August 2022.

**3. Optimism ("OP")**

60. Optimism ("OP") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

61. During the Class Period, members of the Class invested in OP on the Coinbase Digital Asset Platforms by exchanging money or digital assets for OP and paid Coinbase a fee for executing the transaction. OP investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their OP, which they expected to result predominantly, if not solely, from the efforts of OP's creator, developer, and issuer.

62. Upon information and belief, OP was first offered on the Coinbase Digital Asset Platforms in May 2022.

**4. SUI ("SUI")**

63. SUI ("SUI") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

64. During the Class Period, members of the Class invested in SUI on the Coinbase Digital Asset Platforms by exchanging money or digital assets for SUI and paid Coinbase a fee for executing the transaction. SUI investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their SUI, which they expected to result predominantly, if not solely, from the efforts of SUI's creator, developer, and issuer.

65. Upon information and belief, SUI was first offered on the Coinbase Digital Asset Platforms in May 2023.

**5. Onyxcoin ("XCN")**

66. Onyxcoin ("XCN") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

67. During the Class Period, members of the Class invested in XCN on the Coinbase Digital Asset Platforms by exchanging money or digital assets for XCN and paid Coinbase a fee for executing the transaction. XCN investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their XCN, which they expected to result predominantly, if not solely, from the efforts of XCN's creator, developer, and issuer.

68. Upon information and belief, XCN was first offered on the Coinbase Digital Asset Platforms in March 2022.

**6. Decentraland (MANA)**

69. Decentraland ("MANA") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

70. During the Class Period, members of the Class invested in MANA tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for MANA tokens and paid Coinbase a fee for executing the transaction. MANA token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their MANA tokens, which they expected to result predominantly, if not solely, from the efforts of MANA's creator, developer, and issuer.

71. The entity behind the MANA token is headquartered in Carlsbad, California.

**7. Polygon (MATIC)**

72. Polygon ("MATIC") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

73. During the Class Period, members of the Class invested in MATIC tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for MATIC tokens and paid Coinbase a fee for executing the transaction. MATIC token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their MATIC tokens, which they expected to result predominantly, if not solely, from the efforts of MATIC's creator, developer, and issuer.

**8. Near Protocol (NEAR)**

74. Near Protocol ("NEAR") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

75. During the Class Period, members of the Class invested in NEAR tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for NEAR tokens and paid Coinbase a fee for executing the transaction. NEAR token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their NEAR tokens, which they expected to result predominantly, if not solely, from the efforts of NEAR's creator, developer, and issuer.

76. The headquarters for the entity behind the NEAR token is headquartered in San Francisco, California.

**9. Solana (SOL)**

77. Solana ("SOL") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

78. During the Class Period, members of the Class invested in SOL tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for SOL tokens and paid Coinbase a fee for executing the transaction. SOL token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their SOL tokens, which they expected to result predominantly, if not solely, from the efforts of SOL's creator, developer, and issuer.

79. The entity behind the SOL token, Solana Labs, is headquartered in San Francisco, California.

**10. Stellar Lumens (XLM)**

80. Stellar Lumens ("XLM") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

81. During the Class Period, members of the Class invested in XLM tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for XLM tokens and paid Coinbase a fee for executing the transaction. XLM token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their XLM tokens, which they expected to result predominantly, if not solely, from the efforts of XLM's creator, developer, and issuer.

82. The entity behind the XLM token, the Stellar Development Foundation, is located in San Francisco, California.

**11. Tezos (XTZ)**

83. Tezos ("XTZ") is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

84. During the Class Period, members of the Class invested in XTZ tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for XTZ tokens and paid Coinbase a fee for executing the transaction. XTZ token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their XTZ tokens, which they expected to result predominantly, if not solely, from the efforts of XTZ's creator, developer, and issuer.

85. The entity behind the XTZ token, the "Tezos Commons" is headquartered in Palo Alto, California.

**12. Other Coinbase Digital Asset Securities**

86. 1inch ("1INCH"), Aave ("AAVE"), Arcblock ("ABT"), Alchemy Pay ("ACH"), Cardano ("ADA"), AIOZ Network ("AIOZ"), Amp ("AMP"), Ankr ("ANKR"), Bounce Token ("AUCTION"), Avalanche ("AVAX"), Balancer ("BAL"), Basic Attention Token ("BAT"), Bluzelle ("BLZ"), BarnBridge ("BOND"), Celo ("CGLD"), Chiliz ("CHZ"), Clover Finance ("CLV"), Cronos ("CRO"), Compound ("COMP"), Cartesi ("CTSI"), Dash ("DASH"), Decentralized Social ("DESO"), Dogecoin ("DOGE"), Polkadot ("DOT"), Enjin Coin ("ENJ"), Eos ("EOS"), Fetch.ai ("FET"), Flare ("FLR"), Ampleforth Governance Token ("FORTH"), Galxe ("GAL"), Gala ("GALA"), Gnosis ("GNO"), Gods Unchained ("GODS"), The Graph ("GRT"), Immuntable ("IMX"), Jasmy ("JASMY"), Chainlink ("LINK"), Loopring ("LRC"), Polygon ("MATIC"), Moss Carbin Credit ("MCO2"), Enzyme ("MLN"), PolySwarm ("NCT"), NEAR Protocol ("NEAR"), NKN ("NKN"), Numeraire ("NMR"), NuCypher ("NU"), Origin Token ("OGN"), OMG Network ("OMG"), Polkastarter ("POLS"), Pluton ("PLU"), Propy ("PRO"), Rarible ("RARI"), Request ("REQ"), Rally ("RLY"), Render ("RNDR"), Sandbox ("SAND"), Shiba Inu ("SHIB"), Skale ("SKL"), SUKU ("SUKU"), SushiSwap ("SUSHI"), Uma ("UMA"), Uniswap ("UNI"), vechain ("VET"), Xrp ("XRP"), yearn.finance ("YFI"), Horizen ("ZEN"), and 0x Protocol ("ZRX") are all Digital Asset Securities that were listed on the Coinbase Digital Asset Platforms during the Class Period. This is not a comprehensive listing.

87. During the Class Period, members of the Class, including Plaintiffs, invested in, among other tokens, 00, 1INCH, AAVE, ABT, ACH, ADA, AIOZ, AMP, ANKR, AUCTION,

AVAX, BAL, BAT, BLZ, BOND, CGLD, CHZ, CLV, CRO, COMP, CTSI, DASH, DESO, DOGE, DOT, ENJ, EOS, FET, FLR, FORTH, GAL, GALA, GNO, GODS, GRT, IMX, JASMY, LINK, LRC, MATIC, MCO2, MLN, NMR, NCT, NEAR, NKN, NU, OGN, OMG, POLS, PLU, PRO, RARI, REQ, RLY, RNDR, SAND, SHIB, SKL, SUKU, SUSHI, UMA, UNI, VET, XRP, YFI, ZEN, and ZRX tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for these tokens and paid Coinbase a fee for executing the transactions. Token investors on the Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their tokens, which they expected to result predominantly, if not solely, from the efforts of the tokens' creators, developers, and issuers.

88. The entities behind the ACH, ANKR, AUCTION, BOND, CGLD, COMP, FORTH, GAL, NMR, NU, OGN, PRO, RLY, SKL, XRP, and ZRX tokens, at least, are headquartered in the San Francisco Bay Area.

**13. Coinbase Earn Accounts**

89. Coinbase Earn accounts ("Earn") are each a Digital Asset Security that was offered and sold on the Coinbase Digital Asset Platforms during the Class Period. Investors in these accounts deposited certain cryptocurrencies (including, but not limited to, ADA, AVAX, ETH, SOL, NEAR, and DOT) into Coinbase Earn accounts to earn high yield interest rates. These rates advertised by Coinbase were well in excess of the rates concurrently offered on short-term investment-grade fixed income securities or bank savings accounts. After obtaining transfers of digital assets from retail investors, Defendants then pooled these digital assets together to fund its various income generating activities, including its proprietary trading, new digital asset issuances, and cryptocurrency staking. In exchange for investing in the Coinbase Earn accounts, Defendants promised investors an attractive interest rate that would purportedly be paid regularly in the same type of cryptocurrency as originally invested. The Coinbase website has a devoted page to promoting the Coinbase Earn accounts. For example, on that page, Coinbase defines "staking" as follows:

> Staking a method of verifying and securing transactions on proof-of-stake blockchains, like Ethereum, Solana, Polygon, Polkadot and more. Proof-of-stake blockchains pay crypto asset owners to help verify onchain transactions and keep

> the network secure.is a cryptocurrency and decentralized computing platform. Its features include proof of stake consensus, formal verification (which lets developers verify the correctness of their code), and the ability to let stakeholders vote on changes to the protocol.[18]

90. During the Class Period, Coinbase advertised that investors could "Earn up to 10% APY on your crypto"[19] and that Coinbase makes it "safe"[20] for retail investors to utilize the Coinbase Earn accounts.

91. During the Class Period, members of the Class invested in Coinbase Earn accounts on the Coinbase Digital Asset Platforms by depositing digital assets in exchange for promised high-yield interest payments. Coinbase Earn account investors expected to earn profits through the disbursement of high yield payments, which they expected to result solely from the efforts of Coinbase.

## II. COINBASE OPERATES AS AN UNREGISTERED BROKER-DEALER

92. Coinbase's activities further meet the definition of a "broker-dealer" under both Florida and California state law. For example, the Cal. Corp. Code, in part, defines a broker as an entity that is "engaged in the business of effecting transactions in securities in this state for the account of others[. . . .]" CAL. CORP. §25004(a). In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering.

93. Throughout the Class Period, Coinbase operated as a broker by effecting transactions in Digital Asset Securities for Coinbase Platform users by matching buy and sell orders using the Coinbase matching engine as described above. Coinbase also operated as a broker-dealer by facilitating the sale of Digital Asset Securities as part of initial coin offerings ("ICOs").

---

[18] *What is staking?*, COINBASE, https://www.coinbase.com/learn/crypto-basics/what-is-staking (last visited May 3, 2024).

[19] *Earn*, COINBASE, https://www.coinbase.com/earn (last visited May 3, 2024).

[20] *Id.*

94. During the Class Period, Coinbase operated as a dealer under both Florida and California state law by, *inter alia*, (1) holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for Digital Asset Securities; (2) maintaining custody over Coinbase Digital Asset Platform customers' Digital Asset Securities; (3) by providing customers services such as allowing purchase of Digital Asset Securities on credit; (4) by having a regular turnover inventory of Digital Asset Securities; (5) by purchasing Digital Asset Securities for accounts in Coinbase's name (often at a discount to the ICO price); and (6) selling the digital assets to investors for profit immediately, or at a later time, after being held in inventory.

95. Coinbase's activities qualify it as a "broker-dealer" since Coinbase has "engaged in the business of effecting transactions in securities in this state for the account of others[. . . .]" *See* CAL. CORP. §25004(a); FLA. STAT. §517.211. Further, Coinbase is not subject to any exemptions for registering as a broker-dealer, which are outlined in FLA. STAT. §517 and CAL. CORP. §25200, respectively.

96. Coinbase admits that it is a "Securities Broker" in the Coinbase User Agreement, stating that that the Digital Assets sold by Coinbase are "financial assets," (*i.e.*, investment contracts or other securities under FLA. STAT. §517.211), that it is a "securities intermediary," (*i.e.*, a clearing corporation or some other person that "maintains securities accounts for others and is acting in that capacity"), and the Digital Asset Wallets custodially held by Coinbase are "securities account[s]."

97. Like other securities broker/dealers and investment advisors, Coinbase typically acts as a broker (*i.e.*, serving as an agent of both buyer and seller in a securities transaction) in transactions with the customers, but reserves the right to act as a dealer (*i.e.*, buying and selling securities from and for its own account) at its discretion and with no approvals from the customers. In addition, like a trust company or fiduciary, Coinbase retained discretion over most of the related activities.

98. Coinbase solicited every purchase and sale of Digital Asset Securities by means of general solicitations including those on its website and in social media advertising, traditional

advertising, and even Super Bowl commercials. At all times, Coinbase was soliciting the customers to invest in the Digital Asset Securities that it offered on its broker platform. No use case other than investing was ever offered by Coinbase to its customers because there is no other use case.

99. In violation of Florida and California state securities laws, Coinbase has promoted, offered, and sold Digital Asset Securities knowing it had not been registered as required by law. As a result, Coinbase is liable to the customers for the full amount of their statutory damages.

100. Additionally, a cryptocurrency exchange such as Coinbase accepts deposits of digital assets, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange, Coinbase then has dominion and control over those assets. Coinbase then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability of the exchange to its customer.

101. Digital assets so deposited in the customer's Coinbase account receive a credit from Coinbase, which the customer could then take and trade for another cryptocurrency or fiat currency, leave as a balance on the exchange account (leaving an open liability of the exchange to the customer), or withdraw.

102. Coinbase customers do not control access to the assets "in" their respective accounts. The customer needs to make a request to Coinbase to be able to access and send those balances. Coinbase then debits the user account and sends the assets. The processing of such requests are entirely dependent on the willingness, ability, and approval of Coinbase.

103. All exchange accounts with any centralized custodial exchange, including the Coinbase accounts at issue here, are custodial in nature. This means that the customer does not control access to the assets "in" their account, Coinbase does. Notably, a Coinbase customer account cannot hold or store cryptocurrency (thus, the digital assets cannot be "in" such an account). Instead, the Coinbase customer account stores a record of a liability or an IOU to the exchange's customer. It is this "IOU" investment that Plaintiffs purchased from Defendants during the Class Period.

104. Had Coinbase registered with the appropriate state regulatory bodies in either Florida or California as required by law, Coinbase would have been further required to register with FINRA and be bound by FINRA regulations, which includes a prohibition against FINRA members seeking to waive class action liability when conducting business as a FINRA member. Particularly, "FINRA rules prohibit firms [like Coinbase] attempting to prevent investors from participating in judicial class actions by adding waiver language to customer agreements."[21]

**III. PLAINTIFFS ARE ENTITLED TO FEES AND DAMAGES**

105. Even though the Digital Asset Securities are unregistered securities under both the *Howey* test, as adopted in Florida and California, and statutory definitions for the same under those states' securities laws, and the Coinbase Digital Platforms operate as a broker-dealer under both Florida and California law, Coinbase has not registered the Coinbase Digital Asset Platforms as a broker-dealer in either state, nor has Coinbase registered with FINRA.

106. California and Florida state law affords Plaintiffs and the Class the right, which they hereby pursue, to void their purchase or sale agreements with Coinbase and to recover damages, including the fees they have paid under those agreements.

107. Plaintiffs and the Class additionally seek to void their contracts and recover damages with respect to purchases or sales of Digital Asset Securities on the Coinbase Digital Asset Platforms.

**CLASS ALLEGATIONS**

108. Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased the Digital Asset Securities (including, but not limited to, 1INCH, ACH, ADA, AMP, ALGO, ANKR, AUCTION, AVAX, BAL, BAT, BOND, CGLD, CHZ, CLV, CRO, COMP, CTSI, DOT, ENJ, EOS, FET, FLR, FORTH, GAL, GALA, GRT, IMX, LINK, MANA, MATIC, MCO2, MLN, NEAR, NMR, NU, OGN, OMG, PLU, PRO, REQ, RLY, SAND, SHIB, SKL, SOL, SUSHI, UMA, UNI, XRP, XLM, XTZ, ZEN, and ZRX,

---

[21] *Securities Class Action Lawsuits: What Investors Should Know,* FINRA (Jan. 9, 2018), https://www.finra.org/investors/insights/securities-class-action-lawsuits#:~:text=FINRA%20rules%20also%20prohibit%20firms,language%20to%20customer%20account%20agreements.

as well as Coinbase Earn accounts) between January 1, 2017 and the commencement of this action.[22]

109. Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers, and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

110. **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class is unknown at this time, such information being in the sole possession of Coinbase and/or third parties and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that the Class consists of at least hundreds of people. The number of Class members can be determined based on Coinbase's and other third party's records.

111. **Commonality**: Common questions of law and fact exist as to all members of each Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a. whether Defendant Coinbase offered the Digital Asset Securities (cryptocurrency) for sale;

b. whether Defendant Coinbase offered digital assets for sale that constitute securities under the Florida and California state securities laws;

c. whether Defendant Coinbase offered digital assets for sale that constitute investments under the Florida state securities laws;

d. whether Defendant Coinbase operated as a broker-dealer as defined by the state and/or federal securities laws;

e. whether Defendant Coinbase violated the Florida state securities laws;

f. whether Defendant Coinbase violated the California state securities laws;

---

[22] Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

g. whether Plaintiffs and the members of the Class and Subclasses are entitled to damages and the amount and measure thereof;

h. and whether Plaintiffs and members of the Class and Subclass are entitled to declaratory and injunctive relief.

112. **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs and Class members suffered injuries as a result of Coinbase's wrongful conduct that is uniform across the Class and Subclass.

113. **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class, and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer and securities class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

114. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Coinbase's conduct. It would be virtually impossible for individual Class members to effectively redress the wrongs done to them. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly-situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

115. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

116. Plaintiffs have satisfied all conditions precedent to having their claims adjudicated on a class-wide basis.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

117. California's substantive laws apply to every member of the Class, regardless of where in the United States the Class members reside.

118. California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, U.S. CONST. amend XIV, §1, and the Full Faith and Credit Clause, U.S. CONST. art. IV, §1, of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

119. Coinbase's historical and effective headquarters and principal place of business is located in California. Upon information and belief, Coinbase also owns property and conducts substantial business in California, and therefore California has an interest in regulating Coinbase's conduct under its laws. Coinbase's decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.

120. The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

## FIRST CAUSE OF ACTION
**Violations of California Corporate Securities Law of 1968**
**CAL. CORP. §§25110 & 25503**
**(Sale of Unregistered Securities)**
**(Against Coinbase Global and Coinbase, Inc.)**

121. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 120, and further allege as follows:

122. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot are residents of the State of California.

123. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot paid for or purchased Digital Asset Securities in California, and thus the unlawful conduct alleged herein occurred in California.

124. Plaintiffs bring this claim individually and on behalf of the members of the Class against the Coinbase Global and Coinbase, Inc., Defendants.

125. Coinbase Global and Coinbase, Inc., are the primary violators under this cause of action.

126. The Coinbase Digital Asset Securities are securities within the meaning of the California Corporations Code.

127. The Coinbase Digital Asset Securities were and are required to be registered with the Commissioner of Corporations under California law.

128. Section 25110 makes it illegal, in connection with the purchase or sale of any security, for any person, directly or indirectly, to offer or sell a security in California "unless such security or transaction is exempted or not subject to qualification under Chapter 1 (commencing with Section 25100) of this part." Further, the offer or sale of such a security "in a manner that varies or differs from, exceeds the scope of, or fails to conform with either a material term or material condition of qualification of the offering [. . .] shall be an unqualified offer or sale." CAL. CORP. §25110.

129. Section 25503 establishes a private remedy for damages under Section 25110 of the California Corporations Code. In particular, violators of Section 25110 "shall be liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned." In the event that the plaintiff no longer owns the security, damages "shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorneys' fees, and (b) the value of the security at the time it

was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." CAL. CORP. §25503.

130. Conversely, Section 25503 provides that, if the consideration given for the security is not capable of being returned then damages shall be equal to the value of that consideration plus interest at the legal rate from the date of purchase, provided the security is tendered, plus reasonable attorneys' fees; and if the plaintiff no longer owns the security, damages in that case shall be equal to the difference between (a) the value of the consideration given for the security plus interest at the legal rate from the date of purchase, plus reasonable attorneys' fees; and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff. *Id.*

131. Under Section 25503, "[a]ny person on whose behalf an offering is made and any underwriter of the offering, whether on a best efforts or a firm commitment basis, shall be jointly and severally liable under this section."

132. The Coinbase Digital Asset Securities have not been registered with the Commissioner, are not exempt from registration, and are not federally covered. No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

133. Coinbase Global and Coinbase, Inc., by engaging in the conduct described above, directly or indirectly, sold and/or offered to sell securities.

134. Plaintiffs purchased Coinbase Digital Asset Securities from Coinbase Global and/or Coinbase, Inc. The Coinbase Digital Asset Securities were provided and/or sold into the various Coinbase Digital Asset Securities liquidity pools by Coinbase Global and Coinbase, Inc. These actions coincided with Plaintiffs and Class members transacting with the liquidity pools as buyers. Thus, by providing Coinbase Digital Asset Securities to the liquidity pool at the time in which Plaintiffs and the members of the Class made their Coinbase Digital Asset Securities purchases from the liquidity pool on Coinbase, privity between Coinbase Global and/or Coinbase, Inc., and Plaintiffs is established even in the absence of a direct contract linking the two parties.

135. Privity also exists between the issuers and suppliers of the liquidity in the pool (*e.g.*, Coinbase Global and/or Coinbase, Inc.) and all those making purchases (*e.g.*, Plaintiffs and the members of the Class) from the Coinbase exchange because these Defendants are receiving the benefit of a variable buying fee and/or a 1.49% selling fee per Coinbase Digital Asset Securities transaction on that exchange.

136. By reason of the foregoing, each of the Coinbase Global and Coinbase, Inc., Defendants have violated Sections 25110 and 25503 of the California Corporations Code.

**SECOND CAUSE OF ACTION**
**Violation of the Florida Securities and Investor Protection Act**
**FLA. STAT. §517.07**
**(Sale of Unregistered Securities)**
**(Against All Defendants)**

137. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 136, and further allege as follows:

138. Plaintiffs Foy and Maggard are residents of the State of Florida.

139. Plaintiffs Foy and Maggard paid for or purchased Digital Asset Securities in Florida and thus the unlawful conduct alleged herein occurred in Florida.

140. Plaintiffs bring this claim individually, and on behalf of the members of the Class, against all Defendants.

141. The Coinbase Digital Asset Securities are "securities" within the meaning of the term as defined by FLA. STAT. §517.021.

142. Defendants, and each of them, by engaging in the conduct described above within Florida, directly or indirectly, sold and offered to sell securities.

143. Plaintiffs Foy and Maggard, and the members of the purported Class, purchased Coinbase Digital Asset Securities from Defendants.

144. Section 517.07(1) of the Florida Statutes provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Florida Statute §517.051, is sold in a transaction exempt under Florida Statute §517.061, is a federally covered security, or is registered pursuant to Chapter 517 of the Florida Statutes.

145. Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security." FLA. STAT. §517.211(1).

146. The Coinbase Digital Asset Securities sold and offered for sale to Plaintiffs and Class members were not:

a. exempt from registration under FLA. STAT. §517.051;

b. a federal covered security;

c. registered with the Office of Financial Regulations ("OFR"); or

d. sold in a transaction exempt under FLA. STAT. §517.061.

147. Coinbase Global and Coinbase, Inc., by engaging in the conduct described above, directly or indirectly, sold and/or offered to sell securities.

148. Plaintiffs purchased Coinbase Digital Asset Securities from Coinbase Global and/or Coinbase, Inc. The Coinbase Digital Asset Securities were provided and/or sold into the various Coinbase Digital Asset Securities liquidity pools by Coinbase Global and Coinbase, Inc. These actions coincided with Plaintiffs and Class members transacting with the liquidity pools as buyers. Thus, by providing Coinbase Digital Asset Securities to the liquidity pool at the time in which Plaintiffs and the members of the Class made their Coinbase Digital Asset Securities purchases from the liquidity pool on Coinbase, privity between Coinbase Global and/or Coinbase, Inc., and Plaintiffs is established even in the absence of a direct contract linking the two parties.

149. Privity also exists between the issuers and suppliers of the liquidity in the pool (*e.g.*, Coinbase Global and/or Coinbase, Inc.) and all those making purchases (*e.g.*, Plaintiffs and the members of the Class) from the Coinbase exchange because these Defendants are receiving the benefit of a variable buying fee and/or a 1.49% selling fee per Coinbase Digital Asset transaction on that exchange.

150. By reason of the foregoing, each of the Defendants have violated Section 517.07 of the Florida Statues.

**THIRD CAUSE OF ACTION**
**Violation of CAL. CORP. §25210**
**(Unlicensed Broker-Dealer)**
**(Against the Coinbase Global and Coinbase, Inc., Defendants)**

151. Plaintiffs hereby re-allege and incorporate all allegations raised in Paragraphs 1 through 150, as though fully set forth herein.

152. This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Digital Asset Securities on the Coinbase Digital Asset Platforms in California.

153. At all relevant times there was in full force and effect the California Corporate Code, CAL. CORP. §25210, which prohibits, *inter alia*, any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law. *See* CAL. CORP. §25210(a) and (b). Any person who offers or sells a security in violation of Section 25210 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. CAL. CORP. §25501.5(a)(1). Upon recission and tender of the Digital Asset Securities, such purchaser is entitled to recover the consideration paid for the Digital Asset Securities plus interest at the legal rate, less the amount of any income received on the Digital Asset Securities. CAL. CORP. §25501.5(a)(2). A purchaser who no longer owns the Digital Asset Securities is entitled to damages in an amount equal to the difference between: (i) the price at which the security was bought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the Digital Asset Securities by the purchaser. CAL. CORP. §25501.5(a)(4).

154. When issued, the Digital Asset Securities were securities within the meaning of the California Securities Act. CAL. CORP. §25019. Coinbase transacted business as a broker-dealer or agent when it offered or sold the Digital Asset Securities to at least one Plaintiff in California. CAL. CORP. §25004. Coinbase transacted business as a broker-dealer or agent in California, including, without limitation, through solicitations directed by Coinbase to California and received in California.

155. Coinbase was not licensed as a broker-dealer or agent in California, nor was it subject to any exemption from licensing.

156. Accordingly, Coinbase has violated the California Securities Act by transacting business as an unlicensed broker-dealer or agent in the sale of securities.

157. Plaintiffs and Class members therefore seek all available and appropriate relief available under the California Securities Act, including damages for consideration and fees paid in connection with, and a result of, all Digital Asset Securities transactions entered into on the Coinbase Digital Asset Platforms during the Class Period, including applicable costs, attorneys' fees, and interest.

## **FOURTH CAUSE OF ACTION**
**Violation of the FLA. STAT. §517.211**
**(Unregistered Dealer)**
**(Against the Coinbase Global and Coinbase, Inc., Defendants)**

158. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 157, and further allege as follows:

159. Plaintiffs Foy and Maggard are residents of the State of Florida.

160. Plaintiffs Foy and Maggard paid for or purchased Digital Asset Securities in Florida, and thus the unlawful conduct alleged herein occurred in Florida.

161. Plaintiffs bring this claim individually and on behalf of the members of the Class against the Coinbase Global and Coinbase, Inc., Defendants.

162. At all relevant times there was in full force and effect the Florida Securities and Investor Protection Act (FSIPA), which prohibits, *inter alia*, any person from transacting business as a dealer unless he is registered or exempt from registration under Florida law. *See* FLA. STAT. §517.12(1). Any person who offers or sells a security in violation of Section 517.12(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorneys' fees. FLA. STAT. §517.211.

163. When issued, the Digital Asset Securities were securities within the meaning of the FSIPA. *See* FLA. STAT. §517.021(22). Coinbase transacted business as a dealer when it offered or sold the Digital Asset Securities to Plaintiff Maggard in Florida. FLA. STAT. §517.021(6).

164. Further, FSIPA provides for the registration of "paper" (*i.e.*, securities), at §517.07(1) as follows: It is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state unless the security is exempt under §517.051, is sold in a transaction exempt under §517.061, is a federal covered security, or is registered pursuant to this chapter. FLA. STAT. §517.0. Neither the Digital Asset Securities or the EARN Securities Program were registered in Florida, and neither was exempt from registration. In light of that non-registration, Coinbase is strictly liable to the Customers for recessionary damages as provided in FLA. STAT. §517.211, and those damages are "automatic." *See Skurnick v. Ainsworth*, 591 So. 2d 904, 905 (Fla. 1991).

165. In addition to requiring that the "paper" be registered, FSIPRA also provides at §517.12 for the registration of "people" as follows: "No dealer, associated person, or issuer of securities shall sell or offer for sale any securities in or from offices in this state, or sell securities to persons in this state from offices outside this state, by mail or otherwise, unless the person has been registered with the office pursuant to the provisions of this section." FLA. STAT. §517.12(1).

166. Coinbase transacted business as a dealer in Florida, including without limitation through solicitations directed by Coinbase to Florida and received in Florida.

167. Coinbase was not registered as a dealer in Florida, nor was it subject to any exemption from registration for either the Digital Asset Securities or the EARN Securities Program.

168. Accordingly, Coinbase has violated the Florida Securities and Investor Protection Act by transacting business as an unregistered dealer in the sale of securities.

169. Plaintiffs and Class members therefore seek all available and appropriate relief available under the Florida Investor Securities and Investor Protection Act, including recission or damages for consideration and fees paid in connection with, and a result of, all Digital Asset

Securities transactions entered into on the Coinbase Digital Asset Platforms during the Class Period, including applicable costs, attorneys' fees, and interest.

**FIFTH CAUSE OF ACTION**
**Violation of the Fla. Stat. §517.301**
**(Negligence in Connection with the Purchase and Sale of an Investment)**
**(Against All Defendants)**

170. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 169, and further allege as follows:

171. Plaintiffs Foy and Maggard are residents of the State of Florida.

172. Plaintiffs Foy and Maggard paid for or purchased Digital Asset Securities in California and thus the unlawful conduct alleged herein occurred in Florida.

173. Plaintiffs bring this claim individually and on behalf of the members of the Class against all Defendants.

174. At all relevant times there was in full force and effect the Florida Securities and Investor Protection Act (FSIPA), which has various provisions that govern the rendering of any investment advice or the offer, sale, or purchase of any investment or security. Here, Coinbase had a duty to disclose to Plaintiffs and the Class that the Digital Asset Securities were not registered under FSIPA.

175. FLA. STAT. §517.301 defines an "investment" as "any commitment of money or property principally induced by a representation that an economic benefit may be derived from such commitment. Coinbase characterizes the purchase of Digital Asset Securities on the Coinbase platform as investments." FLA. STAT. §517.301(2).

176. FLA. STAT. §517.301 makes it unlawful to "employ any device, scheme, or artifice to defraud" and to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person" in "connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly." FLA. STAT. §517.301(1)(a)(1) & (3). It is also unlawful to publish, give publicity to, or circulate any notice,

circular, advertisement, newspaper, article, letter, investment service, communication, or broadcast which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received directly or indirectly from an issuer, underwriter, or dealer, or from an agent or employee of an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount of the consideration. FLA. STAT. §517.301(1)(b). Florida law also prohibits knowingly and willfully falsifying, concealing, or covering up "by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation," or making or using a false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry. FLA. STAT. §517.301(1)(c).

177. "The elements of a cause of action under Section 301 are identical to those under Rule 10b–5 of the Exchange Act, 'except that the scienter requirement under Florida law is satisfied by [a] showing of mere negligence.'" *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1286 (S.D. Fla. 2011) (quoting *Grippo v. Perazzo*, 357 F.3d 1218, 1223 (11th Cir. 2004)).

178. As alleged herein, Coinbase directly engaged in a common plan, scheme, and unlawful conduct to promote and sell the Coinbase Digital Asset Securities, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs or their agents.

179. Coinbase also made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and their agents. Indeed, Coinbase relentlessly marketed the Coinbase Digital Asset Securities to investors as being investments that were properly registered with the appropriate state and federal governmental authorities while simultaneously failing to disclose that Coinbase's sales of the Coinbase Digital Asset Securities violated, at the very least, Florida state law.

180. In violation of FLA. STAT. §517.301, Coinbase disseminated weekly newsletters to investors that misrepresented the Coinbase Digital Asset Securities as non-securities. Likewise, the Coinbase User Agreement misstates that Coinbase "does not offer securities services in the

United States or to U.S. persons."[23] Further, Coinbase's own website published a blog by Coinbase Chief Legal Officer, Paul Grewal, that unambiguously declared to investors "Coinbase does not list securities. End of story."[24] Grewal also gave the following summation to investors: "TLDR: Coinbase does not list securities on its platform. Period."[25]

181. The purpose and effect of said scheme, plan, and unlawful conduct was, among other things, to conceal Defendants' wrongdoing and obscuring Coinbase's financial interests in the sale of the Coinbase Digital Assets. Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, or participated in the preparation, issuance, and distribution of deceptive and materially misleading statements and omissions to Plaintiffs and their agents.

182. Defendants are jointly and severally liable to Plaintiffs for their participation or aiding in the purchase or sale of unregistered securities in violation of FLA. STAT. §517.301 as discussed herein. *See* FLA. STAT. §517.211(2).

183. Plaintiffs are entitled to recission of securities still owned, or for damages for securities Plaintiffs have sold, as available pursuant to FLA. STAT. §517.301, interests, costs, and attorneys' fees pursuant to FLA. STAT. §517.211.

**<u>SIXTH CAUSE OF ACTION</u>**
**Violation of the Florida's Civil Remedies for Criminal Practices Act,**
**FLA. STAT. §772 (the "Florida RICO Act")**
**(Against All Defendants)**

184. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 183, and further allege as follows:

185. Plaintiffs Foy and Maggard are residents of the State of Florida.

---

[23] *Coinbase User Agreement*, COINBASE (Feb. 6, 2024), https://www.coinbase.com/legal/user_agreement/united_states#:~:text=Coinbase%20is%20not%20registered%20with,States%20or%20to%20U.S.%20persons.

[24] Paul Grewal, *Coinbase does not list securities. End of story.*, COINBASE (July 21, 2022), https://www.coinbase.com/blog/coinbase-does-not-list-securities-end-of-story.

[25] *Id.*

186. Plaintiff Foy and Maggard paid for or purchased Digital Asset Securities in Florida, and thus the unlawful conduct alleged herein occurred in Florida.

187. Plaintiffs bring this claim individually, and on behalf of the members of the purported Class, against all Defendants.

188. This claim is brought on behalf of the Class against Defendants for actual damages, treble damages, and equitable relief under the Florida RICO Act. *See* FLA. STAT. §772.104(1) & (2).

189. Defendants are "person[s]" within the meaning of FLA. STAT. §1.01(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of the Florida RICO Act.

190. Plaintiffs and the members of the Class are each "persons," as that term is defined in FLA. STAT. §1.01(3), who were injured in their business or property as a result of Defendants' wrongful conduct.

191. A RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose. Defendants formed such an association-in-fact enterprise, namely, the Coinbase Digital Asset Enterprise.

192. The Coinbase Digital Asset Enterprise is ongoing and continuing business organizations consisting of "persons" that created and maintained systematic links for a common purpose: to ensure that Defendants could facilitate the sale of unregistered securities on the Coinbase platform and collect huge fees on the sale of Coinbase Digital Asset Securities to retail investors at artificially inflated prices.

193. To accomplish this purpose, the Coinbase Digital Asset Enterprise periodically and systematically promoted the Coinbase Digital Asset Securities — either affirmatively or through half-truths and omissions — to retail investors, including Plaintiffs and the Class, that the Coinbase Digital Asset Securities had been vetted and approved by state and/or federal regulatory authorities. The Coinbase Digital Asset Enterprise concealed from investors, like Plaintiffs and the Class members, that the Coinbase Digital Asset Securities were not the sound investment that

Defendants claimed. This scheme of the Coinbase Digital Asset Enterprise translated into increased volume and more Coinbase Digital Asset investors buying at artificially inflated prices (and therefore, more profits) for the Defendants.

194. The entities engaged in the Coinbase Digital Asset Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by the executive officers and directors at each, respectively. There is regular communication between the Defendants, in which information is shared. Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Defendants share information regarding various timing and content of promotional and/or listing activities for the Coinbase Digital Assets. The Defendants, through their administration, funding, and execution of the scheme to misleadingly market the Coinbase Digital Assets, each functioned as a continuing unit for the purposes of implementing, respectively, the Coinbase Digital Asset Securities pump and dump scheme and, as set forth in the paragraph directly above, when issues arose during the scheme, the scheme's participants agreed to take actions to hide the scheme and continue its existence.

195. During the time that the Coinbase Digital Asset Securities were being launched and first publicly marketed to retail investors, Defendants were knowing and willing participants in various misleading marketing and promotions of the Coinbase Digital Assets, and reaped profits from that conduct. Defendants knew, but did not disclose, that they were allowing the issuers of the Coinbase Digital Asset Securities to engage in this fraud to the detriment of retail investors.

196. The Defendants participated in the conduct of the Coinbase Digital Asset Enterprise, sharing the common purpose of inflating the price and trading volume of Coinbase Digital Asset Securities in order to generate substantial profits from fees, through a pattern of racketeering activity within the meaning of the Florida RICO Act, which includes multiple instances of violations of FLA. STAT. §517. In the Coinbase Digital Asset Enterprise, the Defendants knowingly made material misstatements and/or omissions to retail investors in furtherance of the fraudulent scheme regarding:

a. the regulatory approval of Coinbase Digital Asset Securities;

b. ownership interests of Defendants in the Coinbase Digital Asset Securities; and

c. the Defendants' intent to promote and facilitate the sale the Coinbase Digital Asset Securities after artificially inflating the price.

197. The Coinbase Digital Asset Enterprise engaged in and affected interstate commerce because, *inter alia*, it created the Coinbase Digital Asset Securities that were paid for by thousands of Class members throughout the United States.

198. The foregoing evidences that the Defendants were each willing participants in the Coinbase Digital Asset Enterprise, that the Coinbase Digital Asset Enterprise had a common purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose coupled with the misleading promotion of the Coinbase Digital Asset Securities.

199. During the Class Period, the Defendants exerted control over the Coinbase Digital Asset Enterprise and participated in the operation or management of the affairs of the Coinbase Digital Asset Enterprise, directly or indirectly, in the following ways:

200. The Defendants were directly responsible for the decision to promote, list, and trade unregistered securities on the Coinbase platform;

201. The Defendants concealed that they were causing the Coinbase Digital Asset Securities price to artificially inflate in order to allow themselves (and other insiders) to collect fees on each trade made on the Coinbase platform and to sell off their respective Coinbase Digital Asset Securities holdings (to the extent they could) at that inflated price; and

202. The Defendants expected and intended that the marketing materials would (and did) get distributed through the U.S. Mail and interstate wire facilities, communications that failed to disclose that the Defendants were pumping up price and trading volume of Coinbase Digital Asset Securities artificially.

203. The scheme had a hierarchical decision-making structure that was headed by the Defendants. They controlled the listing of the Coinbase Digital Asset Securities and directed the Company to misleadingly promote the Coinbase Digital Asset Securities to investors.

204. The scheme devised and implemented by the Defendants amounted to a common course of conduct intended to (a) allow the Defendants to artificially inflate the price of and trading volume for the Coinbase Digital Asset Securities; and (b) collect exorbitant fees therefrom at the expense of Plaintiffs and the Class members.

**Defendants' Pattern of Racketeering Activity**

205. The Defendants conducted and participated in the conduct of the affairs of the Coinbase Digital Asset Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. §1341, relating to mail fraud, and 18 U.S.C. §1343, relating to wire fraud. The pattern of racketeering activity by the Coinbase Digital Asset Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful digital asset solicitation scheme. Each of these fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of the Florida RICO Act. Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of the Florida RICO Act, through which the Defendants intended to defraud Plaintiffs, members of the Class, and other intended victims.

206. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the Class. The Defendants calculated and intentionally crafted the Coinbase Digital Asset Enterprise to ensure their own profits remained high, without regard to the effect such behavior had on Plaintiffs and members of the Class who were buying the Coinbase Digital Asset Securities at artificially inflated prices.

207. By intentionally and artificially inflating the Coinbase Digital Asset Securities prices, and then subsequently failing to disclose such practices to the investors, the Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

208. The pattern of racketeering activity alleged herein was continuing until the present.

**The Defendants' Use of the U.S. Mail and Interstate Wire Facilities**

209. The Coinbase Digital Asset Securities Enterprise engaged in and affected interstate commerce because it transmitted and published false and misleading information concerning the growth potential for Coinbase Digital Asset Securities across state lines.

210. During the Class Period, the Coinbase Digital Asset Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, communications, information, products, and funds by the U.S. Mail and interstate wire facilities.

211. The nature and pervasiveness of the fraudulent token promotion scheme, which was orchestrated by the Company's executives, including Individual Defendant Armstrong, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

212. Many of the precise dates of the Coinbase Digital Asset Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the Defendants. Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs describe this below.

213. The Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the fraudulent promotion scheme involved thousands of communications throughout the Class Period including, *inter alia*:

a. Communications on official Coinbase accounts on various social media platforms, including, but not limited to: Twitter, Reddit, Telegram, and Discord to investors, which occurred on a regular basis as investors like Plaintiffs and Class members purchased Coinbase Digital Asset Securities;

b. Written representations and telephone calls between the Defendants and the moderators of the Coinbase social media accounts regarding the promotion of

Coinbase Digital Asset Securities and the financial benefits to the Defendants for doing so;

c. Emails between Defendants and their respective directors and officers agreeing to or effectuating the implementation of the Coinbase Digital Asset Securities fraud scheme;

d. Written and oral communications directed to retail investors that fraudulently misrepresented the growth potential for the Coinbase Digital Asset Securities that were designed to conceal the scheme and deter investigations into the Coinbase Digital Asset Enterprise; and

e. Receipts of increased profits sent through the U.S. Mail and interstate wire facilities — the wrongful proceeds of the scheme.

214. In addition to the above-referenced RICO predicate acts, it was foreseeable to the Defendants that their employees and co-Defendants would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, conceal that the Coinbase Digital Asset Securities price was fraudulently inflated.

**Motive and Common Purpose**

215. The Defendants' motive and purpose in creating and conducting the scheme and the Enterprise(s) was to increase the price and trading volume for the Coinbase Digital Asset Securities so that the Company could collect fees on each transaction on the Coinbase platforms, as well as allowing insiders like Individual Defendant CEO Armstrong to sell off allocations from the Coinbase Digital Asset Securities at grossly inflated prices. Each person joined in that common purpose because each person made more money the higher the Coinbase Digital Asset Securities price rose and, as trading volume increased, the Defendants would be able to sell off in the increased liquidity while collecting millions in transactions fees.

**Damages Caused by the Defendants' RICO Activities**

216. The Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and Class members to be financially injured as a result of purchasing the Coinbase Digital Asset Securities.

217. As described above, when the Defendants executed the Coinbase Digital Asset Securities promotional scheme, the result was to flood the market with unregistered securities for sale, which would allow Coinbase to collect significant fees from every transaction as well as allowing Coinbase insiders like Defendant Armstrong to sell various allocations given to Defendants out of the Coinbase Digital Asset Securities. When the Coinbase Digital Asset Securities price and trading volume is artificially inflated, investors like Plaintiffs and the Class overpay due to a fraudulent price and excess fees.

218. Plaintiffs' injuries, and those of the Class members, were proximately caused by the Defendants' racketeering activity. But for the misleading statements and omissions made by the Defendants, Plaintiffs and others similarly situated would have paid less for the Coinbase Digital Asset Securities.

219. Plaintiffs' injuries were directly caused by the Defendants' racketeering activity. The Defendants' racketeering activity inflated the Coinbase Digital Asset Securities price, which was ultimately paid for by Plaintiffs and the other Class members.

220. Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other Plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from the Defendants' fraudulent scheme.

221. By virtue of these violations of the Florida RICO Act, the Defendants are liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## SEVENTH CAUSE OF ACTION
**Violation of the California Unfair Competition Law**
**CAL. BUS. & PROF. CODE §17200**
**(Based on Unlawful Acts and Practices)**
**(Against All Defendants)**

222. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 221, and further allege as follows:

223. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot are residents of the State of California.

224. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot paid for or purchased Digital Asset Securities in California, and thus the unlawful conduct alleged herein occurred in California.

225. Plaintiffs bring this claim individually, and on behalf of the members of the purported Class, against all Defendants.

226. At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

227. "'An act can be alleged to violate any or all of the three prongs of the UCL – unlawful, unfair, or fraudulent.'" *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1149 (N.D. Cal. 2010) (quoting *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007)).

228. The "unlawful" prong of the UCL prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999). By proscribing "any unlawful" business practice, the UCL permits injured consumers to "borrow" violations of other laws and treat them as unlawful competition that is independently actionable. In other words, an "unlawful" business practice under the UCL is a practice that violates any other law.

229. Any violation of the Florida and/or California broker-dealer laws or the registration requirements for money transmitters necessarily violates the "unlawful" prong of the UCL.

230. In order to have standing for a UCL claim, a plaintiff must meet the injury-in-fact requirement. This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'" *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). A plaintiff's claims under this California statute are governed by the "reasonable consumer" test. *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (noting that the "'unfair business practices claim must be evaluated from the vantage of a reasonable

consumer.'"). Under the reasonable consumer standard, a plaintiff must "show that 'members of the public are likely to be deceived.'" *Id*. (quoting *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1267 (1992)).

231. Defendants engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including, but not limited to, in the following ways:

(a) knowingly and intentionally misrepresenting that the Digital Assets Securities sold on the Coinbase platform were not securities under state or federal law; and

(b) knowingly and intentionally concealing that Coinbase did not, as required by law, register either the Digital Asset Securities it sold on the Coinbase Platform or the Coinbase business itself with the necessary state and federal regulatory entities.

232. Defendants failed to disclose that Coinbase had purposefully avoided registering its business and the Digital Asset Securities products with the necessary state regulatory bodies. Plaintiffs would have found it material to their decisions to purchase Digital Asset Securities to know whether or not the digital assets they purchased were sold in compliance with state and federal securities laws.

233. The facts that the Defendants concealed were material to the decisions of Plaintiffs and the members of the Class about whether to pay for or purchase Digital Asset Securities (at all or for the price they paid), in that they would not have proceeded with their transactions but for the deceptive, fraudulent, and false acts and practices.

234. Upon making statements of fact regarding the registration status of the Digital Asset Securities, this gave rise to a duty to disclose that information, and by failing to disclose that information, Defendants are liable for a UCL fraud by omission claim. *See In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1113-14 (N.D. Cal. 2015) ("Finally, Plaintiffs have alleged that the information regarding the Carrier IQ Software was in the exclusive knowledge of Defendants[.] These allegations are sufficient to plausibly allege that Defendants had exclusive knowledge of a material fact that they had a duty to disclose but chose to omit[]"); *see also In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1303 (S.D. Cal. 2020)

(finding that the plaintiffs adequately alleged a fraudulent omission UCL claim where they pled "a duty to disclose based upon [d]efendant's exclusive knowledge of the alleged inadequacy of its security measures").

235. For example, Coinbase's misleading omissions concerning the Digital Asset Securities offered on the Coinbase platform relate to "'the central functionality of the product,'" which is required to plead a fraud by omission claim under the UCL. *See Hall v. SeaWorld Ent., Inc.*, 747 F. App'x 449, 451 (9th Cir. 2018) (citing *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 863 (9th Cir. 2018)).

236. Further, Defendants, collectively and individually, had superior knowledge of information regarding the regulatory status of Coinbase itself or the Digital Asset Securities sold on its platform.

237. Defendants intended for Plaintiffs and the members of the Class to pay for Digital Asset Securities in reliance upon the deceptive and fraudulent acts and practices described herein.

238. Had any of Defendants disclosed the omitted information, Plaintiffs would have been aware of it because they follow, directly or indirectly, the social media accounts of, and news reports on, Coinbase and its CEO, Individual Defendant Armstrong.

239. As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages. Defendants' activities caused Plaintiffs and the Class members to purchase and/or hold the Digital Asset Securities when they otherwise would not have done so.

240. Taken together, Coinbase's omissions contributed to the deceptive marketing tactics as a whole, which were used to induce customers to use the Coinbase platform to purchase the Digital Asset Securities.

241. In the event that Plaintiffs' broker-dealer and money transmitter claims under Florida and California state securities laws are found to be inapplicable to the wrongdoing alleged herein against Defendants, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

242. In addition, Plaintiffs and the Class lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL. *See M.O. Dion & Sons, Inc. v. VP Racing Fuels, Inc.*, No. CV 19-5154, 2022 WL 18281526, at *8 (C.D. Cal. Nov. 2, 2022).

243. The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution under the UCL.

244. Concurrently, "restitution under the [. . .] UCL would be more certain, prompt, or efficient than the legal remedies" available with state securities and consumer law claims. *See Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) (citing *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937)). For example, the price premium damages model will likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their Digital Asset Securities. Restitution would, therefore, be much more prompt and efficient than this remedy at law.

245. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under CAL. BUS. & PROF. CODE §17200.

**<u>EIGHTH CAUSE OF ACTION</u>**
**Violation of the California Unfair Competition Law**
**CAL. BUS. & PROF. CODE §17200**
**(Based on Unfair Acts and Practices)**
**(Against All Defendants)**

246. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 245, and further allege as follows:

247. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot are residents of the State of California.

248. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot paid for or purchased Digital Asset Securities in California and thus the unlawful conduct alleged herein occurred in California.

249. Plaintiffs bring this claim individually, and on behalf of the members of the purported Class, against all Defendants.

250. At all relevant times there was in full force and effect the UCL, CAL. BUS. & PROF. CODE §17200 *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

251. "'An act can be alleged to violate any or all of the three prongs of the UCL – unlawful, unfair, or fraudulent.'" *Stearns*, 763 F. Supp. 2d at 1149 (quoting *Berryman*, 152 Cal. App. 4th at 1554).

252. Defendants engaged in business acts and practices deemed "unfair" under the UCL, because of the conduct, statements, and omissions described above. Unfair acts under the UCL have been interpreted using different tests, including: (1) whether the public policy which is a predicate to a consumer unfair competition action under the unfair prong of the UCL is tethered to specific constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided.

253. Defendants have engaged in, and continue to engage in, conduct that violates the legislatively declared policies of: (1) CAL. CIV. CODE §§1572,1573, 1709, 1710, 1711 against committing fraud and deceit; (2) CAL. CIV. CODE §1770 against committing acts and practices intended to deceive consumers regarding the representation of goods in certain particulars; and (3) the Federal Tort Claims Act ("FTCA"), 15 U.S.C. §45(a)(1), against unfair or deceptive practices. Defendants gain an unfair advantage over their competitors, whose practices relating to other similar crypto-related products must comply with these laws.

254. Defendants' affirmative acts in soliciting sales of Digital Asset Securities are unfair within the meaning of the UCL, because they constituted immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers, and provided no benefit to consumers or competition.

255. The gravity of the harm to consumers caused by actions of Defendants far outweighs the utility of their conduct. According to a "Data Spotlight" from the Federal Trade Commission ("FTC") from June 3, 2022 (the "FTC Data Spotlight"), entitled: "Reports show scammers cashing in on crypto craze," "[s]ince the start of 2021, more than 46,000 people have reported losing over $1 billion in crypto to scams – that's about one out of every four dollars reported lost, more than any other payment method. The median individual reported loss? A whopping $2,600."[26]

256. The FTC Data Spotlight further stated that "[r]eports point to social media and crypto as a combustible combination for fraud. Nearly half the people who reported losing crypto to a scam since 2021 said it started with an ad, post, or message on a social media platform."[27] Furthermore, "[d]uring this period, nearly four out of every ten dollars reported lost to a fraud originating on social media was lost in crypto, far more than any other payment method."[28] Of the reported crypto fraud losses that began on social media, most are investment scams.[29] Indeed, since 2021, $575 million of all crypto fraud losses reported to the FTC were about bogus investment opportunities, far more than any other fraud type. Defendants facilitated similar bogus

---

[26] Emma Fletcher, *Data Spotlight: Reports show scammers cashing in on crypto craze*, FED. TRADE COMM'N (June 3, 2022), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze.

[27] *Id.* ("From January 1, 2021 through March 31, 2022, 49% of fraud reports to the FTC indicating cryptocurrency as the payment method specified that the scam started on social media, compared to 37% in 2020, 18% in 2019, and 11% in 2018.").

[28] *Id.* ("From January 1, 2021 through March 31, 2022, $1.1 billion was reported to the FTC as lost to fraud originating on social media.").

[29] *Id.* ("From January 1, 2021 through March 31, 2022, people reported to the FTC that $417 million in cryptocurrency was lost to fraud originating on social media. $273 million of these losses were to fraud categorized as investment related, followed by romance scams ($69 million), and business imposters ($35 million).").

crypto "investment opportunity" scams related to the Digital Asset Securities that the FTC Data Spotlight reported on as causing hundreds of millions (and rising) of dollars of damage to investors.

257. The conduct of Defendants was and is substantially injurious to consumers. Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have continued with the transactions in question but for the deceptive, fraudulent, false, and unfair acts and practices alleged herein.

258. Consumers have overpaid for Digital Asset Securities and the injury alleged herein is not outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to consumers or competition results from the alleged conduct of Defendants. Since consumers reasonably rely on the representations, and could not have known about the omitted disclosures, and the injury results from ordinary use of their product, consumers could not have reasonably avoided such injury.

259. Defendants willfully and knowingly engaged in the deceptive and unfair acts and practices described above and knew or should have known that those acts and practices were unlawful and thus in violation of CAL. BUS. & PROF. CODE §17200, *et seq.*

260. These particular facts that Coinbase omitted and concealed were material to the decisions of Plaintiffs and the members of the Class about whether to pay for Digital Asset Securities, in that they would not have proceeded with the transaction but for the deceptive and unfair acts and practices.

261. Defendants' conduct harmed competition. While Coinbase cut corners and minimized costs, their competitors spent the time and money necessary to promote financial products and/or digital assets that complied with the applicable state and federal laws. Further, the injuries suffered by Plaintiffs are not outweighed by any countervailing benefits to consumers or competition.

262. In order to have standing for a UCL claim, a plaintiff must meet the injury-in-fact requirement. This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'" *Reid*, 780 F.3d at 958. A

plaintiff's claims under this California statute are governed by the "reasonable consumer" test. *Freeman*, 68 F.3d at 289 ("'[T]he false or misleading advertising and unfair business practices claim must be evaluated from the vantage of a reasonable consumer.'"). Under the reasonable consumer standard, a plaintiff must "show that 'members of the public are likely to be deceived.'" *Id.* (quoting *Bank of the West*, 2 Cal. 4th at 1267).

263. To meet the heightened pleading standard of Rule 9(b) for claims that sound in fraud, plaintiffs must plead "'the who, what, when, where, and how'" of the alleged fraud. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th 2003).

264. Defendants engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including, but not limited to, in the following ways:

(a) knowingly and intentionally misrepresenting that the Digital Asset Securities sold on the Coinbase platform were not securities under state or federal law; and

(b) knowingly and intentionally concealing that Coinbase did not, as required by law, register either the Digital Asset Securities it sold on the Coinbase Platform or the Coinbase business itself with the necessary state and federal regulatory entities.

265. Defendants not disclose that Coinbase had purposefully avoided registering its business and the Digital Asset Securities products with the necessary state regulatory bodies. Plaintiffs would have found it material to their decisions to purchase Digital Asset Securities to know whether or not the digital assets they purchased were sold in compliance with state and federal securities laws.

266. The facts that the Defendants concealed were material to the decisions of Plaintiffs Aceves, Cordi, Fan, Martinez, and Smoot and the members of the Class about whether to pay for or purchase Digital Asset Securities (at all or for the price they paid), in that they would not have proceeded with their transactions but for the deceptive, fraudulent, and false acts and practices.

267. Upon making statements of fact regarding the registration status of the Digital Asset Securities, this gave rise to a duty to disclose that information, and by failing to disclose that information, Defendants are liable for a UCL fraud by omission claim. *See Carrier IQ, Inc.*, 78 F.

Supp. 3d at 1113-14 ("Finally, Plaintiffs have alleged that the information regarding the Carrier IQ Software was in the exclusive knowledge of Defendants[.] These allegations are sufficient to plausibly allege that Defendants had exclusive knowledge of a material fact that they had a duty to disclose but chose to omit[]"); *see also Solara Med. Supplies, LLC*, 613 F. Supp. 3d at 1303 (finding that the plaintiffs adequately alleged a fraudulent omission UCL claim where they pled "a duty to disclose based upon [d]efendant's exclusive knowledge of the alleged inadequacy of its security measures").

268. For example, Coinbase's misleading omissions concerning the Digital Asset Securities offered on the Coinbase platform relate to "'the central functionality of the product,'" which is required to plead a fraud by omission claim under the UCL. *See Hall*, 747 F. App'x at 451 (citing *Hodsdon*, 891 F.3d at 863).

269. Further, Defendants, collectively and individually, had superior knowledge of information regarding the regulatory status of Coinbase itself or the Digital Asset Securities sold on its platform.

270. Defendants intended for Plaintiffs and the members of the Class to pay for Digital Asset Securities in reliance upon the deceptive and fraudulent acts and practices described herein.

271. Had any of Defendants disclosed the omitted information, Plaintiffs would have been aware of it because they follow, directly or indirectly, the social media accounts of, and news reports on, Coinbase and its CEO, Individual Defendant Armstrong.

272. As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages. Defendants' activities caused Plaintiffs and the Class members to purchase and/or hold the Digital Asset Securities when they otherwise would not have done so.

273. Taken together, Coinbase's omissions contributed to the deceptive marketing tactics as a whole, which were used to induce customers to use the Coinbase platform to purchase the Digital Asset Securities.

274. In the event that Plaintiffs' broker-dealer and money transmitter claims under Florida and California state securities laws are found to be inapplicable to the wrongdoing alleged

herein against Defendants, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

275. In addition, Plaintiffs and the Class lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL. *See M.O. Dion & Sons, Inc.*, 2022 WL 18281526, at *8.

276. The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution under the UCL.

277. Concurrently, "restitution under the [. . .] UCL would be more certain, prompt, or efficient than the legal remedies" available with state securities and consumer law claims. *See Anderson*, 500 F. Supp. 3d at 1009 (citing *Am. Life Ins. Co.*, 300 U.S. at 214). For example, the price premium damages model will likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their Digital Asset Securities. Restitution would, therefore, be much more prompt and efficient than this remedy at law.

278. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under CAL. BUS. & PROF. CODE §17200.

**NINTH CAUSE OF ACTION**
**Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA")**
**FLA. STAT. ANN., §501.211(1)**
**(On Behalf of the Florida Subclass)**

279. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 278, and further allege as follows:

280. Plaintiffs Foy and Maggard are residents of the State of Florida.

281. Plaintiffs Foy and Maggard bring this claim individually, and on behalf of the members of the purported Class, against the Coinbase Global and Coinbase, Inc., Defendants.

282. Plaintiffs Foy and Maggard and members of the Class conferred a monetary benefit on Coinbase as a result of the fees paid to Coinbase for transactions on the Coinbase Platform.

283. Plaintiffs Foy and Maggard paid for or purchased Coinbase Digital Asset Securities in Florida, and thus the deceptive transactions alleged herein occurred in Florida.

284. FDUTPA, FLA. STAT. §501, is to be liberally construed to protect the consuming public, such as Plaintiffs in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

285. Plaintiffs are "consumers" within the meaning of FLA. STAT. §501.203(7).

286. By soliciting investor funds in the manner in which they did, Defendants engaged in "trade and commerce" within the meaning of FLA. STAT. §501.203(8).

287. The elements comprising a consumer claim for damages under FDUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (citing *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008)).

288. Under FDUTPA, "'deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)). "Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably. That is, '[a] party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.'" *Carriuolo*, 823 F.3d at 984 (quoting *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000)).

289. A plaintiff's claims under FDUPTA are governed by the "reasonable consumer" test. *Piescik v. CVS Pharmacy, Inc.*, 576 F. Supp. 3d 1125, 1132 n.2 (S.D. Fla. 2021) ("This case was brought under California's consumer protection laws, which apply the same 'reasonable consumer' test for deception as applied in interpreting FDUTPA.").

290. Plaintiffs Foy and Maggard reasonably relied on the misleading solicitations and omissions alleged herein when deciding to purchase various Coinbase Digital Asset Securities.

291. To establish an unfair practice, the plaintiff must show that it is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or

substantially injurious to consumers.'" *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (quoting *PNR*, 842 So. 2d at 777); *see also CMR Constr. & Roofing, LLC v. UCMS, LLC*, No. 21-11183, 2022 WL 3012298, at *4 (11th Cir. July 29, 2022).

292. Defendants engaged in business acts and practices deemed "deceptive" because of the conduct, statements, and omissions described above, including, but not limited to, failing to disclose that the Coinbase Digital Asset Securities were, in fact, unregistered securities subject to regulation by various federal and state regulatory agencies.

293. These acts and omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiffs, into investing in the Coinbase Digital Asset Securities to their collective financial detriment. Such conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

294. Had Defendants disclosed the omitted information, Plaintiffs Foy and Maggard would have been aware of it because (a) they saw the actual promotions by these Defendants and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) because they follow, directly or indirectly, the social media accounts of, and news reports on, the Company and its CEO, Individual Defendant Armstrong.

295. As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs Foy and Maggard and the members of the purported Class, suffered damages. The activities of the Defendants caused Plaintiffs Foy and Maggard and the members of the Class to purchase and/or hold the Coinbase Digital Asset Securities when they otherwise would not have done so.

296. The materially false statements and omissions as described above, and the fact that this was a misleading investment, were unfair, unconscionable, and deceptive practices perpetrated on Plaintiffs Foy and Maggard and the members of the Class, which would have likely deceived a reasonable person under the circumstances.

297. Defendants were on notice at all relevant times that the false representations of material facts described above were being communicated to prospective investors (such as Plaintiffs Foy and Maggard) by their authorized agents.

298. As a result of the false representations and violations of the laws described above, Plaintiffs Foy and Maggard and the Class have been damaged by, among other things, overpaying for the Coinbase Digital Asset Securities that were artificially inflated by Defendants as well as paying transactions fees associated with their trades on the Coinbase platform.

299. Taken together, the misleading statements and omissions of Defendants contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of Coinbase Digital Asset Securities.

300. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Florida law.

301. Pursuant to FLA. STAT. §§501.211(1) and 501.2105, Plaintiffs are entitled to recover from Defendants the reasonable amount of attorneys' fees Plaintiffs have had to incur in representing their interests in this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B. Appoint Plaintiffs as the representatives of the Class and their counsel as Lead Class counsel;

C. Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

D. Award post-judgment interest on such monetary relief;

E. Award reasonable attorneys' fees and costs; and

F. Grant such further relief that this Court deems appropriate.

**JURY DEMAND**

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

DATED: September 16, 2024

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ *John T. Jasnoch*
JOHN T. JASNOCH (CA 281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
Email: jjasnoch@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
SEAN T. MASSON*
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 619-233-6444
Facsimile: 619-233-6334
Email: smasson@scott-scott.com

**GRADYLAW**
THOMAS GRADY*
720 Fifth Avenue South, Suite 200
Naples, FL 34102

**JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP**
GUY BURNS*
311 Park Place Blvd., #300
Clearwater, FL 33759

**THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*