**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GERARDO ACEVES, THOMAS FAN, EDWIN MARTINEZ, TIFFANY SMOOT, EDOUARD CORDI, BRETT MAGGARD, MOLLIJOY CARTER, BRADLEY BARNES, and ANTONETT FOY Individually, and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>COINBASE GLOBAL, INC., COINBASE, INC., COINBASE ASSET MANAGEMENT, LLC, and BRIAN ARMSTRONG,<br><br>Defendants. | Case No. 1:25-CV-01486-JPC<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

# AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Gerardo Aceves ("Aceves"), Thomas Fan ("Fan"), Edwin Martinez ("Martinez"), Tiffany Smoot ("Smoot"), Edouard Cordi ("Cordi"), Brett Maggard ("Maggard"), Mollijoy Carter ("Carter"), Bradley Barnes ("Barnes"), and Antonett Foy ("Foy") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint ("Complaint") against Defendants Coinbase Global, Inc. ("Coinbase Global"), Coinbase, Inc., (collectively "Coinbase") and Brian Armstrong (collectively "Defendants"). The following allegations are based upon personal knowledge as to Plaintiffs' own facts, upon investigation by Plaintiffs' counsel, and upon information and belief where facts are solely in possession of Defendants. Plaintiffs believe substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1. Plaintiffs pursue claims against Defendants under the laws of California and Florida. This is a nationwide class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired the Coinbase Digital Investments (including, but not limited to, Coinbase Earn, 1INCH, ACH, ADA, AMP, ALGO, AVAX, AAVE, ABT, CRO, DOT, ENJ, FET, GODS, GALA, KEEP, LRC, LINK, MANA, MATIC, NKN, NU, OGN, PRO, SUKU, SHIB, SOL, XLM, and ZRX) from January 1, 2017 through the commencement of this action (the "Class Period").

2. Defendant Coinbase purports to be "a trusted platform that makes it easy for people and institutions to engage with crypto and digital assets, including for trading, staking, safekeeping, spending, and fast, free global transfers." Further, Defendant Coinbase states that "[to]gether with the crypto community, we also advocate for responsible rules to make the benefits of crypto available around the world." In fact, Coinbase has been a part of a shadowy crypto ecosystem operating just outside of the law since formed over 10 years ago. Its entire business model has been built upon a lie and a dream: the lie is that "we do not sell securities," and the dream is that, knowing it would eventually be caught in the lie, "it is better to ask for forgiveness than permission."

3. Coinbase has knowingly, intentionally, and repeatedly violated state securities laws since it began doing business. Indeed, it admits in its User Agreement that is a "Securities Broker," that the Digital Asset Securities sold by Coinbase are "financial assets" (*i.e.*, investment contracts or other securities under CAL. COM. §8102), that Coinbase is a "securities intermediary" (i.e., a clearing corporation or a broker other person that "maintains securities accounts for others and is acting in that capacity"), and that the Digital Asset Wallets custodially held by Coinbase are "securities account[s]."

4. When it filed with the states and the U.S. Securities and Exchange Commission ("SEC") to become a public company a few years ago, it disclosed that its business involved selling securities but that it was not registered to do so. In drafting its User Agreement with the investors and other customers, Coinbase specifically identifies the digital assets it sells as "securities." And yet, Coinbase has never registered itself, its people, or the digital securities it sells.

5. As a consequence, Plaintiffs seek their full recission, statutory damages under California and Florida state law, and, in addition, injunctive relief.

## PARTIES

***Plaintiffs***

6. Plaintiff Gerardo Aceves is a resident and citizen of California, living in Yuba City, California. Plaintiff Aceves invested in the Coinbase Digital Investments during the Class Period and suffered investment losses as a result of Defendants' conduct.

7. Plaintiff Thomas Fan is a resident and citizen of California, living in San Ramon, California. Plaintiff Fan invested in the Coinbase Digital Investments during the Class Period and suffered investment losses as a result of Defendants' conduct. In particular, Plaintiff Fan made purchases of:

- ADA (September 9, 2021; September 20, 2021; November 30, 2021; two purchases on December 3, 2021; December 5, 2021; and December 15, 2021);
- AVAX (December 17, 2021);
- CRO (December 16, 2021);

- DOT (December 24, 2021);
- GALA (December 22, 2021; December 24, 2021; January 13, 2022; andJanuary 21, 2022);
- MANA (two purchases on November 12, 2021; November 26, 2021; December 3, 2021; December 6, 2021; December 13, 2021; December 15, 2021; December 24, 2021; January 22, 2022; and March 1, 2022);and
- SOL (November 26, 2021; two purchases on December 11, 2021; December 13, 2021; December 15, 2021; December 24, 2021; January 13, 2022; January 15, 2022; January 21, 2022; March 1, 2022; May 13, 2022; andJune 12, 2022).

8. Plaintiff Edwin Martinez is a resident and citizen of California, living in La Quinta, California. Plaintiff Martinez invested in the Coinbase Digital Investments during the Class Period and suffered investment losses as a result of Defendants' conduct. In particular, Plaintiff Martinez made the following purchases of Coinbase Digital Investments:

- SHIB (October 6, 2021; October 8, 2021; October 12, 2021; three purchases on October 16, 2021; October 17, 2021; October 24, 2021; October 26, 2021; October 28, 2021; November 4, 2021; November 5, 2021; November 8, 2021; two purchases on December 8, 2021; December 9, 2021; February 5, 2022; and March 25, 2022).

9. Plaintiff Tiffany Smoot is a resident and citizen of California, living in Morgan Hill, California. Plaintiff Smoot invested in the Coinbase Digital Investments, including Coinbase Earn, during the Class Period and suffered investment losses as a result of Defendants' conduct. In particular, Plaintiff Smoot made the following purchases of Coinbase Digital Investments:

- AVAX (December 17, 2021);
- ADA (September 9, 2021; September 20, 2021; November 30, 2021; December 3, 2021; December 5, 2021; and December 15, 2021);
- CRO (December 16, 2021);
- DOT (December 24, 2021);

- GALA (December 22, 2021; December 24, 2021; January 13, 2022; and January 21, 2022);
- MANA (November 12, 2021; November 26, 2021; December 3, 2021; December 6, 2021; December 13, 2021; December 15, 2021; December 24, 2021; January 22, 2022; and March 1, 2022);
- SHIB (November 4, 2022); and
- SOL (November 26, 2021; December 11, 2021; December 13, 2021; December 15, 2021; December 24, 2021; January 13, 2022; January 15, 2022; January 21, 2022; May 13, 2022; and June 12, 2022).

10. Plaintiff Edouard Cordi is a resident and citizen of California, living in Temecula, California. Plaintiff Cordi invested in the Coinbase Digital Investments, including Coinbase Earn, during the Class Period and suffered investment losses as a result of Defendants' conduct. In particular, Plaintiff Cordi made the following purchases of Coinbase Digital Investments:

- SHIB (October 6, 2021; October 8, 2021; October 10, 2021; October 11, 2021; October 12, 2021; February 5, 2022; March 25, 2022).

11. Plaintiff Brett Maggard is a resident and citizen of Florida, living in Tampa, Florida. Plaintiff Maggard invested in Coinbase Digital Investments during the Class Period and suffered investment losses as a result of Defendants' conduct. In particular, Plaintiff Maggard made the following purchases of Coinbase Digital Investments:

- ACH (November 27, 2021);
- ALGO (September 9, 2020);
- AMP (November 27, 2021; November 28, 2021; December 1, 2021; and December 4, 2021);
- CRO (December 2, 2021);
- GALA (November 26, 2021);
- LINK (September 9, 2020);

- LRC (November 8, 2021; November 11, 2021; November 12, 2021; November 18, 2021; November 23, 2022; November 25, 2022; November 26, 2022; November 30, 2021; December 2, 2021; December 3, 2021; December 4, 2021; December 5, 2021; December 8, 2021; December 9, 2021; December 10, 2021; December 11, 2021; December 12, 2021; December 13, 2021; December 15, 2021; December 20, 2021; and December 28, 2021);
- MANA (November 19, 2021; November 25, 2021; and December 27, 2021);
- MATIC (November 29, 2021);
- XLM (April 29, 2021; and June 8, 2022); and
- ZRX (September 16, 2020).

12. Plaintiff Mollijoy Carter is a resident and citizen of California, living in Jamestown, California. Plaintiff Carter invested in the Coinbase Digital Investments, including Coinbase Earn, during the Class Period and suffered investment losses as a result of Defendants' conduct. In particular, Plaintiff Carter invested through Coinbase Earn and additionally made the following purchases of Coinbase Digital Investments:

- AAVE (October 17, 2022);
- ABT (August 20, 2022);
- AVAX (August 6, 2022);
- GODS (September 19, 2022);
- MATIC (September 7, 2022);
- PRO (August 20, 2022);
- SUKU (August 28, 2022); and
- WBTC (September 22, 2022). AAVE (October 17, 2022).

13. Plaintiff Bradley Barnes is a resident and citizen of California, living in Santee, California. Plaintiff Barnes invested in the Coinbase Digital Investments, including Coinbase Earn, during the Class Period and suffered investment losses as a result of Defendants' conduct.

In particular, Plaintiff Barnes invested through Coinbase Earn and additionally made the following purchases of Coinbase Digital Investments:

- ADA (October 28, 2021; November 24, 2021; November 28, 2021; December 4, 2021; March 31, 2023; and November 24, 2023); and
- SHIB (March 28, 2023).

14. Plaintiff Antonett Foy is a resident and citizen of Florida, living in Port St. Lucie, Florida. Plaintiff Foy invested in the Coinbase Digital Investments during the Class Period and suffered investment losses as a result of Defendants' conduct. In particular, Plaintiff Foy made the following purchases of Coinbase Digital Investments:

- 1INCH (April 10, 2021; April 11, 2021; and April 28, 2021);
- ENJ (April 10, 2021; April 11, 2021; and April 28, 2021);
- FET (August 14, 2021);
- KEEP (July 6, 2021);
- NKN (April 10, 2021; April 11, 2021; and April 28, 2021);
- NU (October 17, 2021);
- OGN (April 10, 2021; April 11, 2021; and April 28, 2021); and
- SHIB (October 2, 2021; October 8, 2021; October 15, 2021; October 17, 2021; October 21, 2021; October 26, 2021; and October 27, 2021).

***Defendants***

15. Defendant Coinbase Global, Inc., is a business incorporated under the laws of the State of Delaware with its headquarters located at 1209 N Orange Street, Wilmington, DE 19801, and operates as a holding company for the various Coinbase-related subsidiaries.

16. Defendant Coinbase, Inc., is a subsidiary of Coinbase Global, Inc., incorporated in Delaware in 2009. Although the Company purports to have no physical headquarters, it leases

significant office space in Mountain View, California.[1] It was previously headquartered in San Francisco, California. Coinbase, Inc., operates one of the largest crypto asset securities brokerage platforms in the U.S., with over 98 million users. Its securities are registered and publicly traded on the Nasdaq Stock Market under the symbol COIN, its market capitalization is over $17 billion and its revenues for the 12 months preceding February 2023 exceeded $5 billion. Although Coinbase, Inc., registered its own common stock with the SEC (thus showing it understands the legal requirements of registering securities prior to their sale and understood the likelihood that the Digital Asset Securities were securities even then), it has failed to register itself or the Digital Asset Securities offered and sold to the public, including Plaintiffs and members of the putative Class.

17. Defendant Brian Armstrong ("Armstrong") is the co-founder of Coinbase, and served as the Company's Chief Executive Officer ("CEO") and Chairman of the Coinbase Board of Directors ("Board"). On information and belief, Defendant Armstrong lives in the San Francisco Bay Area[2] and owns property in Los Angeles.[3]

**JURISDICTION AND VENUE**

18. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

---

1 Joshua Bote, *After abandoning San Francisco HQ, Coinbase takes on new Bay Are office space,* SFGATE (July 20, 2023), https://www.sfgate.com/tech/article/coinbase-bay-area-office-space-18210992.php.

2 *Brian Armstrong*, FORBES, https://www.forbes.com/profile/brian-armstrong/ (last visited 9/16/2024).

3 Katherine Clarke and E.B. Solomont, *Crypto CEO Brian Armstrong Buys Los Angeles Home for $133 Million,* THE WALL STREET J. (January 3, 2022) https://www.wsj.com/articles/crypto-ceo-brian-armstrong-buys-los-angeles-home-for-133-million-11641249787.

19. This Court may exercise personal jurisdiction over Defendants because Coinbase maintains and has continuous and systematic contacts with this District, does substantial business in this State and within this District, and engages in unlawful practices in this District as described in this Complaint, so as to subject itself to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

20. Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. §1965 because Coinbase transacts business in, is found in, and/or has agents in this District. Therefore, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District. Further, Defendants successfully sought the transfer of these consolidated actions to this District.

21. Plaintiffs satisfy all conditions precedent for bringing the class action claims alleged herein in this District.

## FACTUAL BACKGROUND

### I. COINBASE OPERATIONS

22. Coinbase was founded in 2009. Throughout its history, Coinbase was headquartered in California and Defendant Armstrong resided in California. Coinbase operates in precisely the same fashion as other securities exchanges and broker/dealers and wholly owns at least two licensed securities broker/dealer. When Coinbase first launched, an affiliate was also launched as a licensed general securities broker/dealer, Coinbase Securities, Inc. ("Coinbase Securities"). Like Coinbase, Coinbase Securities is a subsidiary of Coinbase Global, Inc., incorporated in Delaware in 2009 and approved by the SEC in 2010. It is also registered as a securities broker/dealer with the Florida Office of Financial Regulation and the Financial Industry Regulatory Authority ("FINRA").[4]

23. Coinbase offers and sells investment securities to the public (including the Plaintiffs) in the form of the Digital Asset Securities. Coinbase operates two brokerage platforms:

---

4 The Coinbase Securities and Coinbase Capital Markets FINRA BrokerCheck Reports are attached hereto as Exhibits A and B, respectively.

Coinbase (the "Coinbase Brokerage Platform") and Coinbase Pro (the "Coinbase Pro Brokerage Platform" and collectively with the Coinbase Brokerage Platform, the "Coinbase Digital Asset Brokerage Platforms").

24. Since its formation over 10 years ago, Coinbase has held itself out to the public and the Plaintiffs as a "broker" and a "trusted part" of a regulated financial industry. It boasts that it is "regulated," implying registration under state and federal securities laws. What Coinbase really means by claiming to be regulated is that it has "money transmitter licenses" in many states, just as Western Union and similar companies do. Coinbase has never been registered as a broker/dealer, bank, investment advisor, trust company, or any other regulated financial institution, but holds itself out as such.

25. As part of this effort to appear regulated like, for example, Morgan Stanley, Coinbase's written trading rules, protocols, ability to exercise discretion to maintain orderly markets, etc., are virtually identical to those of competing securities or crypto broker/dealers (*e.g.*, orders, limit orders, market orders, stop orders, order protections (including granting Coinbase discretion to "employ limit order controls to maintain market health"), market maker activities, etc.). In fact, Coinbase even operates as a prime broker, a paradigmatic example of Coinbase's deceptive practice of wrapping itself in the language of securities brokers, transactions, and registrations while complying with none of that: "Access Coinbase Exchange directly or multiple exchanges and liquidity venues through Coinbase Prime, our full-service *prime broker*."[5]

26. Consistent with those rules and protocols, Coinbase's User Agreement also uses the same securities jargon and protocol as used by other securities broker/dealers to successfully portray itself to the public and the customers as a trusted financial industry participant where it and the "investments" it offers are fully registered with and licensed by state and federal regulators.

---

[5] *The trusted bridge to crypto markets for institutions*, COINBASE, https://www.coinbase.com/institutional (last visited May 3, 2024). Unless otherwise noted, all emphasis is added.

As discussed more thoroughly in the section below entitled "Legal Claims," this portrayal was false.

27. Coinbase also acts as a "Prime Broker" like other securities broker/dealers. A prime brokerage arrangement is much different than a traditional account relationship and is even more highly regulated. The SEC has issued a No-Action Letter dated January 25, 1994 (attached as Exhibit B) (which was adopted by the Exchange in Information Memo 94-6 dated February 28, 1994), which specifies conditions that *must* be met by prime brokers, executing brokers (including Coinbase), and customers in prime brokerage arrangements. In that letter, the SEC described prime brokerage as follows:

> Prime brokerage is a system developed by full-service firms to facilitate the clearance and settlement of securities trades for substantial retail and institutional investors who are active market participants. ***Prime brokerage involves three distinct parties: the prime broker, the executing broker, and the customer***. The prime broker is a registered broker-dealer that clears and finances the customer trades executed by one or more other registered broker-dealers ("executing broker") at the behest of the customer. ***Each of the executing brokers receives a letter from the prime broker agreeing to clear and carry each trade placed by the customer with the executing broker where the customer directs delivery of money or securities to be made to or by the prime broker.***
>
> The customer maintains its funds and securities in an account with the prime broker. Orders placed with the executing broker are effected through an account with the executing broker in the name of a prime broker for the benefit of the customer.

Jeffrey C. Bernstein, SEC Staff No-Action Letter, [Jan. 25, 1994] p. 2.

28. Coinbase cannot act like a traditional broker/dealer and a traditional prime broker while at the same time pretending to be outside of the coverage of the Florida Securities and Investor Protection Act ("FSIPA") or the California Securities Act. Rather, Coinbase is required by state law to be registered in multiple securities capacities, and should today be held to the same standards of a registered broker/dealer and prime broker under Florida and California state securities laws.

29. Like other securities broker/dealers and registered persons, Coinbase typically acts as a broker (*i.e.*, serving as an agent of both buyer and seller in a securities transaction) in transactions with the customers but reserves the right to act as a dealer (*i.e.*, buying and selling

securities from and for its own account) at its discretion and with no approvals from the customers. In addition, like a trust company or fiduciary, Coinbase retained discretion over most of the related activities.

30. Coinbase publicly solicited every purchase and sale of Digital Asset Securities by means of general solicitations including those on its website and in social media advertising, traditional advertising, and even Super Bowl commercials. At all times, Coinbase was soliciting the customers ***to invest*** in the Digital Asset Securities that it offered on its broker platform. No use case other than investing was ever offered by Coinbase to the Plaintiffs or the Class (there is no other use case for them)[6] and Coinbase to this day continues to disseminate similar investment bulletins and updates to the Plaintiffs and Class Members. Indeed, the Coinbase website posts a "Weekly Market Commentary.."[7]

31. Prime brokerage is a system developed by full-service firms to facilitate the clearance and settlement of securities trades for substantial retail and institutional investors who are active market participants. ***Prime brokerage involves three distinct parties: the prime broker, the executing broker, and the customer.*** The prime broker is a registered broker-dealer that clears and finances the customer trades executed by one or more other registered broker-dealers ("executing broker") at the behest of the customer. ***Each of the executing brokers receives a letter from the prime broker agreeing to clear and carry each trade placed by the customer with the executing broker where the customer directs delivery of money or securities to be made to or by the prime broker.***

---

[6] "You know, we remember all the use cases for crypto as they kept changing over the past handful of years. It was going to be an alternative currency. It was gonna be a store of value. It was gonna be an inflation hedge. And at the end of the day, it was really just a speculative asset and speculative asset class and with an immense cost structure built around it. So the. dea really was for the crypto, you know, community was how can we extract the most amount of fees from unsuspecting investors? And th? 's my view. I still hold to it." Joe Weisenthal and Tracy Alloway, *Transcript: Jim Chanos on the Tech Bust, Crypto, and Fraud*, BLOOMBERG (Nov. 23, 2022), https://www.bloomberg.com/news/articles/2022-11-23/transcript-jim-chanos-on-the-tech-bust-crypto-and-fraud ("*Chanos Bloomberg Interview*").

[7] Weekly Market *Commentary*, COINBASE (Mar. 12, 2026), https://www.coinbase.com/institutional/research-insights/research/weekly-market-commentary.

## II. "DIGITAL ASSET SECURITIES" ARE INVESTMENTS AND SECURITIES UNDER FLORIDA AND CALIFORNIA STATE LAW

32. Florida state law requires that every offer and sale of securities within the state and/or United States be registered with the Florida Office of Financial Regulation and/or the SEC, or qualify for an exemption from registration. The objective of the requirement is to ensure that the investing public receives complete and accurate information about securities being offered for sale before they purchase them.

33. The registration and disclosure regime imposed by state and federal law applies only to the non-exempt offer and sale of ***securities***. The term "security" is broadly defined under FLA. STAT. §517.021 and includes any of the following:

(a) A note.
(b) A stock.
(c) A treasury stock.
(d) A bond.
(e) A debenture.
(f) An evidence of indebtedness.
(g) A certificate of deposit.
(h) A certificate of deposit for a security.
(i) A certificate of interest or participation.
(j) A whiskey warehouse receipt or other commodity warehouse receipt.
(k) A certificate of interest in a profit-sharing agreement or the right to participate therein.
(l) A certificate of interest in an oil, gas, petroleum, mineral, or mining title or lease or the right to participate therein.
(m) A collateral trust certificate.
(n) A reorganization certificate.
(o) A preorganization subscription.
(p) A transferable share.
(q) An investment contract.
(r) A beneficial interest in title to property, profits, or earnings.
(s) An interest in or under a profit-sharing or participation agreement or scheme.
(t) An option contract that entitles the holder to purchase or sell a given amount of the underlying security at a fixed price within a specified period of time.
(u) Any other instrument commonly known as a security, including an interim or temporary bond, debenture, note, or certificate.
(v) A receipt for a security, or for subscription to a security, or a right to subscribe to or purchase any security.
(w) A viatical settlement investment.

34. The term "investment contract" included within the statutory definition of security is not defined within Florida state law. Notably, the Eleventh Circuit has interpreted the meaning of an "investment contract" as applied to digital assets and applied the test for distinguishing an

investment contract from other commercial dealing set forth in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946). *See, e.g.*, *Fedance v. Harris*, 1 F.4th 1278, 1288 (11th Cir. 2021). In *Howey*, the U.S. Supreme Court found that an "investment contract" exists when there is (1) the investment of money; (2) in a common enterprise; with (3) a reasonable expectation of profits to be derived from the efforts of others.

35. This analysis (referred to as the "*Howey* test") "applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus of the *Howey* test analysis is not only on the form and terms of the instrument itself [. . .] but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales)."[8]

36. Notably, Coinbase itself marketed and sold the Digital Asset Securities to Plaintiffs and the class as "investments." Indeed, Coinbase's marketing and general solicitation materials constantly remind its customers that the sole use case for Digital Asset Securities through Coinbase is for investment purposes. For example, the following Coinbase solicitation from October 2022 in a column entitled "Numbers to Know" compares investments in Digital Asset Securities with other traditional investment securities like stocks and bonds: "Wealthy ***investors*** ages 21 to 43 are 7.5 times more likely to hold crypto than those 43 and older, per a new survey by Bank of America [ ] that gauged the ***investing*** attitudes of Americans with over $3 million of ***investable assets***."[9]

37. Further, Coinbase admits that it is a "Securities Broker." In particular, in the Coinbase User Agreement, Defendants make clear that the Digital Asset Securities sold by Coinbase are "financial assets," (*i.e.*, investment contracts or other securities under CAL. COM. §8102), that it is a "securities intermediary" (*i.e.*, a clearing corporation or a broker other person

[8] *Framework for "Investment Contract" Analysis of Digital Assets*, U.S. SEC, AND EXCHANGE COMM. (Apr. 3, 2019).

[9] *Inside the Reddit NFT obsession*, COINBASE (Oct. 26, 2022), https://www.coinbase.com/bytes/archive/reddit-nft-cryptosnoo-obsession.

that "maintains securities accounts for others and is acting in that capacity"), and the Digital Asset Securities Wallets custodially held by Coinbase are "securities account[s]."[10]

38. Moreover, Coinbase's own press release disclosed that the SEC believes that the Coinbase wallets are securities accounts that must be registered as such. Accordingly, both Coinbase and the SEC agree that the Digital Asset Securities described herein are "securities," the sale of which results in strict liability under Florida and California state securities laws based on both Coinbase's failure to register as a broker/dealer and its sale of unregistered Digital Asset Securities.

## III. REGULATION OF BROKER DEALERS

39. States throughout the country regulate the offer and sale of securities and those who sell them, including broker-dealers.

40. For example, under Florida law, any person operating as a broker or dealer in U.S. securities markets must register with the state. FLA. STAT. §517.12(1). Further, in order for a dealer, associated person, or investment adviser to obtain registration, the applicant must file a written application with the State of Florida. *Id.*

41. Similarly, a "broker-dealer" under California state law is defined as an entity that is "engaged in the business of effecting transactions in securities in this state for the account of others . . . ." CAL. CORP. §25004(a).

42. Brokers typically operate "in the business" of assisting issuers seeking to conduct securities offerings and/or investors seeking to buy or sell securities during either an initial offering or on the secondary market – frequently in exchange for transaction-based compensation.

43. Under Florida law, a "money transmitter" is defined as an entity qualified to do business in the state which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, including transmission by wire, facsimile,

[10] Coinbase has and uses its ability to lock users' accounts and to sell their securities without their affirmative consent.

electronic transfer, courier, the Internet, or through bill payment services or other businesses that facilitate such transfer within this country, or to or from this country. FLA. STAT. §517.12.

44. In addition, the Florida Office of Financial Regulation has concluded that a business offering a service "where a Coinbase user sends fiat currency to another Coinbase user to buy bitcoins" was subject to money transmitter registration requirements under Florida law. *See In re Coinbase, Inc.*, Case No. 62670 (Fla. OFR Nov. 13, 2015) (available from the agency clerk); *see also* FLA. STAT. §560.105 (empowering the Office of Financial Regulation to regulate money services businesses).

## SUBSTANTIVE ALLEGATIONS

### I. COINBASE HAS OFFERED AND SOLD SECURITIES AND INVESTMENTS TO THE PLAINTIFFS AND CLASS

45. At all relevant times, Coinbase has offered and sold securities and investments to the Plaintiffs and the Class.

46. Coinbase has failed to register those persons offering and selling the Coinbase Digital Asset Securities as associated persons of a broker-dealer and has failed to register as a broker-dealer with the SEC, Florida, California, or any other state.

47. However, as explained below, analysis of the facts and circumstances surrounding many of the digital assets listed for trading on the Coinbase Digital Asset Platforms shows that many assets offered for trading by Coinbase are investments, investment contracts under *Howey*, and securities under other sections of Florida and California law, and are therefore securities.

#### A. Digital Assets Listed on Coinbase Are Securities

48. Coinbase recognized early on the significant impact classifying digital assets as securities would have on the operation of the Coinbase Digital Asset Platforms and for this reason chose, or was willfully blind, to not register the securities, persons, or broker-dealers as required by state law. On December 7, 2016, Coinbase first published its *Securities Law Framework* in recognition that "US federal securities laws [. . .] pose the biggest risk for crowdsales of blockchain

tokens."[11] Coinbase's (now deleted) *Securities Law Framework* therefore (1) set out to estimate how likely a particular token is to be a security under U.S. federal securities law; (2) sets out some best practices for crowdsales; and (3) set out a detailed securities law analysis.[12] The *Securities Law Framework* was given to issuers of digital assets seeking to be listed on the Coinbase Digital Asset Platforms.

49. Relatedly, in an effort to promote the sale of Digital Asset Securities on the Coinbase Platforms and obscure the regulatory status of the Digital Asset Securities sold on the Coinbase Platforms, Coinbase formed the Crypto Rating Council ("CRC") on September 30, 2019, and promoted the CRC as "a member-operated organization formed to assist market participants that trade or support crypto assets to comply with U.S. federal securities laws."[13] To analyze whether a digital asset was likely to be deemed a security, the CRC "distilled a set of yes or no questions which are designed to plainly address each of the four *Howey* test factors: whether crypto purchasers (i) invested money, (ii) in a 'common enterprise', (iii) with a reasonable expectation of profit, and (iv) based on the efforts of others."[14] The CRC gives each digital asset it reviews "a final rating between 1 and 5 [and] a score of 5 results when an asset appears to have many characteristics that are consistent with the *Howey*-test factors [and] a score of 1 results when an asset appears to have few characteristics that are consistent with the *Howey*-test factors."[15]

50. Coinbase's publication of the *Securities Law Framework*, together with the creation of the CRC, misleadingly suggested to Plaintiffs and the members of the Class that Coinbase would not list any digital assets that were securities on the Coinbase Platforms.

---

11 *Securities Law Framework*, WAYBACK MACHINE (Apr. 23, 2022), https://web.archive.org/web/20220423201226/www.coinbase.com/legal/securities-law-framework.pdf.

12 *Id.*

13 *Introducing the Crypto Rating Council*, COINBASE BLOG (Sept. 30, 2019), https://www.coinbase.com/blog/introducing-the-crypto-rating-council.

14 *Frequently Asked Questions*, CRYPTO RATING COUNCIL, https://www.cryptoratingcouncil.com/copy-of-the-framework (last visited May 3, 2024).

15 *Id.*

51. But when faced with a huge increase in the interest of buying and selling digital assets, Coinbase let its greed overrule its judgement when it began listing digital assets that qualify as investment contracts, and thus securities, in order to earn fees from Coinbase Digital Asset Platform user transactions. Coinbase listed these Digital Asset Securities despite early knowledge of the fact that there was a substantial likelihood that one or more of the digital assets were securities, and more recent knowledge that it is a certainty that the Digital Asset Securities are securities and doing business in them requires significant registrations and regulation.

52. As of September 16, 2024, Coinbase listed 250 "assets" as "tradable" on the Coinbase Digital Asset Platforms. The following are a small sample of the tokens that constitute Digital Asset Securities that were listed on the Coinbase Digital Asset Platforms and traded by Plaintiffs and the Class during the Class Period:

**1. 1INCH (1INCH)**

53. 1INCH is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

54. 1INCH is a token issued on the Ethereum blockchain. Coinbase describes 1INCH as "an Ethereum token that powers 1inch, a decentralized exchange that aims to offer the 'best rates' by discovering the most efficient swapping routes across all leading DEXes."[16] Decentralized exchanges (a.k.a. DEXes) like 1inch enable users to transact tokens without an intermediary. 1inch "aggregates token prices across decentralized exchanges in order to find the best prices for users."[17] The 1INCH token is marketed as a "utility" token used within the 1INCH ecosystem to pay for services, participate in governance, and incentivize network participation. In

---

16 *1inch Price (1INCH)*, COINBASE, https://www.coinbase.com/price/1inch.

17 *1inch (1INCH), Enjin Coin (ENJ), NKN (NKN) and Origin Token (OGN) are launching on Coinbase Pro,* COINBASE (Apr. 7, 2021), https://www.coinbase.com/blog/1inch-1inch-enjin-coin-enj-nkn-nkn-and-origin-token-ogn-are-launching-on-coinbase-pro ("Starting Today Wednesday April 7, transfer 1INCH, ENJ, NKN, OGN into your Coinbase Pro account ahead of trading. Support for 1INCH, ENJ, NKN, OGN will be available in all Coinbase's supported jurisdictions with the exception of 1INCH and ENJ in New York State. Trading will begin on or after 9AM Pacific Time (PT) Friday April 9, if liquidity conditions are met.").

practice, however, the token was promoted to investors as an asset whose value would increase as the 1INCH network grew and expanded.

55. 1INCH first became available to trade on the Coinbase Pro platform on April 7, 2021. Coinbase publicly announced the listing in a blog post stating that inbound transfers of 1INCH would begin immediately and that trading would commence once sufficient liquidity was established. Coinbase's listing announcements encouraged market participation by inviting users to transfer 1INCH to the platform ahead of trading and by highlighting the impending availability of the token on Coinbase's exchange.[18]

56. On April 9, 2021, 1INCH was listed on the retail Coinbase platform. In a blog post announcing the listing, Coinbase solicited investors to "sign up" and "buy, sell, convert, send, receive, or store 1INCH" on the Coinbase platform.[19] Coinbase further promoted the token by linking users to informational asset pages designed to provide additional details about 1INCH and to encourage trading activity on the platform. These asset pages contained price charts, trading volume information, circulating supply statistics, and other metrics commonly used by investors when evaluating speculative investments. Coinbase also maintained "How to Buy" guides and other onboarding materials directing users through the process of opening an account, funding their wallets, and purchasing 1INCH through Coinbase's exchange.[20]

57. Coinbase also promoted the availability of 1INCH through its official communications channels, including its blog and social media accounts, where the company routinely announces new token listings to millions of followers. *See SEC v. Wahi et al*, No. 2:22-cv-01009 (W.D. Wash. July 21, 2022), Complaint ¶3 (alleging Coinbase announces listings through its blog and Twitter feed). These listing announcements function as market-moving events and serve to attract investor attention and trading activity to newly listed tokens. Indeed,

---

[18] *Id.*

[19] *1inch (1INCH), Enjin Coin (ENJ), NKN (NKN) and Origin Token (OGN) are now available on Coinbase*, COINBASE (Apr. 9, 2021), https://www.coinbase.com/blog/1inch-1inch-enjin-coin-enj-nkn-nkn-and-origin-token-ogn-are-now-available-on.

[20] *1inch Price (1INCH)*, COINBASE, https://www.coinbase.com/price/1inch.

Coinbase's own public filings acknowledge that a substantial portion of the company's revenue derives from transaction fees generated when customers buy, sell, or trade digital assets on the platform.

58. On Coinbase's informational pages for 1INCH, the company solicited investment into the token by presenting market capitalization, price performance, and historical price information alongside investor-oriented tools designed to facilitate speculative trading.[21] Coinbase also hosted modeling tools and interfaces allowing users to evaluate potential returns from purchasing 1INCH under hypothetical investment scenarios, including price-prediction style tools that asked users to consider "If I invested today" outcomes based on projected price movements.[22]

59. Investors in 1INCH had a reasonable expectation of profits based on the efforts of others. The value of the 1INCH token depended entirely on the success and continued development of the 1INCH ecosystem, which was controlled and managed by the project's founders, developers, and affiliated entities. The growth of the purported 1INCH ecosystem, including the adoption of its infrastructure services, staking products, and developer tools, was dependent on the managerial and entrepreneurial efforts of these promoters. Coinbase's promotional materials reinforced the expectation that 1INCH's value would increase as the 1INCH ecosystem expanded.

60. The 1inch Network publicly touted that it planned to use funds raised to support the development of the 1inch Network and its ecosystem. For example, in December 2021, the1inch Network announced it had closed a $175M series B funding round, proclaiming that the "funding will be spent on facilitating an entry to the DeFi space for traditional financial institutions, building new protocols, creating additional utilities for the 1INCH token and scaling up the contributor

---

[21] *Id.*

[22] *See 1INCH Price prediction*, COINBASE, https://www.coinbase.com/price-prediction/1inch (allowing users to explore hypothetical future price scenarios and potential returns from purchasing 1INCH).

team."[23] As part of this announcement, 1inch also highlighted the "huge demand from valuable backers" and even listed several prominent financial institutions as having participated in the founding round, suggesting that these financial institutions would support 1inch's promises of creating and maintaining the 1inch Network.[24] This promotion of the Company's relationships with multiple venture capital firms indicated to potential investors that a purchase of a 1INCH token was an investment with the prospect of financial gain. The messaging to investors was straightforward: major venture capital firms believe there is money to be made from early investing in the 1inch Network, so investors should follow the "smart money" and also invest in 1inch via its 1INCH token while the price was purportedly undervalued.

61. Coinbase's interests were also aligned with those of 1INCH investors. Coinbase earned transaction-based revenue each time users purchased or sold 1INCH on its platform, including through trading fees and spreads embedded in customer transactions. Coinbase's public filings state that a significant portion of its revenues are generated from transaction fees derived from digital asset trading activity. By soliciting investors to purchase 1INCH and facilitating secondary market trading in the token, Coinbase directly benefited financially from increased trading volume in 1INCH.

62. Accordingly, 1INCH constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold 1INCH to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**2. Aave (AAVE)**

63. AAVE is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

---

23 *The 1inch Network closes a $175 mln Series B round*, 1INCH (Dec. 1, 2021), https://blog.1inch.com/the-1inch-network-closes-a-175-mln-series-b-round/.

24 *Id.*

64. Aave is a platform that allows users to lend, borrow, and earn interest on crypto assets. AAVE is the governance token for the Aave platform. AAVE has been available for trading on the Coinbase Platform since approximately December 14, 2020.

65. Aave was founded in 2017 by Stani Kulechov. The business, originally named ETHLend, raised $16.2 million in an initial coin offering (ICO) in 2017, during which time it sold 1 billion units of its AAVE cryptocurrency—originally named LEND. According to an ETHLend white paper, 300 million LEND were "held for development fund to incentivise the development team and to recruit more talent for ETHLend,"[25] aligning the fortunes of Aave's managers and developers with investors'. The white paper further stated: "The aim of the token sale is to provide a discounted participation for the early adopters of the global peer-to-peer lending market and further develop the global scale decentralized lending market. To provide a functional lending market to such extent, early adopters are required. By purchasing LEND, the early adopters receives [sic] a discounted price for using the decentralized lending platform."[26] The LEND cryptocurrency migrated to AAVE at a rate of 100 LEND tokens to 1 AAVE, with a total supply of 16 million AAVE. ETHLend was different from Aave in that, instead of pooling funds, it tried to match lenders and borrowers in a peer-to-peer fashion. In 2018, ETHLend was renamed Aave, which means "ghost" in Finnish. ETHLend became a subsidiary of Aave.

66. Kulechov's LinkedIn profile describes him as "Founder & CEO" of "Aave Labs," which in turn describes itself as a London-based entity that "created" Aave. Avara's website indicates that Aave Labs is a developer of the Aave Protocol, and that Aave Labs as being a subsidiary of Avara.[27] In public statements, Kulechov has identified himself as part of Aave Labs,

---

25 *ETHLend.io White Paper - Democratizing Lending*, GITHUB (Feb. 25, 2018), https://github.com/ETHLend/Documentation/blob/master/ETHLendWhitePaper.md.

26 *Id.*

27 *Introducing Avara and Announcing Our Acquisition of Family*, Avara (Nov. 16, 2023), https://avara.xyz/blog/introducing-avara-and-announcing-acquisition-of-family.

referring to him as founder and CEO of Aave Labs.[28] Aave also purports to have a degree of decentralized governance through its "DAO," through which Aave holders can participate in proposing, discussing, and voting on Aave governance matters. Aave Labs is a leading contributor to governance proposals in Aave's governance forum.

67. Aave features lending pools that enable users to lend or borrow a variety of different crypto assets, including ETH, BAT, and MANA tokens. Lenders deposit crypto assets they wish to lend, which are then collected into a liquidity pool. Borrowers may then draw from those pools when they take out a loan. As with other so-called "decentralized" lending platforms, Aave borrowers must post collateral before they can borrow. Lenders who supply liquidity receive interest paid by the borrowers, while the Aave platform itself also earns fees from the interest paid by borrowers, with these fees going to the "Aave Treasury." As of June 2024, the Aave platform had more than $20 billion dollars of deposits and was reportedly generating more than $115 million in annualized revenue.

68. AAVE investors reasonably expected profits from the efforts of Aave's managers, including Aave Labs and Kulechov, to grow and develop the Aave platform. As noted above, the Aave platform collects fees from interest paid by borrowers. Aave has publicly touted this fact and the amount of revenue it earns, including on the "FAQ" page of its website and in statements made by Aave's leadership.[29] Aave has frequently posted public updates about the Aave platform's development and expansion plans and achievements, including on its blog and X accounts. For example:

- In June 2024, Kulechov announced on the social media platform X (where he has more than 250,000 followers) that "Aave DAO is now earning $115 million

---

28 Stani Kulechov, LINKEDIN, https://uk.linkedin.com/in/stani-kulechov (last visited Mar. 12, 2026) (stating that Kulechov is the "Founder & CEO" of Aave).

29 *FAQ*, AAVE, https://aave.com/faq.

annualized. Let that sink in," a statement that was further broadcasted by crypto news platforms.[30]

- When Aave launched its own collateralized stablecoin (a cryptocurrency that aims to be pegged to a fiat currency such as the U.S. dollar) called GHO, it publicly stated that the move would "generate additional revenue for the Aave DAO by sending 100% of interest payments on GHO borrows to the DAO."[31]
- In March 2025, Aave Labs and Avara announced "Horizon, a new initiative building institutional DeFi [decentralized finance] products."[32] Aave elaborated, "Horizon's first product will enable institutions to use tokenized money market funds (MMFs) as collateral to access [crypto] stablecoin liquidity . . . . The goal is to position the Aave ecosystem as the preferred liquidity and infrastructure layer for institutional DeFi and as a leader in the real-world assets (RWAs) space . . . . As traditional finance and DeFi converge, Horizon will broaden institutional access to onchain capital, accelerating the adoption of Aave and enabling borrowing against RWAs at scale."[33] Similarly, in a March 2025 LinkedIn Post promoting Horizon, Kulechov described Horizon as "our new initiative at Aave Labs focused on building institutional DeFi products," touting, "Now, through Horizon, we're bringing Aave's tech to institutions and moving closer to becoming a pillar of global finance."[34]

---

[30] *Aave tops $20 billion in deposits amid record revenue and fee switch discussions*, CRYPTOSLATE (Jun. 5, 2024), https://cryptoslate.com/aave-tops-20-billion-in-deposits-amid-record-revenue-and-fee-switch-discussions/.

[31] *Introducing: GHO*, AAVE (Jul. 2022), https://governance.aave.com/t/introducing-gho/8730.

[32] *Aave Horizon: The DeFi Catalyst for Institutional RWAs*, AVARA (Mar. 13, 2025), https://avara.xyz/blog/horizon.

[33] *Id.*

[34] Stani Kulechov, LINKEDIN, https://www.linkedin.com/posts/stani-kulechov-361284132_introducing-project-horizonour-new-initiative-activity-7305953835712151552-r4Zd/ (last visited Mar. 12, 2026).

69. The AAVE token also offers holders several benefits that would further lead AAVE investors to reasonably expect to profit from Aave's operation and growth. AAVE holders may participate in governance and vote on changes to Aave's business, a benefit that becomes more valuable as the Aave platform grows in size and revenue. For example, AAVE holders can vote on Aave Improvement Proposals (AIPS) that expand the platform's lending capacity and thus the value of the AAVE token. Borrowers who use AAVE as collateral on the Aave platform get a discount on fees, and can borrow larger amounts. AAVE owners can further look at loans before they are released to the general public if they pay a fee in AAVE. Aave also features what it calls a "Safety Module," where participants can stake their AAVE to act as insurance in case of a liquidity deficit.[35] Doing so earns stakers more AAVE tokens, along with a percentage of the protocol fees. Moreover, as Aave states, "AAVE tokens can be supplied to liquidity pools within the Aave Protocol, or external pools such as decentralised exchanges, allowing users to earn yield."[36] AAVE investors have also had a reasonable expectation of profit from the possibility that Aave might distribute transaction fees for loans executed on its platform to AAVE holders, similar to a dividend, or repurchase AAVE tokens on the open market and distribute them to holders of AAVE. These possibilities have been proposed and discussed on multiple occasions in Aave's governance forum, with crypto news sources reporting on the proposals and noting the substantial revenues Aave generates. Indeed, in March 2025, Kulechov publicized one such proposal on the social media site X, announcing a "New Aavenomics update" and calling the proposal a "Fee Switch on steroids," meaning a governance change that would effectively redirect significant fees earned by Aave to AAVE holders.[37] In addition, AAVE's finite supply further contributes to AAVE investors' reasonable expectation of profit.

---

35 Safety Module, AAVE, https://app.aave.com/safety-module/.

36 *AAVE Introduction*, AAVE, https://aave.com/docs/ecosystem/aave.

37 *DeFi Lender Aave Weighs Changing Tokenomics to "Fee Switch on Steroids,"* THE DEFIANT (March 4, 2025), https://thedefiant.io/news/defi/defi-lender-aave-weighs-changing-tokenomics-to-fee-switch-on-steroids.

70. Coinbase has advertised that AAVE's "unique selling points include the ability to lend and borrow in a variety of cryptocurrencies, offering users a variety of choices," and that it "allows borrowers to switch between fixed and variable interest rates, providing flexibility based on market conditions."[38]

71. AAVE peaked at a price of approximately $661.69 per token and a market capitalization of approximately $8.0 billion on May 18, 2021. As of March 12, 2026, it traded at around $135.28, with a market capitalization of $2.0 billion—reflecting a price drop of approximately 79% and a loss of approximately $6.3 billion in market value.

72. Accordingly, AAVE constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold AAVE to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**3. Alchemy Pay (ACH)**

73. ACH is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Alchemy is an Ethereum token that powers Alchemy Pay, a platform that enables payments using a wide variety of fiat and cryptocurrencies. Fees are paid using the ACH token and users can earn ACH rewards for purchases.

74. Coinbase announced on August 2, 2021 that ACH was "launching on Coinbase Pro."[39] The following day, Coinbase announced that that ACH was available on the main Coinbase retail platform.[40]

---

[38] *Aava Price (AAVE)*, COINBASE, https://www.coinbase.com/price/aave.

[39] *Alchemy Pay (ACH), PlayDapp (PLA) and Rai Reflex Index (RAI) are launching on Coinbase Pro*, COINBASE (Aug. 2, 2021), https://www.coinbase.com/blog/alchemy-pay-ach-playdapp-pla-and-rai-reflex-index-rai-are-launching-on-coinbase-pro.

[40] *Alchemy Pay (ACH) and Rai Reflex Index (RAI) are now available on Coinbase*, COINBASE (Aug. 3, 2021), https://www.coinbase.com/blog/alchemy-pay-ach-and-rai-reflex-index-rai-are-now-available-on-coinbase.

75. Coinbase's ACH-related web funnel solicits investors to purchase ACH. First, Coinbase maintains an ACH "price" page with a "Buy Alchemy Pay" prompt, "Trading Insights" metrics (buyer ratio, number of buyers/sellers, and trade counts), and other investor-facing market data.[41] Coinbase provides an ACH "price prediction" page that uses explicitly investment-framed language "If I invested today" to display a "Predicted Total in 5 years," and it places a "Buy Alchemy Pay" call-to-action in immediate proximity to the prediction output.[42]

76. Accordingly, ACH constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold ACH to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**4. ArcBlock Token (ABT)**

77. ABT is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

78. ABT is a token issued on the Ethereum blockchain. ArcBlock, Inc. and related entities operate the ArcBlock Network, which purports to provide infrastructure for building and deploying decentralized applications and blockchain services.[43] The ArcBlock ecosystem promotes tools for developers to create blockchain-based applications, decentralized identity systems, and Web3 services. The ABT token is marketed as a utility token within the ArcBlock ecosystem and is used to pay for services on the network and to participate in certain network activities. Despite this characterization, the token was promoted to investors as an asset whose value would increase as the ArcBlock platform and ecosystem grew.

---

41 *Alchemy Pay Price (ACH)*, COINBASE, https://www.coinbase.com/price/alchemy-pay.

42 *ACH price prediction*, COINBASE, https://www.coinbase.com/price-prediction/alchemy-pay.

43 *See Arcblock Price (ABT)*, COINBASE, https://www.coinbase.com/price/arcblock.

79. ABT first became available to trade on the Coinbase Pro platform in July 2022. Coinbase publicly announced that it would add support for ArcBlock (ABT) on the Ethereum network and advised users that inbound transfers of ABT would be accepted prior to the commencement of trading. Coinbase stated that trading would begin once sufficient liquidity conditions were met and it identified the trading pairs that would be supported on the platform. These listing announcements encouraged investors to transfer ABT to Coinbase ahead of trading and generated market attention surrounding the availability of the token on Coinbase's exchange.[44]

80. Shortly thereafter, ABT became available to trade on the retail Coinbase platform. Coinbase promoted the availability of ABT through public communications inviting users to access the token through its exchange and encouraging investors to "buy," "sell," "convert," "send," "receive," and "store" ABT on Coinbase. Coinbase also launched informational asset pages for ABT designed to provide investors with details about the token and facilitate trading activity. These pages included price charts, market capitalization information, circulating supply data, trading volume statistics, and other information typically used by investors evaluating speculative digital asset investments.

81. Coinbase further solicited investment in ABT through its educational and onboarding materials. Coinbase maintained "How to Buy ArcBlock" guides that walked users through the process of opening a Coinbase account, connecting a payment method such as a bank account or debit card, and completing a purchase of ABT through the Coinbase platform.[45] These guides explicitly instructed users that they could "buy ArcBlock on Coinbase's centralized exchange" and directed investors to complete a purchase through a "Buy now" transaction interface.[46]

---

[44] *See Coinbase Assets*, THREADREADER (July 20, 2022), https://threadreaderapp.com/thread/1549784543363743744.html.

[45] *How to buy Arcblock on Coinbase in United States*, COINBASE, https://www.coinbase.com/how-to-buy/arcblock.

[46] *Id.*

82. Coinbase also hosted investor-focused tools on its website designed to encourage speculative investment in ABT. These tools included pricing interfaces, conversion calculators showing the cost of purchasing specific quantities of ABT, and price-prediction style tools that modeled potential future price movements for the token over multi-year time horizons. These interfaces encouraged users to consider hypothetical returns based on projected price increases and directed investors toward purchasing the token on Coinbase's platform.[47]

83. Coinbase promoted the availability of ABT through its official communications channels, including social media accounts used to announce newly listed assets. These listing announcements are widely understood in the cryptocurrency markets to function as market-moving events that attract investor attention and trading activity to newly listed tokens. Regulators have previously alleged that prices of newly listed crypto assets frequently increase following Coinbase listing announcements because of the influx of new investors trading on the platform.

84. Investors in ABT had a reasonable expectation of profits based on the efforts of others. The value of the ABT token depended entirely on the success and continued development of the ArcBlock Network and its ecosystem of blockchain infrastructure products. The growth of the platform, including the adoption of ArcBlock's development tools, decentralized identity systems, and application infrastructure, was dependent on the managerial and entrepreneurial efforts of ArcBlock's founders, developers, and affiliated entities. Coinbase's promotional materials reinforced the expectation that ABT's value would increase as the ArcBlock ecosystem expanded.

85. Coinbase's financial interests were also aligned with those of ABT investors. Coinbase earns transaction-based revenue each time users purchase or sell digital assets on its platform, including through trading fees and spreads embedded in customer transactions. Coinbase's public filings acknowledge that a substantial portion of the company's revenues are derived from transaction fees generated when customers buy, sell, or trade digital assets through

---

[47] *See ABT price prediction*, COINBASE, https://www.coinbase.com/price-prediction/arcblock.

Coinbase's exchange. By soliciting investors to purchase ABT and facilitating secondary market trading in the token, Coinbase directly benefited financially from increased trading activity in ABT.

86. Accordingly, ABT constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold ABT to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**5. Cardano ("ADA")**

87. ADA is the native token of the Cardano blockchain. ADA can be bought and sold for fiat currency or other crypto assets on numerous secondary trading platforms. According to statements by Coinbase, ADA has been available for trading on the Coinbase Platform since approximately March 2021.

88. Ethereum co-founder Charles Hoskinson and an Ethereum operations manager Jeremy Wood created the Cardano blockchain in 2015. According to Cardano's website, the Cardano blockchain protocol is built on its own proof-of-stake consensus protocol called Ouroboros, which is purportedly energy efficient. Hoskinson and Wood created ADA and purported to limit the supply of ADA to 45 billion. From 2015 to 2017, Input Output Hong Kong ("IOHK"), a company founded by Hoskinson and Wood, sold approximately 25.9 billion ADA in exchange for bitcoin, at what equates to an average price of $0.0024 per token. This sale raised approximately $62 million for Cardano.

89. There are currently three entities that are responsible for Cardano: (1) the Cardano Foundation, a Swiss entity that is the legal custodian of the Cardano protocol and owner of its brand; (2) IOHK, an engineering company controlled by Hoskinson and Wood responsible for designing, building, and maintaining the Cardano blockchain; and (3) Emurgo, an entity with offices in New York and California that, according to its website, is "essentially the for-profit arm of Cardano," and, according to its website, "provides products and services to drive the adoption

of Cardano's Web3 ecosystem" endeavoring "to advance the platform and drive adoption through commercial ventures."[48] Cardano's website explains that "IOHK develops the technology, the Cardano Foundation is responsible for supervising development and promoting Cardano, while Emurgo drives commercial adoptions."[49] These three entities collectively received 5.2 billion ADA following the initial mining of ADA, or approximately 16.7% of the initial token supply of 31.1 billion ADA.

90. The Cardano Foundation, IOHK, and Emurgo used the proceeds from ADA sales to fund the development, marketing, business operations, and growth of the Cardano protocol. For example, investor funds were used to enact the Cardano Roadmap created by IOHK—specifically, to develop each of the Cardano development "eras."[50]

91. Based on the information publicly disseminated by Cardano, IOHK, and Emurgo—including since the initial sales of ADA—ADA holders, including Oregonians who purchased ADA in or after March 2021, reasonably viewed ADA as an investment in and expect to profit from the Cardano Foundation's, IOHK's, and Emurgo's efforts to grow the Cardano platform, which, in turn, would increase the demand for and the value of ADA.

92. In public statements on Twitter and other social media, as well as on their respective websites, including statements made and available after ADA became available to trade on the Coinbase Platform, the Cardano Foundation, IOHK, and Emurgo have described their expertise in developing blockchain networks and the efforts they have made and will continue to make to develop the Cardano protocol and blockchain and attract users to the technology. Such statements include, for example: (a) a blog post by IOHK in or around September 2021 about the deployment of smart contracts capabilities on the protocol, which supposedly would "enable[e] a host of new

---

[48] *Discover Cardano*, CARDANO, https://cardano.org/discover-cardano/.

[49] *What is Cardano?*, CARDANO ROADMAP, https://roadmap.cardano.org/en/.

[50] *Development phases and eras*, CARDANO, https://docs.cardano.org/about-cardano/evolution/eras-and-phases.

use cases for decentralized applications";[51] (b) a blog post by IOHK in or around November 2022 describing its efforts to introduce "innovations, new functionality, and new features" to the blockchain; (c) posts on Twitter by the Cardano Foundation touting ADA's listing on various cryptocurrencies exchanges; (d) a blog post by IOHK on or around November 17, 2022 extolling that ADA could be traded "on more than 30 cryptocurrency exchanges," and describing IOHK's plans to "improv[e] the underlying performance of the Cardano network to better support growth and adoption of thousands of applications with high transaction volumes";[52] and (e) a blog post by Cardano in January 2025 describing Cardano's "evolution into a community-governed blockchain platform" and its "aim[] to support billions of users by 2030" by improving "usability" to "drive widespread adoption" of the blockchain.[53]

93. Coinbase has promoted ADA as an investment. When Coinbase listed ADA for trading, Coinbase promoted the listing on its website. Coinbase maintains an information page about ADA, including a "Cardano news" section highlighting "[t]rending articles" regarding Cardano and ADA.[54] For example, Coinbase's information page included an excerpt from a Coinbase article called "Whale street: How big-money institutional investors are preparing for the next bull run," which featured the following statement: "As crypto markets have risen from their slumber this year, institutional investors from Wall Street, Silicon Valley, and beyond are paying attention."[55] Major firms are increasing their investments in crypto, crypto-oriented venture funds are busy raising and deploying capital, and many of the world's biggest banks are exploring blockchain-native financial products like tokenized treasuries and loans. Institutions are showing

---

[51] Tomiwabold Olajide, *Cardano Users Should Watch These Crucial Dates on Road to Vasil: Details*, UTODAY (Sep. 14, 2022), https://u.today/cardano-users-should-watch-these-crucial-dates-on-road-to-vasil-details.

[52] *How Binance Sold the ADA Token as an Unregistered Security*, HACKERNOON (Sep. 24, 2023), https://hackernoon.com/how-binance-sold-the-ada-token-as-an-unregistered-security.

[53] Mike Ward, *What's next for Cardano?*, INPUT | OUTPUT (Jan. 29, 2025), https://www.iog.io/news/what-s-next-for-cardano.

[54] *Cardano Price (ADA)*, COINBASE, https://www.coinbase.com/price/cardano.

[55] *A key BTC metric just hit a new high*, COINBASE (Nov. 8, 2023), https://www.coinbase.com/bytes/archive/a-key-btc-metric-just-hit-a-new-high.

rising enthusiasm for altcoins, with investment in products focused on Cardano ($0.5 million) growing last week.[56]

94. In March 2025, Coinbase highlighted a BeInCrypto article stating that, "[d]espite a 16.8% decline, Cardano traders remain bullish as key indicators suggest a recovery."[57] The same webpage also highlighted "potential use cases for ADA," claiming that "Cardano's supports a wide range of use cases," noting that "a the platform has been used by agricultural companies to ensure transparency in the supply chain, tracking produce from field to table," and "[e]ducational institutions have leveraged Cardano's blockchain network to store credentials in a tamper-proof system, while retailers use it to combat counterfeit goods."[58] The webpage further proclaims that "[t]he introduction of smart contracts with the Alonzo upgrade has expanded Cardano's potential into areas like DeFi and NFT marketplaces" and that Cardano's "goal to process high volume transactions quickly and efficiently makes Cardano a potential choice for developers aiming to build innovative digital assets and applications."[59]

95. Coinbase's webpage about ADA also includes "Analysis" featuring what "Bulls say" and what "Bears say," with the "bull" case for investing in ADA emphasizing Cardano's "significant" 2023 updates which "demonstrat[e] their desire to innovate and add new functionalities to the network."[60] Coinbase also promoted an update that allows Ethereum application developers to build on Cardano's network without the need to install new toolkits or learn a new computer language, expanding the ecosystem's usefulness.

96. ADA peaked at a price of approximately $3.09 per token and a market capitalization of approximately $95.0 billion on September 2, 2021. As of March 12, 2026, it

---

56 *Id.*

57 *Cardano Price Pulls Away From $1 After 9% Drop, Yet Traders Seem Optimistic*, BEINCRYPTO, https://www.bitget.com/amp/news/detail/12560604627194.

58 *Cardano Price (ADA)*, COINBASE, https://www.coinbase.com/price/cardano.

59 *Id.*

60 *Id.*

traded at around $0.62 with a market capitalization of approximately $22.3 billion—reflecting a price drop of about 80% and a loss of approximately $72.6 billion in market value.

97. Accordingly, ADA constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold ADA to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**6. Algorand (ALGO)**

98. ALGO is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

99. "ALGO" is the native token of the Algorand blockchain. ALGO was listed for trading on the Coinbase Platform in or around July 2020.

100. Algorand is a blockchain protocol founded by Silvio Micali. The Algorand blockchain uses a consensus algorithm it calls "Pure Proof-of-Stake," in which each user's ability to influence the choice of a new block is proportional to its stake (number of tokens) in the system.[61] Because ALGO is the native token of the Algorand blockchain, those utilizing the Algorand blockchain need to hold (and potentially stake) certain amounts of ALGO. ALGO has a maximum supply of 10 billion, which were minted at the launch of the Algorand network.

101. The Algorand Foundation Ltd. (the "Algorand Foundation") conducted an initial ALGO token sale on or about June 19, 2019, selling 25 million tokens at $2.40 per ALGO, raising approximately $60 million. In advance of the token sale, the Algorand Foundation promoted the token sale on Twitter and included a link to its website.

102. The Algorand Foundation promoted the June 19, 2019 token sale in part with a refund policy that allowed ALGO investors to return the ALGO to the Algorand Foundation later at 90% of the original purchase price. The Algorand Foundation explained the economic rationale

---

[61] *Reaching consensus through Pure Proof-of-Stake*, ALGORAND, https://algorand.co/technology/pure-proof-of-stake.

behind the refund policy by noting its own belief in and commitment to the value of ALGO: "The Algorand Foundation believes in the underlying value of the Algorand blockchain, the Algo, and the potential of the borderless economy. Our goal is to invest in the growth, sustainability and performance of that economy."

103. In other words, in promoting the ALGO token sale, the Algorand Foundation tied the potential growth of the Algorand blockchain to potential demand for the ALGO token itself, and to its own commitment to preserving a price floor for ALGO.

104. In or around August 2019, the Algorand Foundation publicly offered ALGO investors an early refund opportunity, and ALGO investors returned a total of approximately 20 million ALGO tokens to the Algorand Foundation in exchange for a refund that was 85% of the original purchase price. In or around June 2020, ALGO investors who did not refund their ALGO tokens in August 2019 were publicly offered a second refund window.

105. Through its rewards programs and incentive structures, the Algorand Foundation continued distributing tokens after the June 2019 token sale. As of March 2025, approximately 8.5 billion ALGO were in circulation.

106. There are currently two entities that are responsible for Algorand: (1) the Algorand Foundation, an organization purportedly focused on Algorand "protocol governance, token dynamics and supporting grassroots, open-source development on the Algorand ecosystem," which was incorporated in Singapore; and (2) Algorand, Inc., a company purportedly focused on "layer-1 development of the Algorand Protocol and enabling Enterprise adoption of Algorand blockchain technology."

107. The Algorand Foundation and Algorand, Inc. purportedly collaborate on projects and initiatives for the Algorand community.

108. Shortly before the June 19, 2019 ALGO token sale, Steven Kokinos, the CEO of Algorand, Inc., posted a publicly available article stating: "(a) We will be holding our founder's tokens for the long term and will not be selling them. (b) We will use our founder's tokens to participate in consensus and assist in securing the network, though we will never represent more

than 49% of the voting. (c) We will use our founder's tokens to support the ecosystem and encourage development."

109. The Algorand Foundation purportedly owns 1.645 billion ALGO tokens and the participation and governance rewards associated with those tokens. Also, according to the SEC, members of the Algorand Foundation's board of directors and its advisory committees receive ALGO as compensation.

110. In addition to the tokens it owns, as of December 31, 2024, the Algorand Foundation also controls over 1.6 billion ALGO tokens in wallets publicly identified as for "Governance and Community Rewards," "Market Operations," "Fee Sink," and "Foundation Treasury," signaling to the public that the Algorand Foundation would use the ALGO tokens to support the ALGO economy or ecosystem as well as to reward itself and participants in this ecosystem.

111. Based on the information Algorand, Inc. and the Algorand Foundation publicly disseminated, investors reasonably viewed ALGO as an investment in and expected to profit from Algorand, Inc.'s and the Algorand Foundation's efforts to grow the Algorand protocol, which, in turn, would increase demand for and value of ALGO.

112. In public statements on Twitter, as well as on their respective websites, Algorand, Inc. and the Algorand Foundation promoted the Algorand protocol.

113. The Algorand Foundation told the investing public that ALGO investors could receive participation rewards (purportedly a form of staking by delegation) by "participation in the Algorand ecosystem via holding Algo in an online wallet.[62]"

114. Later, the Algorand Foundation publicly stated that it would replace the participation rewards that ALGO holders were entitled to receive with so-called governance rewards. The Algorand Foundation described "Governance" as a way for investors to make

[62] *Algorand Foundation*, FACEBOOK (Jan. 14, 2021), https://www.facebook.com/AlgorandFoundation/photos/a.406639173221169/799861203898962/?type=3.

investment returns on their ALGO purchases—stating it is "a decentralized program which allows Algo holders to vote on the future of Algorand."[63] For example, the Algorand Foundation advertised that "Governors who register and stake Algos for a three month period during the sign up phase will be entitled to vote on the voting measures put forward by the Foundation in the voting phase, and will then receive rewards in the rewards phase."[64] The Algorand Foundation also indicated on at least one occasion that participating in governance was "the best way to earn rewards for holding Algo, with APY% of 10.02% - 14.05% seen in previous periods."[65]

115. The Algorand, Inc. and Algorand Foundation websites tout their technical experience and expertise in the areas of cryptography and business development. For example, Algorand, Inc.'s website states: "Algorand Technologies employs the industry's most accomplished professionals across engineering and research, cryptography, and product development."[66]

116. A January 2024 report explained that "[t]he Algorand Foundation is a not-for-profit organization focused on ecosystem initiatives like governance, funding Algorand-based projects, building developer tooling, and encouraging grassroots development."[67]

117. Algorand, Inc. and the Algorand Foundation have also taken steps to incentivize third parties to participate in and attract users to the ALGO protocol. For example, in or around February 2022, the Algorand Foundation announced a $10 million incentive for developers that can make the Algorand blockchain compatible with applications built on the Ethereum blockchain.

---

63 *Claim from Algo Rewards Program*, ALGORAND, https://algoreward.com/ (last visited Mar. 12, 2026).

64 *Id.*

65 *The SEC Comes for Bittrex*, BLOOMBERG (Apr. 17, 2023), https://www.bloomberg.com/opinion/articles/2023-04-17/the-sec-comes-for-bittrex.

66 *Leadership Team*, ALGORAND TECHS., https://algorandtechnologies.com/our-team/.

67 Micah Casella, *Algorand Q4 2023 Brief*, MESSARI (Jan. 18, 2024), https://messari.io/report/algorand-q4-2023-brief.

118. Also in February 2022, the Algorand Foundation announced on social media a section of its website called AlgoHub, which it touted as "a virtual community designed to grow the pipeline of #Algorand developers."[68]

119. Based on statements such as those alleged above, ALGO investors reasonably expected to profit from Algorand, Inc.'s and Algorand Foundation's efforts to increase demand for the Algorand technology, thereby resulting in a price increase for ALGO.

120. ALGO peaked at a price of approximately $3.09 on June 20, 2019, and reached its highest market capitalization of approximately $13.4 billion on November 12, 2021. As of March 12, 2026, it traded at around $0.18 and its market capitalization was approximately $1.6 billion—reflecting a price drop of nearly 95% and a loss in market value of approximately $11.5 billion.

121. Accordingly, ALGO constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold ALGO to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**7. AMP (AMP)**

122. AMP is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

123. AMP is an Ethereum-based token that was created by Flexa Network, Inc. ("Flexa"), a company incorporated in Delaware and headquartered in New York, New York. Flexa operates what has been described as a digital merchant payment network designed to enable rapid, universal, and secure processing of digital asset transactions (the "Flexa network").

124. AMP can be bought and sold on numerous secondary trading platforms, including the Coinbase Platform, where it has been available for trading on the Coinbase Platform since approximately June 8, 2021.

---

[68] Algo Foundation (@AlgoFoundation), X (Feb. 17, 2022 at 16:48), https://x.com/AlgoFoundation/status/1494428612665225218?s=20.

125. Flexa claims that the Flexa network facilitates the use of crypto assets to make everyday purchases. Customers seeking to use crypto assets link their wallets to Flexa. When the customer makes a purchase, Flexa states that deducts the equivalent value of crypto assets from the customer's wallet, pays the merchant immediately in either fiat or a convertible digital currency of its choice, and collects payment processing fees from the merchant Flexa states that the AMP token serves as collateral to decentralize risk within the Flexa network. Flexa describes this process as follows: (1) AMP holders stake their AMP tokens in blockchain-based collateral pools, where they are used to guarantee transactions taking place on the Flexa network; (2) when a transaction takes place on the Flexa network, a collateral manager holds AMP tokens equal to the fiat value of the transaction in escrow while Flexa converts the crypto asset into fiat currency to settle the transaction; (3) once the transaction settles, the AMP tokens held as collateral are released from escrow and are available to guarantee another transaction; and (4) if the transaction fails, the AMP tokens are liquidated. Flexa uses fees that it collects from merchants to purchase AMP on the open market and distributes those AMP tokens as a reward to those who stake AMP based on a pro rata shares of the tokens that were staked in the collateral pool. These rewards can lead to further profit for AMP holders.

126. AMP is the successor token to Flexacoin, which was developed in February 2018 by Flexa's CEO, Tyler Spalding. Between February 2018 and April 2019, Flexa sold 12 billion Flexacoins in private sales to groups of accredited investors and token funds, raising over $14 million in April 2019 alone. While the Flexa network was not yet operational at the time, Flexa has claimed that "[t]he proceeds from this token sale have helped us continue to build out the Flexa network through additional merchant integrations and relationships with critical infrastructure partners."[69]

127. In April 2019, Flexa announced that the supply of Flexacoins would be capped at 100 billion tokens and that the Flexacoins would ultimately be allocated as follows: 10% to a

---

69 *Introducing Flexacoin*, MEDIUM (Apr. 25, 2019), https://medium.com/flexa/introducing-flexacoin-b4c8099e3a91.

Network Development Fund; 20% to token sales; 20% to a Founding Team and Employee Pool; 25% to a Merchant Development Fund; and 25% to Developer Grants. The Flexa network launched in May 2019.

128. To help collateralize the Flexa network, in November 2019, Flexa announced a plan to distribute 1 billion Flexacoin from its Network Development Fund as rewards to those who provides capacity on the Flexa network. In January 2020, Flexa began public sales to investors of an additional 4.5 billion Flexacoins.

129. In September 2020, Flexa migrated the collateral function on the Flexa network from Flexacoins to the newly developed AMP token. Flexa allowed Flexacoin holders to exchange their tokens for AMP at a 1:1 ratio. Flexa's management explained that "[b]ecause of the nature of the interfaces required to implement the new capabilities of Amp, it wouldn't have been possible to simply upgrade the Flexacoin token."[70] Like Flexacoin, Flexa limited the supply of AMP to 100 billion tokens. On September 30, 2020, Flexa stopped using Flexacoins and began using AMP as collateral for transactions on the Flexa network.

130. Purchasers of AMP, and purchasers of Flexacoin before them, have invested in a common enterprise. Flexa has pooled proceeds from its sales of Flexacoin and AMP in order to fund development and growth of the Flexacoin platform. Moreover, as Flexa stated in the May 2019 Flexacoin white paper, "Flexacoin is staked to collateralize every payment on the Flexa network."[71] And, when it switched to AMP, Flexa similarly explained in its November 2020 AMP white paper, Flexa explained that "participants stake AMP into pools that secure the network."[72] These collateral pools, comprised entirely of Amp, are what allow Flexa to operate. Or, as Flexa

70 *Flexa Capacity is migrating to Amp*, MEDIUM (Sep. 8, 2020), https://medium.com/flexa/flexa-capacity-is-migrating-to-amp-636bd94e1241.

71 *Flexa Network Whitepaper*, FLEXA (May 2019), https://flexa.network/whitepaper.pdf.

72 *Amp: A digital collateral token to enable immediate settlement of payment transactions*, AMP TOKEN (Nov. 24, 2020), https://4079620000-files.gitbook.io/~/files/v0/b/gitbook-x-prod.appspot.com/o/spaces%2FbUyUOpvS5Hnfel4aMnVz%2Fuploads%2F8ZKNS6MmVMUQaiN2BidF%2FAmp%20Whitepaper.pdf?alt=media&token=66f22011-0b4c-42d7-8a2c-17eaea145ee1.

explained in the AMP white paper, the "Amp token serves as the singular type of collateral within Flexa to decentralize risk within the network."[73] Investors who stake AMP can earn rewards when the collateral pools are successful. Coinbase has advertised that "Amp supports a wide variety of use cases for collateralization," including "to collateralize any account, application, or transaction, providing a versatile solution for value transfer activities." As an example, Coinbase explains that "Amp can be used to collateralize payment networks, enabling instant, fraud-free payments to merchants across digital payment networks."

131. AMP investors also share a common interest with Flexa's management. Flexa explained in an April 2019 Medium post that 20% of the total percentage of Flexacoin was reserved for the Founding Team and Employee Pool to "incentiviz[e] current and future Flexa team members. All supply from this allocation will be distributed on a four-year vesting schedule."[74]

132. Investors in Flexacoin/AMP reasonably expected to profit based on the efforts of others. From the start, Flexa has regularly emphasized the profit opportunity for AMP holders. For example:

- The AMP white paper explained that AMP "serves as a medium for accruing value" and "continuously appreciates in value as a direct result of its utility" within the Flexa network.[75]
- The AMP white paper also stated that "Amp token pricing is based on user demand for staking yield, spending utility, and, expectation of future productivity growth."[76]

---

[73] *Id.*

[74] *Introducing Flexacoin*, MEDIUM (Apr. 25, 2019), https://medium.com/flexa/introducing-flexacoin-b4c8099e3a91.

[75] *Amp: A digital collateral token to enable immediate settlement of payment transactions*, AMP TOKEN (Nov. 24, 2020), https://4079620000-files.gitbook.io/~/files/v0/b/gitbook-x-prod.appspot.com/o/spaces%2FbUyUOpvS5Hnfel4aMnVz%2Fuploads%2F8ZKNS6MmVMUQaiN2BidF%2FAmp%20Whitepaper.pdf?alt=media&token=66f22011-0b4c-42d7-8a2c-17eaea145ee1.

[76] *Id.*

- The white paper further explained that as Amp's "token price increases, adoption (*i.e.*, staking) increases, and the AMP staking cycle becomes systematic and more correlated to consumption."[77]

- The white paper further claimed that participants that stake AMP into the collateral pools are entitled to receive additional AMP tokens on a pro-rata basis as "network rewards."[78] These rewards are derived from the "entirety of network transaction revenue," which includes fees charged to merchants.[79] This transaction revenue, in turn, "funds the continuous open-market purchase of Amp tokens for redistribution as network rewards."[80] Accordingly, the number of AMP tokens distributed as network rewards grows as the number and value of transactions on the Flexa network—and the revenue generated from those transactions— increases Flexa's August 2019 description of Flexacoin, AMP's predecessor, also reinforced the potential rewards for investors: "Stakers don't collateralize Flexa payments purely out of the goodness of their hearts . . . . Rather, as incentive for deploying Flexacoin as collateral—and to compensate the risk they incur when collateralizing unproven apps on the network—stakers earn the network reward generated after every successful payment confirmation."[81] As described above, Flexa's management team maintains these collateral pools.

133. Flexa has continually promoted the availability of AMP (and previously, Flexacoin) to be bought and sold on secondary trading platforms. For example:

- On July 9, 2019, Flexa posted on its blog that Flexacoin was now available to buy and sell on a secondary market platform, making it "*easier than ever* for people all

---

77 *Id.*

78 *Id.*

79 *Id.*

80 *Id.*

81 *A quick primer on Flexacoin staking*, MEDIUM (Aug. 21, 2019), https://medium.com/flexa/a-quick-primer-on-flexacoin-staking-4923fcc994b7.

over the world to take part in Flexa's vision of mainstream cryptocurrency payments, and soon, to stake those payments themselves while earning rewards for collateralizing every purchase."[82]

- Flexa repeatedly publicized the listing of AMP on additional secondary trading markets and crypto trading platforms. According to the SEC, Flexa also sought to facilitate such listings.

134. The May 2019 Flexacoin white paper made clear that the co-founders and a small number of employees were responsible for Flexa's administrative, marketing, and technical development. Further, as noted above, Flexa's founders and management team held 20 billion of the total 100 billion Flexacoin (and therefore hold the same number of AMP tokens) to "incentiviz[e] current and future Flexa team members."[83]

135. Flexa and its founders have continued to emphasize their importance to the future success of the Flexa network and Amp. For example:

- In a September 8, 2020 Medium post, Flexa stated that "we take our responsibility to the Flexa community very seriously," and "we recognize our great fortune in being able to build the future of payments on top of revolutionary software like Bitcoin, Ethereum, and the various platforms that collectively represent DeFi."[84]
- On June 18, 2020, the CEO and co-founder of Flexa bragged in a YouTube video how the efforts of the founders had built the AMP network from the ground up and created an open network.
- In a January 28, 2021 Flexa blog post, the founders detailed the many improvements they have made to the network, including partnerships and upgrades.

---

82 *Enabling cryptocurrency payments for even more people*, MEDIUM (Jul. 9, 2019), https://medium.com/flexa/cryptocurrency-payments-for-even-more-people-5bd38b11d8a4.

83 *Introducing Flexacoin*, MEDIUM (Apr. 25, 2019), https://medium.com/flexa/introducing-flexacoin-b4c8099e3a91.

84 *Flexa Capacity is migrating to Amp*, MEDIUM (Sep. 8, 2020), https://medium.com/flexa/flexa-capacity-is-migrating-to-amp-636bd94e1241.

- In an August 15, 2024 post on its website, Flexa stated that "[w]e built Flexa to enable fast, affordable digital currency acceptance that has completely eliminated loss due to fraud," and that "we're here to make the transition to these new, fast, and more efficient payment rails as smooth and worthwhile as possible. In fact, it's our entire mission: to help sellers thrive in the next era of commerce."[85]

136. Throughout 2021 and 2022, Flexa's management has continued to issue blog posts highlighting continued improvements and greater acceptance of the Flexa network and the AMP token. For example, in February 2025, Flexa announced the "release [of] the third generation of Flexa Capacity," which it described as a "massive upgrade" that "revolutionizes the way Flexa uses Amp collateral and rewards collateral providers."[86]

137. AMP peaked at a price of approximately $0.12 per token and a market capitalization of approximately $5.7 billion on June 16, 2021. As of March 12, 2026, it traded at around $0.0036, with a market capitalization of approximately $305 million—reflecting a price drop of approximately 97% and a loss of approximately $5.4 billion in market value.

138. Accordingly, AMP constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold AMP to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**8. Avalanche (AVAX)**

139. AVAX is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

---

85 *Transforming transactions: Introducing Flexa Components*, FLEXA (Aug. 15, 2024), https://flexa.co/newsroom/transforming-transactions.

86 *Introducing Flexa Capacity v3—a new era for onchain collateralization*, FLEXA (Feb. 26, 2025), https://flexa.co/newsroom/capacity.

140. AVAX is the native token associated with the Avalanche blockchain platform. Coinbase describes Avalanche as an open, programmable smart contracts platform for decentralized applications and represents that AVAX is used to pay transaction fees and can be staked to help secure the network.[87]

141. Coinbase announced on September 29, 2021 that AVAX was "launching on Coinbase Pro."[88] Coinbase instructed customers to "transfer AVAX" into their Coinbase Pro accounts "ahead of trading," and stated that trading would begin "on or after 9AM Pacific Time" on September 30, 2021 (subject to liquidity).[89] Coinbase also invited customers to "sign up" for an account "to start trading."[90] The following day, Coinbase announced that "Avalanche (AVAX) is available on Coinbase.com and in the Coinbase Android and iOS apps," stating that Coinbase customers could "trade, send, receive, or store" AVAX.[91] Coinbase further invited customers to "sign up for a Coinbase account" to "buy, sell, convert, send, receive, or store" AVAX.[92]

142. Coinbase's AVAX-related web funnel solicits investors to purchase AVAX. First, Coinbase maintains an AVAX "price" page with a "Buy Avalanche" prompt, "Trading Insights" metrics (buyer ratio, number of buyers/sellers, and trade counts), and other investor-facing market data.[93] Coinbase provides an AVAX "price prediction" page that uses explicitly investment-framed language "If I invested today" to display a "Predicted Total in 5 years," and it places a "Buy Avalanche" call-to-action in immediate proximity to the prediction output.[94]

---

87 *Avalanche Price (AVAX)*, COINBASE, https://www.coinbase.com/price/avalanche.

88 *Avalanche (AVAX) is launching on Coinbase Pro*, MEDIUM (Sep. 29, 2021), https://medium.com/the-coinbase-blog/avalanche-avax-is-launching-on-coinbase-pro-f010909265c5.

89 *Id.*

90 *Id.*

91 *Avalanche (AVAX) is now available on Coinbase*, COINBASE (Sep. 30, 2021), https://www.coinbase.com/blog/avalanche-avax-is-now-available-on-coinbase.

92 *Id.*

93 *Avalanche Price (AVAX)*, COINBASE, https://www.coinbase.com/price/avalanche.

94 *AVAX price prediction*, COINBASE, https://www.coinbase.com/price-prediction/avalanche.

143. Coinbase solicits AVAX sales by advertising staking participation and yield-based marketing. Coinbase's Avalanche staking page advertises "Earn up to 4.47% APY," invites users to "Create a Coinbase account to stake Avalanche," and provides a "Stake Avalanche" action link.[95] This page also characterizes staking as "passive income" by describing it as a way of earning rewards by "simply holding" Avalanche.[96]

144. On April 18, 2025, the State of Oregon alleged that the AVAX token was an unregistered security offered and sold through crypto trading platforms such as Coinbase. In that enforcement action, Oregon alleged that investors in AVAX reasonably expected to profit from the efforts of Avalanche's management, including Ava Labs and its founder Emin Gün Sirer, and that the token's value depended on the growth and development of the Avalanche ecosystem. The complaint further alleged that Coinbase promoted AVAX to investors through its asset pages and "AVAX Insights," which presented bullish investment narratives about the token and highlighted institutional collaborations designed to increase investor demand.[97]

145. Accordingly, AVAX constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold AVAX to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**9. Cronos (CRO)**

146. CRO is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

---

95 *Avalanche AVAX*, COINBASE, https://www.coinbase.com/earn/staking/avalanche.

96 *Id.*

97 *See State of Oregon v. Coinbase, Inc.*, No. 3:25-cv-00952, at Complaint ¶170 (D. Or.).

147. CRO is a token issued on the Ethereum blockchain. Crypto.com Chain and related entities operate the CRO ecosystem.[98] The CRO token is marketed as a "utility" and governance token used within the Crypto.com ecosystem to pay for services, participate in governance, and incentivize network participation.[99] In practice, however, the token was promoted to investors as an asset whose value would increase as the CRO network grew and expanded.

148. CRO first became available to trade on the Coinbase Pro platform on November 2, 2021. Coinbase publicly announced the listing in a blog post stating that inbound transfers of CRO would begin immediately and that trading would commence once sufficient liquidity was established. Coinbase's listing announcements encouraged market participation by inviting users to transfer CRO to the platform ahead of trading and by highlighting the impending availability of the token on Coinbase's exchange.[100]

149. On November 3, 2021, CRO was listed on the retail Coinbase platform. In a blog post announcing the listing, which was amplified on Coinbase's social media, Coinbase solicited investors to "sign up" and "buy, sell, convert, send, receive, or store CRO" on the Coinbase platform.[101] Coinbase further promoted the token by linking users to informational asset pages designed to provide additional details about CRO and to encourage trading activity on the platform. These asset pages contained price charts, trading volume information, circulating supply statistics, and other metrics commonly used by investors when evaluating speculative investments. Coinbase also maintained "How to Buy" guides and other onboarding materials directing users through the

---

[98] *See Cronos Price (CRO)*, COINBASE, https://www.coinbase.com/price/cronos (describing CRO as an "Ethereum token that powers Crypto.com Pay, a service that aims to allow users to pay for goods and services with cryptocurrency while receiving cashback rewards").

[99] *Id.*

[100] *Crypto.com Protocol (CRO) is launching on Coinbase Pro*, COINBASE (Nov. 2, 2021) https://www.coinbase.com/en-gb/blog/crypto-com-protocol-cro-is-launching-on-coinbase-pro ("Starting Today . . . transfer CRO into your Coinbase Pro account ahead of trading . . . .Trading will begin on or after 9AM Pacific Time (PT) Wednesday November 3, if liquidity conditions are met.").

[101] Coinbase (@Coinbase), X (Nov. 3, 2021 at 16:37), https://x.com/coinbase/status/1455997532505477122?s=20.

process of opening an account, funding their wallets, and purchasing CRO through Coinbase's exchange.

150. Coinbase also promoted the availability of CRO through its official communications channels, including its blog and social media accounts, where the company routinely announces new token listings to millions of followers. *Wahi*, Complaint ¶3 (alleging Coinbase announces listings through its blog and Twitter feed). These listing announcements function as market-moving events and serve to attract investor attention and trading activity to newly listed tokens. Indeed, Coinbase's own public filings acknowledge that a substantial portion of the company's revenue derives from transaction fees generated when customers buy, sell, or trade digital assets on the platform.

151. On Coinbase's informational pages for CRO, the company solicited investment into the token by presenting market capitalization, price performance, and historical price information alongside investor-oriented tools designed to facilitate speculative trading.[102] Coinbase also hosted modeling tools and interfaces allowing users to evaluate potential returns from purchasing CRO under hypothetical investment scenarios, including price-prediction style tools that asked users to consider "If I invested today" outcomes based on projected price movements.[103]

152. Investors in CRO had a reasonable expectation of profits based on the efforts of others. The value of the CRO token depended entirely on the success and continued development of the Cronos ecosystem, which was controlled and managed by the project's founders, developers, and affiliated entities. The growth of the purported Cronos ecosystem, including the adoption of its infrastructure services, staking products, and developer tools, was dependent on the managerial

---

[102] *See Cronos Price (CRO)*, COINBASE, https://www.coinbase.com/price/cronos (displaying price charts, market capitalization, trading volume, circulating supply, and historical price performance for CRO).

[103] *See CRO price prediction*, COINBASE, https://www.coinbase.com/price-prediction/cronos (allowing users to explore hypothetical future price scenarios and potential returns from purchasing CRO).

and entrepreneurial efforts of these promoters. Coinbase's promotional materials reinforced the expectation that CRO's value would increase as the Cronos ecosystem expanded.

153. Coinbase's interests were also aligned with those of CRO investors. Coinbase earned transaction-based revenue each time users purchased or sold CRO on its platform, including through trading fees and spreads embedded in customer transactions. Coinbase's public filings state that a significant portion of its revenues are generated from transaction fees derived from digital asset trading activity. By soliciting investors to purchase CRO and facilitating secondary market trading in the token, Coinbase directly benefited financially from increased trading volume in CRO.

154. Accordingly, CRO constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold CRO to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**10. Enjin Coin (ENJ)**

155. ENJ is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

156. ENJ is a token issued on the Ethereum blockchain. The Enjin ecosystem, which includes ENJ, was founded in 2009 by CEO Maxim Blagov and CTO Witek Radomski. ENJ is "used to directly back the value of NFTs minted within the Enjin ecosystem."[104] The ENJ token is marketed as a "utility" token used within the ENJ ecosystem to pay for NFT-related services, participate in governance, and incentivize network participation. In practice, however, the token

[104] *1inch (1INCH), Enjin Coin (ENJ), NKN (NKN) and Origin Token (OGN) are launching on Coinbase Pro*, COINBASE, (Apr. 7, 2021), https://www.coinbase.com/blog/1inch-1inch-enjin-coin-enj-nkn-nkn-and-origin-token-ogn-are-launching-on-coinbase-pro ("Starting Today Wednesday April 7, transfer 1INCH, ENJ, NKN, OGN into your Coinbase Pro account ahead of trading. Support for 1INCH, ENJ, NKN, OGN will be available in all Coinbase's supported jurisdictions with the exception of 1INCH and ENJ in New York State. Trading will begin on or after 9AM Pacific Time (PT) Friday April 9, if liquidity conditions are met.").

was promoted to investors as an asset whose value would increase as the ENJ network grew and expanded.

157. ENJ first became available to trade on the Coinbase Pro platform on April 7, 2021. Coinbase publicly announced the listing in a blog post stating that inbound transfers of ENJ would begin immediately and that trading would commence once sufficient liquidity was established. Coinbase's listing announcements encouraged market participation by inviting users to transfer ENJ to the platform ahead of trading and by highlighting the impending availability of the token on Coinbase's exchange.[105]

158. On April 7, 2021, ENJ was listed on the retail Coinbase platform. In a blog post announcing the listing, Coinbase solicited investors to "sign up" and "buy, sell, convert, send, receive, or store ENJ" on the Coinbase platform.[106] Coinbase further promoted the token by linking users to informational asset pages designed to provide additional details about ENJ and to encourage trading activity on the platform. These asset pages contained price charts, trading volume information, circulating supply statistics, and other metrics commonly used by investors when evaluating speculative investments. Coinbase also maintained "How to Buy" guides and other onboarding materials directing users through the process of opening an account, funding their wallets, and purchasing LRC through Coinbase's exchange.

159. Coinbase also promoted the availability of ENJ through its official communications channels, including its blog and social media accounts, where the company routinely announces new token listings to millions of followers. *See Wahi*, Complaint ¶3 (alleging Coinbase announces listings through its blog and Twitter feed). These listing announcements function as market-moving events and serve to attract investor attention and trading activity to newly listed tokens. Indeed, Coinbase's own public filings acknowledge that a substantial portion of the company's

---

105 *Id.*

106 *1inch (1INCH), Enjin Coin (ENJ), NKN (NKN) and Origin Token (OGN) are now available on Coinbase*, COINBASE (Apr. 9, 2021), https://www.coinbase.com/blog/1inch-1inch-enjin-coin-enj-nkn-nkn-and-origin-token-ogn-are-now-available-on.

revenue derives from transaction fees generated when customers buy, sell, or trade digital assets on the platform.

160. On Coinbase's informational pages for ENJ, the company solicited investment into the token by presenting market capitalization, price performance, and historical price information alongside investor-oriented tools designed to facilitate speculative trading.[107] Coinbase also hosted modeling tools and interfaces allowing users to evaluate potential returns from purchasing ENJ under hypothetical investment scenarios, including price-prediction style tools that asked users to consider "If I invested today" outcomes based on projected price movements.[108]

161. Investors in ENJ had a reasonable expectation of profits based on the efforts of others. The value of the ENJ token depended entirely on the success and continued development of the ENJ ecosystem, which was controlled and managed by the project's founders, developers, and affiliated entities. The growth of the purported Enjin ecosystem, including the adoption of its infrastructure services, staking products, and developer tools, was dependent on the managerial and entrepreneurial efforts of these promoters. For example, in its November 2023 whitepaper, Enjin promoted ENJ as a "staking/rewards token."[109]

162. Enjin also made several allusions to the growth potential for its products and services, including ENJ in its whitepaper. For example, the whitepapers notes that "A McKinsey 2022 report entitled 'Value Creation in the Metaverse" valued the metavers at US$5trillion by 2030" and "PwC's Global Entertainment & Media Outlook 2022-2026 valued the global E&M market at US$2.9 trillion by 2026; and the global gaming and virtual item market at US$321 billion by 2026."[110] The Enjin whitepaper also provided investors with a history and roadmap for future

[107] *See ENJIN Coin Price (ENJ)*, COINBASE, https://www.coinbase.com/price/enjin-coin (displaying price charts, market capitalization, trading volume, circulating supply, and historical price performance for ENJ).

[108] *See ENJ price prediction*, COINBASE, https://www.coinbase.com/price-prediction/enjin-coin (allowing users to explore hypothetical future price scenarios and potential returns from purchasing ENJ).

[109] *Enjin Blockchain Whitepaper*, ENJIN (June 2023), https://enjin.io/whitepaper.

[110] *Enjin Blockchain Whitepaper*, ENJIN (June 2023), https://enjin.io/whitepaper.

milestones for expansion and growth of the Enjin blockchain and its ecosystem: "It began with Enjin Coin (ERC-20)'s launch in 2017)" and then providing "proposed upgrades" to be effectuated by Enjin. In particular, the whitepaper touted "Expanding validator network"; "Launch of maxichains" "Enhanced marketplace and NFT matching capability"; a "Web Editor for Recipes"; "Legally Compliant transactions"; "R&D next generation NFTs for Enjin Matrix Chains" These promotional materials, which were made available to investors by Coinbase on the ENJ page on its website, reinforced the expectation that ENJ's value would increase as the Enjin ecosystem expanded along with the trillion-dollar NFT market. Further, these promoted efforts to raise the market for and value of ENJ tokens could only be undertaken by Enjin. Thus, purchasers of ENJ had to rely on Enjin's management's efforts to achieve the promised growth potential.

163. Coinbase's interests were also aligned with those of ENJ investors. Coinbase earned transaction-based revenue each time users purchased or sold ENJ on its platform, including through trading fees and spreads embedded in customer transactions. Coinbase's public filings state that a significant portion of its revenues are generated from transaction fees derived from digital asset trading activity. By soliciting investors to purchase ENJ and facilitating secondary market trading in the token, Coinbase directly benefited financially from increased trading volume in ENJ.

164. Purchasers of ENJ have invested in a common enterprise with Enjin. Enjin pooled proceeds from its sales of ENJ and $100M "Metaverse Fund" raise in order to fund development and growth of the Enjin ecosystem. As Enjin stated in a November 4, 2021 blog post announcing the successful fundraising efforts: "We've formed a US$100 million Efinity Metaverse Fund to formalize support for our ecosystem partners and help make the decentralized Metaverse a reality.[111] Reports indicate that "[t]he fund would be used to support a wide range of things such

---

[111] Hassan Maishera, *Enjin Sets up a $100 Million Metaverse Fund. The Investments in Metaverse Space is Just Starting*, YAHOO!FINANCE (Nov. 4, 2021) https://finance.yahoo.com/news/enjin-sets-100-million-metaverse-165345554.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAAzjKPVc20Dv8aJdU1lg7ZGrHilrr5YuDcSTxfyWqSdy1U8VpubAeuBZB5tFon06FQVaCgW0D8DaFrKkOWYMsiPHLBDOG-stFte-

as metaverse projects, specifically built on the Enjin and Polkadot blockchains. Game developers in the Enjin ecosystem will also benefit from the fund to create mixed reality (AR/VR), esports, immersive entertainment, virtual events, and more."[112]

165. Accordingly, ENJ constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold ENJ to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**11. Fetch.AI (FET)**

166. FET is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. FET is an Ethereum token that powers Fetch.ai, a decentralized machine learning platform for applications such as asset trading, gig economy work, and energy grid optimization. Fetch.AI's first decentralized finance application helps Uniswap users automate trading according to predefined conditions.

167. On July 27, Coinbase announced that "Fetch.ai (FET) is available on Coinbase."[113] Coinbase announced the listing in a blog post and noted that "Coinbase Ventures may be an investor in the crypto projects mentioned here" and linked to a list of tokens projects that Coinbase Ventures invested in, including Fetch.[114]

168. Coinbase's FET-related web funnel solicits investors to purchase FET. First, Coinbase maintains an FET "price" page with a "Buy Fetch" prompt, "Trading Insights" metrics (buyer ratio, number of buyers/sellers, and trade counts), and other investor-facing market

hfVxIXvyVWKSsJ6X7A1ill62s6O_dNVHcDOM5J6n1zYPE3efbXNTpqvjUN_VBtI7d_iWP2HS

[112] *Id.*

[113] *Fetch.ai (FET) is now available on Coinbase*, COINBASE (July 27, 2021), https://www.coinbase.com/blog/fetch-ai-fet-is-now-available-on-coinbase.

[114] *Id.*

data.[115] Coinbase provides an FET "price prediction" page that uses explicitly investment-framed language "If I invested today" to display a "Predicted Total in 5 years," and it places a "Buy [FET]" call-to-action in immediate proximity to the prediction output.[116]

169. Fetch also promoted the growth potential for Fetch.AI and the use of FET therein. For example, in its 2019 whitepaper, Fetch stated that "As Fetch secures its foothold in the data, transport, services, and IoT industries its token grows in demand as each sector makes a larger and larger contribution to the Fetch network's economic throughout."[117] This growth potential for the demand for FET was further promoted throughout 2020: "As the Fetch.AI network grows, an increasing number of developers from major corporate companies and beyond will be coding and deploying Autonomous Economic Agents. For example, in a new project in partnership with Datarella, AI-agents will autonomously negotiate parking pricing on behalf of their owner."[118] By tying Fetch and FET's growth to an influx of "major corporate companies" and touting its partnerships and business relationships, Fetch and Coinbase (separately and collectively) created a reasonable expectation of profits in investors. This expectation was underscored by Fetch's statements that the "$FET token is the key component" of the Fetch ecosystem as it would fund Fetch's operations and "provide[ ] the fuel to drive the network and complete and activities using it."[119] Fetch also indicated the growth potential for FET by stating: "A thriving Fetch.AI network that includes many millions or, as we hope and expect in the future, billions of autonomous agents, requires a token to enable this new digital economy to function."[120] This statement provided

---

[115] *Artificial Superintelligence Alliance Price (FET)*, COINBASE, https://www.coinbase.com/price/fetch.

[116] *Fetch price prediction*, COINBASE, https://www.coinbase.com/price-prediction/fetch.

[117] Simpson, Toby, et. al., *Fetch: Technical Introduction* (February 2019), https://files.coinswitch.co/white_paper/fetch.ai-whitepaper.pdf.

[118] Fetch.ai, *The role of $FET in the Fetch.ai network*, MEDIUM (Nov. 26, 2020), https://medium.com/fetch-ai/the-role-of-fet-in-the-fetch-ai-network-356914a5d9fd.

[119] *Id.*

[120] *Id.*

investors with an expectation of profit that would come from the increase in the price of FET that resulted from the increased demand for it by "billions" of autonomous agents.

170. Similarly, Fetch promoted a "yearlong gaming influencer campaign" and partnership with "a leading professional esports organization," that aim of which was to "enable Fetch.ai to to expand its reach to a growing demographic of gaming and esports viewers interested in learning about crypto."[121] Again, such promotions indicated to investors the growth potential for Fetch, and in turn ENJ, that could come from its entrance into the lucrative gaming industry.

171. Fetch continues to promote FET and its financial growth potential, reinforcing the expectation of profits created from its earlier promotions. For example, in a 2025 marketing campaign, Fetch contributed FET tokens to a lunar mission whose aim was "to establish humanity's first off-world cryptographic molecular data archive."[122] This promotion was a tongue in cheek reference to the crypto slang phrase "to the moon." Moon/Mooning is used to describe a cryptocurrency that is projected as having a strong upward market trend; when a cryptocurrency is mooning, it means its price is skyrocketing so high that it's figuratively going to the moon.[123] This catchphrase similarly alludes to a cryptocurrency experiencing a "sky-high valuation" or "soaring prices." The expression is often used in an attempt to convince others to invest. In such instances, crypto promoters use it to indicate that "it's a good time to invest" since the coin will purportedly soon "go to the moon."[124] That phrase is also used "to shill a cryptocurrency, where

---

[121] Press Release, *Fetch.ai partners up with esports organization Immortals for gaming crypto outreach* (Dec. 8, 2021), https://www.prnewswire.com/news-releases/fetchai-partners-up-with-esports-organization-immortals-for-gaming-crypto-outreach-301440296.html#:~:text=DETROIT%2C%20Dec.,interested%20in%20learning%20about%20crypto.&text=Immortals%20and%20Fetch.ai%20announce,%E2%80%9CTeam%20Fetch.ai.%E2%80%9D&text=Team%20Fetch.ai%20members%20will,new%20to%20the%20crypto%20space

[122] *Iridia Makes History: First Cryptocurrency and Molecular Off-World Data Archive Successfully Lands on the Moon*, IRIDIA.COM (May 4, 2025), https://news.iridia.com/blog/to-the-moon.

[123] *Crypto Slang: 28 Terms You Should Know*, cyrpto.com (Aug. 31, 2022), https://crypto.com/en/university/crypto-slang-terms-you-should-know.

[124] *To The Moon Meaning*, LEDGER ACADEMY (Oct. 4, 2023), https://www.ledger.com/academy/glossary/to-the-moon.

malicious investors hype a coin to sway the market in favor of their crypto assets."[125] Here, Fetch's promotion of FET literally going to the moon reinforced its early promotions to investors that there was a prospect of financial gain from the purchase of FET.

172. Accordingly, FET constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold FET to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**12. Gala (GALA)**

173. GALA is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

174. GALA is a token issued on the Ethereum blockchain and largely used to support the Gala Ecosystem. Gala Games is headquartered in Jackson, Wyoming. GALA is described as a "digital utility token of the Gala Games and Entertainment ecosystem. The goal of introducing $GALA is to provide a convenient and secure method of payment and settlement between participants who interact within the Gala Games and Entertainment ecosystem."[126] A user earns GALA tokens by being a top user/player of any GalaGames or being a Founder Node and meeting the requirements for Distribution.[127] As of the filing of this complaint, GALA has a market cap of $162.92 million, with nearly all 47 billion tokens in circulation of the 47 billion total supply.[128]

---

125 *Id.*

126 *What is $GALA?*, GALA (Jan. 28, 2024), https://support.gala.com/hc/en-us/articles/22440779338267-What-is-GALA.

127 *Id.*

128 *Gala V1 Price (GALA)*, COINBASE, https://www.coinbase.com/price/gala?q=MCO2&searchTab=PERPETUALS.

175. GALA first became available on Coinbase on November 16, 2021.[129] Coinbase advertised the listing on its X account[130] and its blog.[131] On Coinbase's informational pages for GALA, the company solicited investment into the token by presenting market capitalization, price performance, and historical price information alongside investor-oriented tools designed to facilitate speculative trading.[132] Coinbase also hosted modeling tools and interfaces allowing users to evaluate potential returns from purchasing GALA under hypothetical investment scenarios, including price-prediction style tools that asked users to consider "If I invested today" outcomes based on projected price movements.[133] GALA has since been delisted from Coinbase as of May 12, 2023.[134]

176. Investors in GALA had a reasonable expectation of profits based on the efforts of others. The value of the GALA token depended entirely on the success and continued development of the Gala Network, which was controlled and managed by the project's founders, developers, and affiliated entities. The growth of the purported Gala ecosystem, including the adoption of its infrastructure services, staking products, and developer tools, was dependent on the managerial and entrepreneurial efforts of these promoters. Coinbase's promotional materials reinforced the expectation that GALA's value would increase as the Gala Network expanded.

177. Coinbase's interests were also aligned with those of Gala investors. Coinbase earned transaction-based revenue each time users purchased or sold GALA on its platform,

---

[129] Coinbase (@Coinbase), X (Nov. 16, 2021 at 17:37), https://x.com/coinbase/status/1460738834623184896.

[130] *Id.*

[131] *Alchemix (ALCX), Ethereum Name Service (ENS), Gala (GALA), GYEN (GYEN) and Power Ledger (POWR) are launching on Coinbase*, MEDIUM (Nov. 16, 2021), https://medium.com/@coinbaseblog/alchemix-alcx-ethereum-name-service-ens-gala-gala-gyen-gyen-and-power-ledger-powr-are-e472f0e9cf7.

[132] *How to buy Gala GALA*, COINBASE, https://web.archive.org/web/20220927103342/https://www.coinbase.com/how-to-buy/GALA.

[133] *Trade Gala Today*, COINBASE, https://web.archive.org/web/20221201105902/https://www.coinbase.com/price/gala.

[134] Coinbase Assets (@CoinbaseAssets), X (May 3, 2023 at 11:00), https://x.com/CoinbaseAssets/status/1653776590289993730?lang=en.

including through trading fees and spreads embedded in customer transactions. Coinbase's public filings state that a significant portion of its revenues are generated from transaction fees derived from digital asset trading activity. By soliciting investors to purchase GALA and facilitating secondary market trading in the token, Coinbase directly benefited financially from increased trading volume in GALA.

178. The Gala Network further created the expectation of profits among investors by promoting a series of partnerships with the gaming industry it had entered into, which, in turn, suggested to investors that the GALA tokens would increase in value as the Gala Network became more integrated within the mainstream gaming industry. Gala Games promoted the following partnerships for this purpose:

- December 2020: Gala Games Brings GALA to Polyient DEX — Polyient Capital, the asset management arm of Polyient, added GALA to the decentralized Polyient DEX.
- March 2021: Gala Games Sponsors Mazer Gaming, a professional esports and entertainment organization.
- March 2021: Gala Games Partners with PAC Global — The partnership was essentially to help build and scale the Gala Games' node network.
- March 2021: Gala Games Connects Partners with Wasder — Wasder is building a social media site for gamers, and Gala Games will be integrated in the platform.
- March 2021: Gala Games Partners with Polygon — "Working with Polygon will be an important piece to solving the crucial gas puzzle for Gala Games."
- April 2021: Gala Games Invests in Concept Art House — Since it was founded in 2007, Concept Art House has provided art for some of the most popular and successful game companies in the world. "With the partnership, CAH and Gala seek to provide End-to-End NFT Solutions for the very best brands, artists, and creators in digital entertainment." In addition, CAH will dedicate a purpose-built team to support Gala Games.

- April 2021: Gala Games Partners with South Korean Media Protocols — Through this collaboration, it is possible to surface Gala Games content, Town Star playthroughs, and other relevant content in the Korean marketplace.
- August 2021: GALA Comes to Binance Smart Chain — This is part of an effort to make the GALA token more liquid and accessible.
- December 2021: Gala Games Partners with C2 Ventures for $100M Fund — the fund will invest in blockchain gaming projects.[135]

179. By tying Gala Games and GALA token growth to an influx of partnerships and business relationships, Gala Games created a reasonable expectation of profits in investors. And by pooling the funds from GALA tokens sales and Gala Games' series funding, investors in GALA and Gala Games were both in a common enterprise.

180. Accordingly, GALA constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold GALA to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**13. Gods Unchained Token (GODS)**

181. GODS is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

182. GODS is described by Coinbase as an Ethereum (ERC-20) token that powers the Gods Unchained blockchain-based trading card game. Coinbase represents that GODS can be used to craft NFTs and other digital items within the game, and that the token provides voting power on the future of the platform.[136]

---

[135] *Gala Games' History, Strategy, and Outlook*, NAAVIK (May 23, 2022), https://naavik.co/digest/gala-games/

[136] *Gods Unchained Price (GODS)*, COINBASE, https://www.coinbase.com/price/gods-unchained.

183. Coinbase made GODS available for trading on its platform in December 2021. On Dec. 8, 2021, Coinbase announced that it would begin accepting inbound transfers of GODS to Coinbase Pro and that trading would begin on or after December 9, 2021 if liquidity conditions were met.[137] On December 9, 2021, Coinbase announced that GODS was "available on Coinbase.com and in the Coinbase Android and iOS apps," and that Coinbase customers could "trade, send, receive, or store" GODS in most supported regions.[138] Coinbase's December 9 announcement further included explicit onboarding language, inviting customers to "sign up for a Coinbase account" to "buy, sell, [and] convert", thereby soliciting investors to transact in the newly listed assets.[139]

184. Coinbase's GODS product pages contain multiple investor-directed prompts to solicit investment. Coinbase's GODS asset page displays a "Buy" call-to-action and a "Sign me up" flow alongside the GODS purchase prompt.[140] The same asset page frames market capitalization as a proxy for value ("A high market cap implies that the asset is highly valued by the market"), reports the all-time high price, and uses social-proof style features and "bullish" sentiment signals.[141] Coinbase also maintains a dedicated "How to buy" guide that walks users through connecting payment methods and executing a "Buy now" purchase.[142]

---

137 *API3 (API3), Bluezelle (BLZ), Gods Unchained (GODS), Immutable X (IMX), Measurable Data Token (MDT) and Ribbon Finance (RBN) are launching on Coinbase Pro*, COINBASE (Dec. 8, 2021), https://www.coinbase.com/blog/api3-api3-bluezelle-blz-gods-unchained-gods-immutable-x-imx-measurable-data-token-mdt.

138 *API3 (API3), Bluezelle (BLZ), Circuits of Value (COVAL), Gods Unchained (GODS), Immutable X (IMX), Measurable Data Token (MDT) mStable USD (MUSD) and Ribbon Finance (RBN) are launching on Coinbase*, COINBASE (Dec. 9, 2021), https://www.coinbase.com/blog/api3-api3-bluezelle-blz-circuits-of-value-coval-gods-unchained-gods-immutable-x-imx.

139 *Id.*

140 *Gods Unchained Price (GODS)*, COINBASE, https://www.coinbase.com/price/gods-unchained.

141 *Id.*

142 *How to buy Gods Unchained on Coinbase in United States*, COINBASE, https://www.coinbase.com/how-to-buy/gods-unchained.

185. Accordingly, GODS constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold GODS to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**14. Keep Network (KEEP)**

186. KEEP is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

187. KEEP is an Ethereum token that powers the Keep Network, a platform that aims to bridge public blockchains and private data.[143] KEEP was promoted to investors as a digital asset whose value would increase as the Keep Network expanded and gained adoption.

188. Coinbase announced on June 15, 2021 that KEEP was launching on Coinbase Pro.[144] Coinbase also invited customers to "sign up" for an account "to start trading."[145] On June 17, 2021, KEEP became available on Coinbase.com and in Coinbase mobile apps.

189. Coinbase's Keep Network related web funnel solicited investors to purchase KEEP. First, Coinbase maintains an KEEP "price" page with "Trading Insights" metrics (buyer ratio, number of buyers/sellers, and trade counts), and other investor-facing market data.[146] Coinbase provides an KEEP "price prediction" page that uses explicitly investment-framed language "If I invested today" to display a "Predicted Total in 5 years".[147]

190. Accordingly, KEEP constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the

[143] *Keep Network Price (KEEP)*, COINBASE, https://www.coinbase.com/price/keep-network.

[144] *Chiliz (CHZ) Keep Network (KEEP) and Shiba Inu (SHIB) are launching on Coinbase Pro*, COINBASE (Jun. 15, 2021), https://www.coinbase.com/blog/chiliz-chz-keep-network-keep-and-shiba-inu-shib-are-launching-on-coinbase-pro.

[145] *Id.*

[146] *Keep Network Price (KEEP)*, COINBASE, https://www.coinbase.com/price/keep-network.

[147] *KEEP price prediction*, COINBASE, https://www.coinbase.com/price-prediction/keep-network.

entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold KEEP to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**15. Chainlink (LINK)**

191. LINK is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

192. LINK is an Ethereum-based token associated with the Chainlink protocol, a platform for providing real-world data feeds for blockchain-based smart contracts. LINK has been available for trading on Coinbase platform since approximately June 26, 2019.

193. Chainlink was developed by Sergey Nazarov and Steve Ellis in 2017. According to Coinbase's website, Nazarov had previously co-founded several tech companies, including SmartContract, a platform that sought to connect smart contracts to external data and bank payments. Ellis worked as a software engineer before co-founding Secure Asset Exchange, a company that aimed to facilitate easy web access to a decentralized asset exchange.

194. According to Coinbase, Chainlink "allows smart contracts on Ethereum to securely connect to external data sources, [application programming interfaces], and payment systems."[148] Chainlink has stated that its platform "enable[s] the utilization of tokenized assets and support[s] a thriving onchain finance ecosystem."[149] Coinbase further describes Chainlink as "utilize[ing] a network of independent oracle node operators to help source, verify, and deliver data and off-chain computation to smart contracts."[150]

195. Coinbase further explains that "There is a diverse set of oracle operators supplying the answers to the data requests, decentralizing the process and preventing any tampering. The

---

[148] *Chainlink (LINK) is now available on Coinbase*, COINBASE (Jun. 29, 2019), https://www.coinbase.com/blog/chainlink-link-is-now-available-on-coinbase.

[149] *Chainlink Digital Asset Insights: Q2 2024*, CHAINLINK (Jul. 17, 2024), https://blog.chain.link/chainlink-digital-asset-insights-q2-2024/.

[150] *Guide to Chainlink*, COINBASE (May 18, 2023), https://www.coinbase.com/developer-platform/discover/protocol-guides/guide-to-chainlink.

answers each oracle node provides are aggregated, verified, and then sent back to the smart contract. Chainlink oracles constantly update the data . . . . Node operators bridge the gap between off-chain data to an on-chain attestation. Mechanically, they do this by retrieving data from off-chain sources and putting it into a format that can be used by smart contracts, responding to requests for data from smart contracts, and providing the data. Oracle node operators need to maintain uptime requirements to ensure that the data provided is accurate and timely."[151]

196. In September 2017, Chainlink raised $32 million through a presale and initial coin offering of LINK. In total, 35% of the total 1 billion LINK supply was distributed to early investors at an average sale price of $0.091. Another 35% (350 million LINK) was allocated to incentivize node operators and support the ecosystem's growth, and the remaining 30% (300 million LINK) was reserved for the Chainlink team to fund ongoing development and operational costs.

197. By investing in the LINK token, investors reasonably expected to earn profits as a result of the management and control exerted by Chainlink Labs, among other stakeholders. Entities and individuals responsible for the management of Chainlink include Chainlink Labs and Nazarov. Chainlink Labs' website has described it "a world-class team of over 600 developers, researchers, and capital markets experts with deep experience in cryptography and decentralized systems and a singular vision to build Chainlink into the global standard for onchain finance."[152] It has further stated that Chainlink Labs's teams "focus on the core development, security, and innovation of Chainlink encompassing the departments responsible for creating and maintaining industry-standard technology."[153] As of February 2025, Nazarov's LinkedIn profile described him as an active "Co-Founder" of Chainlink Labs.[154] It further described him as "Building Chainlink,

---

151 *Id.*

152 *Chainlink Labs*, WAYBACK MACHINE (Dec. 11, 2024), https://web.archive.org/web/20241211195214/https://chainlinklabs.com/.

153 *How our teams work together*, CHAINLINK, https://chainlinklabs.com/careers/how-we-work.

154 Sergey Nazarov, LINKEDIN, https://www.linkedin.com/in/sergeydnazarov/ (last visited Mar. 12, 2026).

the industry-standard Web3 services platform that has enabled trillions of dollars in transaction volume across DeFi, insurance, gaming, NFTs, and other major industries" and noted that "[a]s the leading decentralized oracle network, Chainlink enables developers to build feature-rich Web3 applications with seamless access to real-world data and off-chain computation across any blockchain and provides global enterprises with a universal gateway to all blockchains."[155]

198. Chainlink has also disseminated statements to investors and the public about the growth and investment potential of Chainlink and the LINK token. In a blog post dated June 2022, for example, Chainlink announced how the introduction of LINK staking would "Generate Sustainable Rewards From Real-Long Term Use."[156] Chainlink explained that:

- "The third goal of staking is the creation and distribution of rewards to stakers. We expect that there will be various sources of rewards provided to stakers over time. As network adoption increases and more protocol fees are generated, a greater portion of staking rewards can be sourced from non-emissions-based sources."
- "Native token emissions from the LINK token supply will be used to create an initial base level of rewards for stakers, with the goal of tapering off over time as other sources of rewards grow and begin to be directed to stakers."
- "User service fees from sponsors of Chainlink oracle services, with a portion directed to the stakers. The more users pay for Chainlink oracle services, the greater the amount of fees that can become available to reward stakers who help secure those services."[157]

199. Chainlink went on to explain that "[a]nother anticipated source of benefits for stakers is the Partner Growth Program (PGP)—an initiative where Chainlinked protocols and DAOs provide various incentives to accelerate their growth and facilitate cross-ecosystem

---

155 *Id.*

156 *Chainlink Staking: Exploring the Long-Term Goals, Roadmap, and Initial Implementation*, CHAINLINK (Jun. 7, 2022), https://blog.chain.link/chainlink-staking-roadmap/.

157 *Id.*

participation. It's expected that a number of projects benefiting from Chainlink's security will take part in the Partner Growth Program."[158]

200. Also, Chainlink announced that they "are exploring the possibility of loss protection, which would drive additional user service fees from sponsors of Chainlink oracle services seeking protection against supported oracle networks not abiding by their SLAs" because "[t]he more value secured, the greater the potential demand for protection and the greater the amount of rewards potentially available to stakers."[159]

201. The blog post further touted Chainlink's growth and growth prospects as a platform, stating that "Chainlink is foundational infrastructure for the smart contract economy, supporting nearly a thousand oracle networks that collectively secure tens of billions of dollars across hundreds of projects."[160] Additionally, "[w]ith Chainlink continually being integrated on more blockchains and supporting new categories of oracle services, it's important to further scale the security of Chainlink in order to match the increasing amount of value within Chainlink-powered applications," and "[t]his new era of sustainable growth and security—Chainlink Economics 2.0—begins with staking."[161]

202. Coinbase has promoted LINK on its website. For example, in addition to promoting Chainlink's "use cases," Coinbase's webpage for LINK has included a "Bulls say" section stating (1) "Chainlink enables smart contracts to interact with external data, a connection that is crucial for many digital agreements that depend on real-world information"; (2) "a substantial majority of DeFi applications rely on Chainlink's oracle services to provide accurate and timely external data to smart contracts, which enhances the overall security and efficiency of their protocol"; and (3) Chainlink's recent collaboration with SWIFT to successfully transfer tokenized assets across multiple blockchains showcases its potential to bridge the gap between traditional finance and

---

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] *Id.*

blockchain technology."[162] Coinbase's webpage also featured a "Coinbase Bytes" article dated November 8, 2023 titled "Whale street: How big-money institutional investors are preparing for the next bull run," which stated "Institutions are showing rising enthusiasm for altcoins, with investment in products focused on" "Chainlink ($2 million)" and other crypto tokens "all growing last week."[163]

203. LINK peaked at a price of approximately $52.70 per token with a market capitalization of approximately $22.2 billion. As of March 12, 2026, it traded at $9.00 with a market capitalization of approximately $6.38 billion—reflecting a price drop of more than 83% and a loss of approximately $15.8 billion in market value.

204. Accordingly, LINK constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold LINK to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**16. Loopring (LRC)**

205. LRC is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

206. LRC is a token issued on the Ethereum blockchain. LRC is the native token of Loopring, an open protocol designed for the building of decentralized crypto exchanges.[164] The LRC token is marketed as a "utility" and governance token used within the LRC ecosystem to pay for services, participate in governance, and incentivize network participation. In practice,

162 *Chainlink Price (LINK)*, COINBASE, https://www.coinbase.com/price/chainlink.

163 *Id.*

164 *See Loopring Price (LRC)*, COINBASE, https://www.coinbase.com/price/loopring (last visited Mar. 12, 2026) (describing LRC as "an open-sourced, audited, and non-custodial exchange protocol" that "aims to allow anyone to build non-custodial, order book-based exchanges on Ethereum by leveraging zero-knowledge proofs").

however, the token was promoted to investors as an asset whose value would increase as the LRC network grew and expanded.

207. LRC first became available to trade on the Coinbase Pro platform on September 15, 2020. Coinbase publicly announced the listing in a blog post stating that inbound transfers of LRC would begin immediately and that trading would commence once sufficient liquidity was established. Coinbase's listing announcements encouraged market participation by inviting users to transfer LRC to the platform ahead of trading and by highlighting the impending availability of the token on Coinbase's exchange.[165]

208. On September 15, 2020, LRC was listed on the retail Coinbase platform. In a blog post announcing the listing, Coinbase solicited investors to "sign up" and "buy, sell, convert, send, receive, or store LRC" on the Coinbase platform. Coinbase further promoted the token by linking users to informational asset pages designed to provide additional details about LRC and to encourage trading activity on the platform. These asset pages contained price charts, trading volume information, circulating supply statistics, and other metrics commonly used by investors when evaluating speculative investments. Coinbase also maintained "How to Buy" guides and other onboarding materials directing users through the process of opening an account, funding their wallets, and purchasing LRC through Coinbase's exchange.[166]

209. Coinbase also promoted the availability of LRC through its official communications channels, including its blog and social media accounts, where the company routinely announces new token listings to millions of followers. *See SEC v. Wahi*, Complaint ¶3 (alleging Coinbase announces listings through its blog and Twitter feed). These listing announcements function as market-moving events and serve to attract investor attention and trading activity to newly listed tokens. Indeed, Coinbase's own public filings acknowledge that a

---

[165] *Loopring (LRC) is launching on Coinbase Pro*, COINBASE (Sept. 10, 2020), https://www.coinbase.com/blog/loopring-lrc-is-launching-on-coinbase-pro ("On Monday, September 14, we began accepting inbound transfers of LRC to Coinbase Pro. Trading will begin on or after 9AM Pacific Time (PT) Tuesday September 15, if liquidity conditions are met.").

[166] *Id.*

substantial portion of the company's revenue derives from transaction fees generated when customers buy, sell, or trade digital assets on the platform.

210. On Coinbase's informational pages for LRC, the company solicited investment into the token by presenting market capitalization, price performance, and historical price information alongside investor-oriented tools designed to facilitate speculative trading.[167] Coinbase also hosted modeling tools and interfaces allowing users to evaluate potential returns from purchasing LRC under hypothetical investment scenarios, including price-prediction style tools that asked users to consider "If I invested today" outcomes based on projected price movements.[168]

211. Investors in LRC had a reasonable expectation of profits based on the efforts of others. The value of the LRC token depended entirely on the success and continued development of the LRCnos ecosystem, which was controlled and managed by the project's founders, developers, and affiliated entities. The growth of the purported LRCnos ecosystem, including the adoption of its infrastructure services, staking products, and developer tools, was dependent on the managerial and entrepreneurial efforts of these promoters. Coinbase's promotional materials reinforced the expectation that LRC's value would increase as the LRCnos ecosystem expanded.

212. Coinbase's interests were also aligned with those of LRC investors. Coinbase earned transaction-based revenue each time users purchased or sold LRC on its platform, including through trading fees and spreads embedded in customer transactions. Coinbase's public filings state that a significant portion of its revenues are generated from transaction fees derived from digital asset trading activity. By soliciting investors to purchase LRC and facilitating secondary market trading in the token, Coinbase directly benefited financially from increased trading volume in LRC.

---

[167] *See Loopring Price (LRC)*, COINBASE, https://www.coinbase.com/price/loopring (displaying price charts, market capitalization, trading volume, circulating supply, and historical price performance for CRO).

[168] *See LRC Price Prediction*, COINBASE, https://www.coinbase.com/price-prediction/loopring (allowing users to explore hypothetical future price scenarios and potential returns from purchasing LRC).

213. Accordingly, LRC constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold LRC to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**17. Decentraland (MANA)**

214. Decentraland (MANA) is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

215. MANA is a token issued on the Ethereum blockchain and largely used to support the Decentraland Universe. According to their whitepaper, Decentraland is a "virtual reality platform… [where] users can create, experience, and monetize content and applications."[169] MANA is typically burned to claim LAND, a non-fungible parcel within the virtual world of Decentraland, and to make in-world purchases of goods and services.[170] As explained in the whitepaper "[a]lso, MANA used to buy goods and services in the virtual world creates *utility value* for the token."[171] As of the filing of this complaint, MANA has a market cap of $183.66 million, with nearly 2 billion tokens in circulation of the 2.2B billion total supply.

216. MANA first became available on Coinbase on November 5, 2020.[172] Coinbase also promoted the listing on their X account by advertising the launch of the token "within the next 15 minutes."[173] Decentraland also advertised the option to connect a Coinbase wallet into the virtual

---

169 DECENTRALAND, WHITE PAPER, https://decentraland.org/whitepaper.pdf (last visited Mar. 12, 2026).

170 *Id.* at 12.

171 *Id.* at 13.

172 *Civic (CVC), Decentraland (MANA), and district 0x (DNT), are now available on Coinbase*, COINBASE BLOG (Nov. 5, 2020), https://www.coinbase.com/blog/civic-cvc-decentraland-mana-and-district0x-dnt-are-now-available-on-coinbase.

173 Coinbase (@coinbase), X (Nov. 5, 2020, at 13:45), https://x.com/coinbase/status/1324422551540563970.

world.[174] Coinbase's public communications around the MANA listing on Coinbase Pro included solicitations to investors to "sign up" and "start trading" and assured investors that it was "the most trusted place for people and businesses to buy, sell, and manage Decentraland."[175] Decentraland further advertised the utility of its token in an X post that stated "It's a NAME, an Emote, a Wearable, or LAND. $MANA is the utility token for the world of Decentraland and has a role in the everyday activity of the ecosystem."[176] Decentraland promoted the integration of Coinbase into its platform "Users can now use Coinbase Wallet to login, explore and own a piece of the metaverse. Coinbase Wallet will be integrated across the browser platform as well as the PC desktop client!" [177]

217. On Coinbase's informational pages for MANA, the company solicited investment into the token by presenting market capitalization, price performance, and historical price information alongside investor-oriented tools designed to facilitate speculative trading.[178] Coinbase also hosted modeling tools and interfaces allowing users to evaluate potential returns from purchasing MANA under hypothetical investment scenarios, including price-prediction style tools that asked users to consider "If I invested today" outcomes based on projected price movements.[179]

---

[174] Decentraland (@decentraland), X (Nov. 5, 2024, at 09:32), https://x.com/decentraland/status/1853807722564612509.

[175] *Decentraland on Coinbase in United States*, COINBASE, https://www.coinbase.com/how-to-buy/decentraland (last visited Mar, 12, 2026).

[176] Decentraland (@decentraland), X (Oct. 14, 2025, at 12:21), https://x.com/decentraland/status/1978133998720127170.

[177] Decentraland (@decentraland), X (Jun. 28, 2022, at 18:27), https://x.com/decentraland/status/1541911086923931651.

[178] *Decentraland on Coinbase in United States*, Coinbase, https://www.coinbase.com/how-to-buy/decentraland (last visited Mar. 12, 2026).

[179] *Decentraland Price (MANA)*, COINBASE, https://www.coinbase.com/price/decentraland (last visited Mar. 12, 2026).

218. Investors in MANA had a reasonable expectation of profits based on the efforts of others. The value of the MANA token depended entirely on the success and continued development of Decentraland, which was controlled and managed by the project's founders, developers, and affiliated entities. The growth of the purported Decentraland ecosystem, including the adoption of its infrastructure services, staking products, and developer tools, was dependent on the managerial and entrepreneurial efforts of these promoters. Coinbase's promotional materials reinforced the expectation that MANA's value would increase as Decentraland expanded.

219. Coinbase's interests were also aligned with those of MANA investors. Coinbase earned transaction-based revenue each time users purchased or sold MANA on its platform, including through trading fees and spreads embedded in customer transactions. Coinbase's public filings state that a significant portion of its revenues are generated from transaction fees derived from digital asset trading activity. By soliciting investors to purchase MANA and facilitating secondary market trading in the token, Coinbase directly benefited financially from increased trading volume in MANA.

220. Accordingly, MANA constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold MANA to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

221. During the Class Period, members of the Class invested in MANA tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for MANA tokens and paid Coinbase a fee for executing the transaction. MANA token investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their MANA tokens, which they expected to result predominantly, if not solely, from the efforts of MANA's creator, developer, and issuer.

222. The entity behind the MANA token is headquartered in Carlsbad, California.

**18. Polkadot (DOT)**

223. DOT is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

224. DOT is a token issued on the Ethereum blockchain. Polkadot is an open-source multichain protocol that purportedly "seeks to connect and secure a network of specialized blockchains. It aims to facilitate the cross-chain transfer of any data or asset types, not just tokens, striving to make blockchains interoperable with each other."[180] The DOT token is marketed as a "utility" and governance token used within the DOT ecosystem to pay for services, participate in governance, and incentivize network participation. In practice, however, the token was promoted to investors as an asset whose value would increase as the DOT network grew and expanded.

225. DOT first became available to trade on the Coinbase Pro platform on June 16, 2021. Coinbase publicly announced the listing in a blog post stating that inbound transfers of DOT would begin immediately and that trading would commence once sufficient liquidity was established. Coinbase's listing announcements encouraged market participation by inviting users to transfer DOT to the platform ahead of trading and by highlighting the impending availability of the token on Coinbase's exchange.[181]

226. On June 16, 2021, DOT was listed on the retail Coinbase platform. In a blog post announcing the listing, Coinbase solicited investors to "sign up" and "buy, sell, convert, send, receive, or store DOT" on the Coinbase platform. Coinbase further promoted the token by linking users to informational asset pages designed to provide additional details about DOT and to encourage trading activity on the platform. These asset pages contained price charts, trading volume information, circulating supply statistics, and other metrics commonly used by investors

---

[180] *See Polkadot Price (DOT)*, COINBASE, https://www.coinbase.com/price/polkadot.

[181] *Polkadot (DOT) is launching on Coinbase Pro*, COINBASE (Jun. 14, 2021), https://www.coinbase.com/blog/polkadot-dot-is-launching-on-coinbase-pro ("Starting Today Monday June 14, transfer DOT into your Coinbase Pro account ahead of trading . . . . Trading will begin on or after 9AM Pacific Time (PT) Wednesday June 16, if liquidity conditions are met.").

when evaluating speculative investments. Coinbase also maintained "How to Buy" guides and other onboarding materials directing users through the process of opening an account, funding their wallets, and purchasing DOT through Coinbase's exchange.[182]

227. Coinbase also promoted the availability of DOT through its official communications channels, including its blog and social media accounts, where the company routinely announces new token listings to millions of followers. *See Wahi*, Complaint ¶3 (alleging Coinbase announces listings through its blog and Twitter feed). These listing announcements function as market-moving events and serve to attract investor attention and trading activity to newly listed tokens. Indeed, Coinbase's own public filings acknowledge that a substantial portion of the company's revenue derives from transaction fees generated when customers buy, sell, or trade digital assets on the platform.

228. On Coinbase's informational pages for DOT, the company solicited investment into the token by presenting market capitalization, price performance, and historical price information alongside investor-oriented tools designed to facilitate speculative trading.[183] Coinbase also hosted modeling tools and interfaces allowing users to evaluate potential returns from purchasing DOT under hypothetical investment scenarios, including price-prediction style tools that asked users to consider "If I invested today" outcomes based on projected price movements.[184]

229. Investors in DOT had a reasonable expectation of profits based on the efforts of others. The value of the DOT token depended entirely on the success and continued development of the Polkadot ecosystem, which was controlled and managed by the project's founders, developers, and affiliated entities. The growth of the purported Polkadot ecosystem, including the

---

[182] *Polkadot (DOT) is now available on Coinbase Pro*, COINBASE (Jun. 16, 2021), https://www.coinbase.com/blog/polkadot-dot-is-now-available-on-coinbase.

[183] *See Polkadot Price (DOT)*, COINBASE, https://www.coinbase.com/price/polkadot (last visited Mar. 12, 2026) (displaying price charts, market capitalization, trading volume, circulating supply, and historical price performance for DOT).

[184] *See DOT price prediction*, COINBASE, https://www.coinbase.com/price-prediction/polkadot (allowing users to explore hypothetical future price scenarios and potential returns from purchasing DOT).

adoption of its infrastructure services, staking products, and developer tools, was dependent on the managerial and entrepreneurial efforts of these promoters. Coinbase's promotional materials reinforced the expectation that DOT's value would increase as the Polkadot ecosystem expanded.

230. Coinbase's interests were also aligned with those of DOT investors. Coinbase earned transaction-based revenue each time users purchased or sold DOT on its platform, including through trading fees and spreads embedded in customer transactions. Coinbase's public filings state that a significant portion of its revenues are generated from transaction fees derived from digital asset trading activity. By soliciting investors to purchase DOT and facilitating secondary market trading in the token, Coinbase directly benefited financially from increased trading volume in DOT. Furthermore, the Polkadot management team and other insiders were also financially aligned with investors. In fact, "Polkadot's ownership remains highly concentrated, with a significant portion of DOT held by a relatively small number of large wallets" held by Polkadot executives and insiders.[185] As such, DOT purchasers were investing in a common enterprise with Polkadot whereby the fortunes of DOT insiders and retail investors were tied.

231. Accordingly, DOT constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold DOT to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**19. Polygon (MATIC)**

232. Polygon (MATIC) is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

233. MATIC is the native token of the Polygon network. The Polygon network is an Ethereum scaling platform that enables developers to build scalable user-friendly dApps with low

---

185 Dan Mitchell, *Who owns the most Polkadot crypto? DOT token attracting interest for its ESG credentials*, CAPITAL.COM (Nov. 24, 2025), https://capital.com/en-int/analysis/polkadot-who-owns-most-dot-crypto-tokens-esg-credentials.

transaction fees, purportedly by hosting "sidechains" that run alongside the Ethereum blockchain, and allows users to process transactions and initiate the transfer of assets and technology development on Polygon's supposedly less congested sidechain network.

234. The information Polygon publicly disseminated has led MATIC holders to reasonably expect to profit from Polygon's efforts to grow the Polygon protocol, which, in turn, would increase the demand for and the value of MATIC. For example, Polygon stated publicly, including in the whitepaper, that it would pool investment proceeds through its private and public fundraising to develop and grow its business. MATIC was promoted to investors as an asset whose value would increase as the Polygon network grew and expanded.

235. Coinbase announced on March 9, 2021 that Polygon (MATIC) was launching on Coinbase Pro, stating that users could transfer MATIC into Coinbase Pro ahead of trading and that trading would begin "on or after 9AM Pacific Time (PT) Thursday March 11" if liquidity conditions were met.[186] On March 11, 2021, Coinbase announced it supported Polygon (MATIC) at Coinbase.com and in its Android and iOS apps, stating that customers could "buy, sell, convert, send, receive, or store" MATIC.[187]

236. Coinbase's webpage about MATIC includes "Polygon Insights" featuring what "Bulls say" and what "Bears say," with the "bull" case for investing in MATIC stating that "[b]y market capitalization and users, Polygon is one of the most popular scaling solutions for Ethereum" in part because "[i]t caters to diverse use cases and is renowned for its rapid, cost-effective transactions," and noted that a June 2023 update "aims to strengthen the platform's architecture, promote a variety of decentralized applications, and signal a commitment to fostering a vibrant ecosystem."

---

[186] *Polygon (MATIC), SKALE (SKL) and SushiSwap (SUSHI) are launching on Coinbase Pro*, COINBASE BLOG (Mar. 9, 2021), https://www.coinbase.com/blog/polygon-matic-skale-network-skl-and-sushiswap-sushi-are-launching-on-coinbase-pro.

[187] *Polygon (MATIC), SKALE (SKL) and SushiSwap (SUSHI) are now available on Coinbase*, COINBASE BLOG (Mar. 11, 2021), https://www.coinbase.com/blog/polygon-matic-skale-skl-and-sushiswap-sushi-are-now-available-on-coinbase.

237. Coinbase's MATIC-related web funnel solicits investors to purchase MATIC. First, Coinbase maintains an MATIC "price" page with a "Buy MATIC" prompt, "Trading Insights" metrics (buyer ratio, number of buyers/sellers, and trade counts), and other investor-facing market data.[188] Coinbase provides an MATIC "price prediction" page that uses explicitly investment-framed language "If I invested today", to display a "Predicted Total in 5 years," and it places a "Buy MATIC" call-to-action in immediate proximity to the prediction output.[189]

238. Accordingly, MATIC constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold MATIC to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**20. NKN Token ("NKN")**

239. NKN is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

240. NKN is the native token of the NKN network (New Kind of Network), a public-blockchain-based peer-to-peer networking protocol that incentivizes "miners"/nodes to relay data and share bandwidth. The NKN token was promoted to investors as an asset whose value would increase as the NKN network grew and expanded.

241. Coinbase announced on April 7, 2021 that NKN was launching on Coinbase Pro.[190] Coinbase instructed customers to "transfer NKN" into their Coinbase Pro accounts "ahead of

---

[188] *Explore Crypto*, COINBASE, https://www.coinbase.com/price/matic (last visited Mar. 12, 2026).

[189] *Explore Crypto*, COINBASE, https://www.coinbase.com/price-prediction/matic (last visited Mar. 12, 2026).

[190] *1inch (1INCH), Enjin Coin (ENJ), NKN (NKN) and Origin Token (OGN) are launching on Coinbase Pro*, COINBASE BLOG (Apr. 7, 2021), https://www.coinbase.com/blog/1inch-1inch-enjin-coin-enj-nkn-nkn-and-origin-token-ogn-are-launching-on-coinbase-pro.

trading,". Coinbase also invited customers to "sign up" for an account "to start trading." On April 9, 2021, Coinbase announced that NKN was available on its main retail platform.[191]

242. Coinbase's NKN-related web funnel solicits investors to purchase NKN. First, Coinbase maintains an NKN "price" page with a "Buy NKN" prompt, "Trading Insights" metrics (buyer ratio, number of buyers/sellers, and trade counts), and other investor-facing market data.[192] Coinbase provides an NKN "price prediction" page that uses explicitly investment-framed language "If I invested today", to display a "Predicted Total in 5 years," and it places a "Buy NKN" call-to-action in immediate proximity to the prediction output.[193]

243. Accordingly, NKN constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold NKN to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**21. NuCypher Token ("NU")**

244. NU is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

245. NuCypher (NU) is an Ethereum token that can be staked to run a node on the NuCypher network; Coinbase describes NuCypher as a threshold cryptography network that provides data privacy and key management for decentralized applications and protocols.[194]

---

191 *1inch (1INCH), Enjin Coin (ENJ), NKN (NKN) and Origin Token (OGN) are now available on Coinbase*, COINBASE BLOG (Apr. 9, 2021), https://www.coinbase.com/blog/1inch-1inch-enjin-coin-enj-nkn-nkn-and-origin-token-ogn-are-now-available-on.

192 *NKN Price (NKN)*, COINBASE, https://www.coinbase.com/price/nkn (last visited Mar. 12, 2026).

193 *NKN price prediction*, COINBASE, https://www.coinbase.com/price-prediction/nkn (last visited Mar. 12, 2026).

194 *NuCypher Price (NU)*, COINBASE, https://www.coinbase.com/price/nucypher (last visited Mar. 12, 2026).

246. Coinbase announced on November 30, 2020 that NU was launching on Coinbase Pro.[195] Coinbase instructed customers to "transfer NU" into their Coinbase Pro accounts "ahead of trading," and stated that trading would begin. Coinbase also invited customers to "sign up" for an account "to start trading." On December 3, Coinbase announced that NU was available on its main retail platform.[196]

247. Coinbase's NuCypher-related web funnel solicits investors to purchase NU. First, Coinbase maintains an NU "price" page with "Trading Insights" metrics (buyer ratio, number of buyers/sellers, and trade counts), and other investor-facing market data.[197] Coinbase provides an NU "price prediction" page that uses explicitly investment-framed language "If I invested today", to display a "Predicted Total in 5 years".[198]

248. Accordingly, NU constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold NU to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

249. During the Class Period, members of the Class invested in OP on the Coinbase Digital Asset Platforms by exchanging money or digital assets for OP and paid Coinbase a fee for executing the transaction. OP investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their OP, which they expected to result predominantly, if not solely, from the efforts of OP's creator, developer, and issuer.

---

195 *NuCypher (NU) is launching on Coinbase Pro*, COINBASE BLOG (Nov. 30, 2020), https://www.coinbase.com/blog/nucypher-nu-is-launching-on-coinbase-pro.

196 *NuCypher (NU) is now available on Coinbase*, COINBASE BLOG (Dec. 3, 2020), https://www.coinbase.com/blog/nucypher-nu-is-now-available-on-coinbase.

197 *NuCypher Price (NU)*, COINBASE, https://www.coinbase.com/price/nucypher (last visited Mar. 12, 2026).

198 *NU price prediction*, COINBASE, https://www.coinbase.com/price-prediction/nucypher (last visited Mar. 12, 2026).

**22. Origin Token (OGN)**

250. OGN is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

251. OGN is the governance and value-accrual token of Origin Protocol, with governance and economic rights primarily exercised by staking OGN into xOGN (a locked position that concentrates voting weight and reward share). The token was promoted to investors as an asset whose value would increase as the Origin Ecosystem grew.

252. Coinbase announced on April 7, 2021 that OGN was launching on Coinbase Pro.[199] Coinbase also invited customers to "sign up" for an account "to start trading." On April 9, Coinbase announced that OGN was available on its main retail platform.[200]

253. Coinbase's OGN-related web funnel solicits investors to purchase OGN. First, Coinbase maintains an OGN "price" page with a "Buy OGN" prompt, "Trading Insights" metrics (buyer ratio, number of buyers/sellers, and trade counts), and other investor-facing market data.[201] Coinbase provides an OGN "price prediction" page that uses explicitly investment-framed language "If I invested today", to display a "Predicted Total in 5 years," and it places a "Buy OGN" call-to-action in immediate proximity to the prediction output.[202]

254. Accordingly, OGN constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold OGN to

---

[199] *1inch (1INCH), Enjin Coin (ENJ), NKN (NKN) and Origin Token (OGN) are launching on Coinbase Pro*, COINBASE BLOG (Apr. 7, 2021), https://www.coinbase.com/blog/1inch-1inch-enjin-coin-enj-nkn-nkn-and-origin-token-ogn-are-launching-on-coinbase-pro.

[200] *1inch (1INCH), Enjin Coin (ENJ), NKN (NKN) and Origin Token (OGN) are now available on Coinbase*, COINBASE BLOG (Apr. 9, 2021),https://www.coinbase.com/blog/1inch-1inch-enjin-coin-enj-nkn-nkn-and-origin-token-ogn-are-now-available-on.

[201] *Explore crypto*, COINBASE, https://www.coinbase.com/price/origin (last visited Mar. 12, 2026).

[202] *Explore crypto*, COINBASE, https://www.coinbase.com/price-prediction/origin (last visited Mar. 12, 2026).

investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**23. Propy (PRO)**

255. PRO is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

256. Propy Token (PRO) is a token issued on the Ethereum blockchain associated with the Propy platform that assists with onchain title-registry functions such as minting Address NFTs and recording deeds onchain. PRO was promoted to investors as a digital asset whose value would increase as the Propy platform expanded and gained adoption.

257. Coinbase Pro announced on Jan. 12, 2022 that PRO would launch on Coinbase Pro, with transfers enabled ahead of trading and trading expected to begin on or after 9AM PT on Jan. 13, 2022 if liquidity conditions were met; the next day, Coinbase posted that PRO was available on Coinbase.com and in its consumer apps, and that customers could trade, send, receive, or store PRO.[203]

258. Coinbase's Propy-related web funnel solicits investors to purchase PRO. First, Coinbase maintains a PRO "price" page with a "Buy PRO" prompt, "Trading Insights" metrics (buyer ratio, number of buyers/sellers, and trade counts), and other investor-facing market data.[204] Coinbase provides a PRO "price prediction" page that uses explicitly investment-framed language "If I invested today", to display a "Predicted Total in 5 years," and it places a "Buy PRO" call-to-action in immediate proximity to the prediction output.[205]

259. Accordingly, PRO constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the

---

203 *Inverse Finance (INV), Liquity (LQTY), Polyswarm (NCT) and Propy (PRO) are launching on Coinbase Pro*, COINBASE BLOG (Jan. 12, 2022), https://www.coinbase.com/blog/inverse-finance-inv-liquity-lqty-polyswarm-nct-and-propy-pro-are-launching-on-coinbase.

204 *PropyPrice (PRO)*, COINBASE, https://www.coinbase.com/price/propy (last visited Mar. 12, 2026).

205 *PRO price prediction*, Coinbase, https://www.coinbase.com/price-prediction/propy (last visited Mar. 12, 2026).

entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold PRO to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**24. Shiba Inu ("SHIB")**

260. SHIB is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. Shiba Inu (SHIB) is a token issued on the Ethereum blockchain associated with the Shiba Inu Token ecosystem, that supports projects like an NFT art incubator and the development of a decentralized exchange called Shibaswap. SHIB was promoted to investors as a digital asset whose value would increase as the Shiba Inu ecosystem expanded and gained adoption. Utility/use cases in the Shiba Inu ecosystem include payments and financial services on Shibarium, decentralized exchange functionality through ShibaSwap, and staking/governance features.

261. Coinbase announced on June 15, 2021, that SHIB was launching on Coinbase Pro.[206] Coinbase also invited customers to "sign up" for an account "to start trading." On September 16, 2021, Coinbase announced that SHIB was available on its main retail platform.[207]

262. Coinbase's Shiba Inu-related web funnel solicits investors to purchase SHIB. First, Coinbase maintains an SHIB "price" page with a "Buy SHIB" prompt, "Trading Insights" metrics (buyer ratio, number of buyers/sellers, and trade counts), and other investor-facing market data.[208] Coinbase provides an SHIB "price prediction" page that uses explicitly investment-framed

---

[206] *Chiliz (CHZ) Keep Network (KEEP) and Shiba Inu (SHIB) are launching on Coinbase Pro*, COINBASE BLOG (Jun. 15, 2021), https://www.coinbase.com/blog/chiliz-chz-keep-network-keep-and-shiba-inu-shib-are-launching-on-coinbase-pro.

[207] *Shiba Inu (SHIB) is now available on Coinbase*, COINBASE BLOG (Sep. 16, 2021), https://www.coinbase.com/blog/shiba-inu-shib-is-now-available-on-coinbase.

[208] *SHIBA INU Price (SHIB)*, COINBASE, https://www.coinbase.com/price/shiba-inu (last visited Mar. 12, 2026).

language "If I invested today", to display a "Predicted Total in 5 years," and it places a "Buy SHIB" call-to-action in immediate proximity to the prediction output.[209]

263. Accordingly, SHIB constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold SHIB to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

264. During the Class Period, members of the Class invested in SUI on the Coinbase Digital Asset Platforms by exchanging money or digital assets for SUI and paid Coinbase a fee for executing the transaction. SUI investor Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their SUI, which they expected to result predominantly, if not solely, from the efforts of SUI's creator, developer, and issuer.

265. Upon information and belief, SUI was first offered on the Coinbase Digital Asset Platforms in May 2023.

**25. Solana (SOL)**

266. "SOL" is the native token of the Solana blockchain. SOL can be bought and sold for fiat currency or other crypto assets on numerous secondary trading platforms, and has been available for trading on the Coinbase Platform since approximately June 2021.

267. The Solana blockchain was created by Solana Labs, Inc. ("Solana Labs"), a Delaware corporation headquartered in San Francisco. Solana Labs was founded in 2018 by Anatoly Yakovenko and Raj Gokal, who are Solana Labs' current CEO and COO, respectively. According to Solana's website, the Solana blockchain is a network upon which decentralized apps ("dApps") can be built, and aims to improve blockchain scalability and achieve high transaction speeds by using a combination of consensus mechanisms.

---

[209] *SHIB price prediction*, COINBASE, https://www.coinbase.com/price-prediction/shiba-inu (last visited Mar. 12, 2026).

268. Between May 2018 and early March 2020, Solana Labs filed multiple forms with the SEC claiming that its offers and sales of securities were exempt from registration under Rule 506(c) of Regulation D. In its SEC filings, Solana described its offers and sales of securities as the sale and issuance of rights to receive Solana Labs, Inc. tokens in the future via a Simple Agreement for Future Tokens (SAFTs). Solana sold approximately 177 million SOL through such offers and sales, raising over $23 million.

269. In March 2020, on the CoinList trading platform (www.coinlist.co), Solana Labs sold additional SOL in a "Dutch auction," where investors place bids and the entire offering occurs at the price with the highest number of bidders. Through this offering, Solana Labs sold approximately 8 million SOL, at an average price of $0.22, raising approximately $1.76 million. In the summer of 2021, Solana Labs completed another, purportedly private, sale of SOL, raising over $314 million from investors, each of whom paid for SOL with fiat currency. On information and belief, these investors were required to sign a purchase agreement.

270. Solana Labs took steps in 2020 to make SOL available for trading on crypto asset trading platforms. For example, in a September 17, 2020, X post, Solana Labs stated: "The Solana community in the United States has been eagerly awaiting the chance to trade SOL on a U.S. exchange, and now that day has come. SOL/USDT, SOL/USD, and SOL/BTC pairs are all open for trading on @ftx_us."[210] Later that same day, Solana Labs tweeted: "@BinanceUS announces Support for SOL, making it the Second US Exchange to list SOL within one day."

271. Solana Labs publicly disseminated information based on which SOL purchasers, including those who purchased SOL since June 2021, reasonably viewed SOL as an investment in and expected to profit from Solana Labs' efforts to develop, expand, and grow the Solana network, which, in turn, would increase the demand for and the value of SOL.

272. Solana Labs stated publicly that it would use the proceeds from its SOL sales to fund the development, operations, and marketing efforts with respect to the Solana blockchain in

[210] Solana (@solana), X (Sep. 17, 2020 at 13:20), https://x.com/solana/status/1306644088452648960?s=20.

order to attract more users to that blockchain. Such efforts were an attempt to increase the demand for, and therefore the value of, SOL itself, given the need for those who wish to interact with the Solana blockchain to tender SOL and the need for those who wish to earn SOL rewards by validating Solana transactions to hold and stake SOL. For example, in connection with the 2021 private sale of SOL, Solana Labs stated publicly that it would use investor funds to: (i) "accelerate the deployment of market-ready applications focused on onboarding the next billion users into crypto"; (ii) "launch an incubation studio to accelerate the development of decentralized applications and Platforms building on Solana"; and (iii) develop a "venture investing arm" and "trading desk dedicated to the Solana ecosystem."

273. Of the 500 million SOL tokens Solana Labs initially minted, 12.5% were allocated to Solana Labs' founders, including Yakovenko and Gokal, and another 12.5% to the Solana Foundation, a non-profit organization headquartered in Zug, Switzerland "dedicated to the decentralization, growth, and security of the Solana network."[211] On April 8, 2020, Solana Labs transferred 167 million SOL tokens to the Solana Foundation, and in its public announcement about the creation of the Solana Foundation, Solana Labs stated that "[t]he Foundation's initial focus is expanding and developing the ecosystem of the Solana protocol." Both of Solana Labs' two original founders have worked for the Solana Foundation: Gokal serves as a current member of the Solana Foundation Council, and Yakovenko was a member and President of the Solana Foundation Council until December 2021, when he stepped down to focus on his work at Solana Labs.

274. In public statements on its website and social media pages, including statements made and available while SOL has been available to trade on the Coinbase Platform, Solana specified its expertise in developing blockchain networks and described the efforts Solana and its founders had made and would continue to make to develop the Solana blockchain protocol and

---

211 Solana (@solana), X, https://x.com/SolanaFndn?lang=en (bio information).

attract users to the technology, which, again, required those utilizing the technology to demand some amount of SOL.

275. Through promotional efforts, Solana Labs boosted increased participation in its network and thus demand for SOL, including through: (a) "Validated," a Solana podcast of which there have been at least 140 episodes since July 2019, with interviews of key Solana Labs management and other key personnel, including Yakovenko; (b) a YouTube channel with over 80,000 subscribers; and (c) dedicated Telegram, Twitter, Reddit, Discord, and GitHub channels, with links to each available on Solana's website.

276. Solana Labs' promotional statements via these channels about SOL and Solana Labs' efforts to increase demand and value for SOL include:

- July 28, 2019 blog post in which Yakovenko stated that "Solana . . . supports upwards of 50,000 TPS" (transactions per second) "making it the most performant blockchain and the world's first web-scale decentralized network" and that the "Solana team—comprised of pioneering technologists from [several high-profile technology companies]—has focused on building the tech required for Solana to function with these groundbreaking performance standards";[212]
- A statement on its website that "Solana is engineered for widespread, mainstream use by being energy efficient, lightning fast, and extremely inexpensive" and that "[m]any of the core Solana builders, like co-founder Anatoly Yakovenko, have a background in building cell phone networks," which "means that they are singularly focused on building for scalability (the ability to grow) and efficiency (the ability to get the most information across with the least amount of resources)";
- An April 14, 2021 post on Medium.com in which Yakovenko touted the Solana network's ability to "support a theoretical peak capacity of 65,000 transactions

[212] *8 Innovations that Make Solana the First Web-Scale Blockchain*, SOLANA (Jul. 28, 2019), https://solana.com/news/8-innovations-that-make-solana-the-first-web-scale-blockchain.

per second, currently" ("around 10,000 times faster than Bitcoin, 4,000 times faster than Ethereum, and 35 times faster than Ripple—even around 2.5 times faster than Visa") and projecting that such speed would "doubl[e] in capacity every two years with improvements in hardware and bandwidth";[213]

- A December 23, 2022 post marketing various "upgrades" that Solana and its engineers would undertake, including "turbine optimizations" introduced by the "core engineering team," which Yakovenko described as the "coolest piece of technology that we built that nobody knows about;"[214] and
- A January 3, 2024 post stating that "throughout 2023, the developer ecosystem has made major advancements in tooling, developer experience, quality of content, and diversity of available programming languages."[215]

277. Solana Labs also markets that it burns SOL tokens as part of a "deflationary model." As Yakovenko explained in an April 14, 2021 article, "Solana transaction fees are paid in SOL and burnt (or permanently destroyed) as a deflationary mechanism to reduce the total supply and thereby maintain a healthy SOL price."[216] Solana explained on its website that since the Solana Network was launched, the "Total Current Supply" of SOL "has been reduced by the burning of transaction fees and a planned token reduction event." This marketed burning of SOL as part of the Solana network's "deflationary mechanism" has led investors reasonably to view their purchase of SOL as having the potential for profit to the extent there is a built-in mechanism to decrease the supply and increase the price of SOL.

---

[213] *Solana (SOL) — A Case Study*, MEDIUM (Apr. 27, 2023) https://medium.com/coinmonks/solana-sol-a-case-study-c3bb4ce12bed.

[214] *Looking forward: What the Solana community will tackle in 2023 and beyond*, SOLANA FOUNDATION (Dec. 23, 2022), https://solana.com/news/looking-forward-what-the-solana-community-will-tackle-in-2023-and-beyond.

[215] *The 2023 State of the Solana Developer Ecosystem*, SOLANA FOUNDATION (Jan 8, 2024), https://solana.com/news/2023-state-of-solana-developer-ecosystem.

[216] *Solana (SOL)*, UPHOLD, https://uphold.com/prices/crypto/solana-price (last visited Mar. 12, 2026).

278. SOL may be "staked" on the Solana blockchain to earn rewards from validating transactions on the blockchain, and, to avoid potential bad actors from "spamming" the blockchain, a small amount of SOL must be "burned" to propose a transaction on the Solana blockchain. Solana publicly advertises the financial rewards available for staking SOL, including on its website.

279. Coinbase has touted that Solana's "approach has attracted interest from a diverse range of traders, from small-scale individuals to institutional entities," and "Solana's protocol is designed to serve both small-time users and enterprise customers alike, aiming to make decentralized finance accessible on a larger scale."[217]

280. On February 5, 2024, in a "Solana Insights" section on its platform, Coinbase noted the "Bulls" case for investing in SOL: "Solana's distinctive scaling approach makes it attractive for those seeking efficient blockchain solutions" and that "the Solana community has remained steadfast and actively engaged" in part because "[t]he platform is known to iterate quickly, demonstrating a commitment to continual improvement and adaptability, regularly introducing new features and updates that enhance user experience and expand its capabilities." Solana's performance also resulted in Coinbase publicizing that crypto research firm Messari declared the token "crypto's comeback player of the year."

281. Each of these statements and announcements highlighted the "rewards" that investors could enjoy from purchasing SOL and served to create a reasonable expectation of profit within DOT purchasers.

282. SOL peaked at a price of approximately $293 and a market capitalization of approximately $140 billion on January 19, 2025. As of March 12, 2026, SOL traded at around $86.88 with a market capitalization of approximately $49.6 billion—reflecting a price drop of more than 70% and a loss of approximately $90 billion in market value.

---

[217] *Solana (SOL)*, COINBASE, https://www.coinbase.com/en-gb/price/.

**26. Stellar Lumins (XLM)**

283. XLM is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period. XLM powers the Stellar payment network. Stellar aims to connect the world's financial system, enabling businesses and developers to take advantage of the network's fast speeds, low transaction costs, and interoperability. In March 2019, Coinbase announced that XLM would be available on Coinbase Pro[218] and on the Coinbase retail platform.[219]

284. Coinbase's XLM-related web funnel solicits investors to purchase XLM. First, Coinbase maintains an XLM "price" page with a "Buy Stellar" prompt, "Trading Insights" metrics (buyer ratio, number of buyers/sellers, and trade counts), and other investor-facing market data.[220] Coinbase provides an XLM "price prediction" page that uses explicitly investment-framed language "If I invested today" to display a "Predicted Total in 5 years," and it places a "Buy Stellar Lumens" call-to-action in immediate proximity to the prediction output.[221]

285. Accordingly, XLM constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold XLM to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

286. Accordingly, SHIB constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the

---

218 *Support for XLM will be immediately available in Coinbase's supported jurisdictions, with the exception of New York State. Additional jurisdictions may be added at a later date*, COINBASE (Mar. 13, 2019), https://www.coinbase.com/blog/stellar-lumens-xlm-is-launching-on-coinbase-pro.

219 *Stellar Lumens (XLM) now available on Coinbase*, COINBASE (Mar. 3, 2019), https://www.coinbase.com/blog/stellar-lumens-xlm-now-available-on-coinbase.

220 *Stellar Lumens Price (XLM)*, COINBASE, https://www.coinbase.com/price/stellar.

221 *Steller Lumens price prediction*, COINBASE, https://www.coinbase.com/price-prediction/stellar.

entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold SHIB to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**27. SUKU (SUKU)**

287. SUKU is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

288. SUKU is a token issued on the Ethereum blockchain. Citizens Reserve, Inc. is the team behind the Suku Network and the SUKU token, which aims to "transform the web3 experience to be more accessible, faster, and simpler to use, for everyone." [222] Citizen's Reserve is headquartered in Miami, Florida and incorporated in Delaware. According to their whitepaper, "SUKU is a blockchain-based ecosystem that aims to make supply chains more transparent, efficient, and accessible by offering a supply-chain-as-a-service platform that connects businesses and consumers."[223] This ecosystem includes the SUKU token which is "used by Trading Partners and Technology Partners within the SUKU Ecosystem."[224] Those Trading and Technology Partners are then incentivized to use and promote the platform in exchange for reserve SUKU tokens.[225] As of the filing of this complaint, SUKU has a market cap of $4.42 million, with nearly 585 million tokens in circulation of the 1.5 billion total supply.[226]

---

[222] *Suku Home*, SUKU, https://www.suku.world/#top (last visited Mar. 12, 2026).

[223] 2020 WHITEPAPER, SUKU, https://resources.suku.world/suku_one_pager.pdf (last visited Mar. 12, 2026).

[224] *Id.*

[225] *Id.*

[226] *SUKU Price (SUKU)*, COINBASE, https://www.coinbase.com/price/suku?q=SUKU (last visited Mar. 12, 2026).

289. SUKU first became available on Coinbase on November 3, 2021.[227] Suku also announced a partnership with Coinbase on January 7, 2025.[228] The partnership allowed users to "add funds with 0% fee with debit card and Apple Pay" making it easier than ever to use Suku Pay by "introducing new on-ramps." Coinbase also advertised the partnership by touting the ability to use SukuPay "within seconds…to send money to 150+ countries worldwide" and hyped the "ZERO-fee USDC conversions."[229] Suku Pay was then integrated into the largest bank in Guatemala and thanked Coinbase for "building the rails of tomorrow with us."[230] Coinbase also promoted the Suku partnership with Banco Industrial in Guatemala and further advertised its own partnership with Suku Pay in the same post.[231]

290. On Coinbase's informational pages for SUKU, the company solicited investment into the token by presenting market capitalization, price performance, and historical price information alongside investor-oriented tools designed to facilitate speculative trading.[232] Coinbase also hosted modeling tools and interfaces allowing users to evaluate potential returns from purchasing SUKU under hypothetical investment scenarios, including price-prediction style tools that asked users to consider "If I invested today" outcomes based on projected price movements.[233]

---

[227] *Crypto.com Protocol (CRO) and SUKU (SUKU) are launching on Coinbase*, COINBASE BLOG (Nov. 3, 2021), https://www.coinbase.com/blog/crypto-com-protocol-cro-and-suku-suku-are-launching-on-coinbase.

[228] Suku (@Suku_world), X (Jan. 7, 2025, at 15:11), https://x.com/Suku_world/status/1876723441895715083.

[229] Coinbase Developer Platform (@CoinbaseDev), X (Dec. 5, 2024, at 17:40), https://x.com/CoinbaseDev/status/1864802149517135897.

[230] Suku (@Suku_world), X (May 21, 2025, at 13:01), https://x.com/Suku_world/status/1925235403402948881.

[231] Coinbase Developer Platform (@CoinbaseDev), X (May 21, 2025, at 16:09), https://x.com/CoinbaseDev/status/1925282818306773260.

[232] *How to Buy SUKU on Coinbase in the United States*, Coinbase, https://www.coinbase.com/how-to-buy/suku (last visited Mar. 12, 2026).

[233] *SUKU Price (SUKU)*, COINBASE, https://www.coinbase.com/price/suku (last visited Mar. 12, 2026).

291. Investors in SUKU had a reasonable expectation of profits based on the efforts of others. The value of the SUKU token depended entirely on the success and continued development of the Suku Network, which was controlled and managed by the project's founders, developers, and affiliated entities. The growth of the purported Suku ecosystem, including the adoption of its infrastructure services, staking products, and developer tools, was dependent on the managerial and entrepreneurial efforts of these promoters. Coinbase's promotional materials reinforced the expectation that SUKU's value would increase as the Suku Network expanded.

292. Coinbase's interests were also aligned with those of SUKU investors. Coinbase earned transaction-based revenue each time users purchased or sold SUKU on its platform, including through trading fees and spreads embedded in customer transactions. Coinbase's public filings state that a significant portion of its revenues are generated from transaction fees derived from digital asset trading activity. By soliciting investors to purchase SUKU and facilitating secondary market trading in the token, Coinbase directly benefited financially from increased trading volume in SUKU. Not to mention Coinbase is a partner in the Suku Network and has more than transaction fees to gain from the increased usage and profit of the Suku Network.

293. Accordingly, SUKU constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold SUKU to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

**28. 0x Protocol (ZRX)**

294. ZRX is a Digital Asset Security that was listed on the Coinbase Digital Asset Platforms during the Class Period.

295. ZRX is the governance token for 0x Protocol. On its ZRX informational page, Coinbase describes ZRX as an Ethereum token used to power the 0x protocol, which is designed to allow Ethereum tokens to be traded at low cost directly from a user's wallet.

296. Coinbase announced on October 11, 2018 that ZRX was "launching on Coinbase Pro."[234] Coinbase instructed customers to "transfer ZRX" into their Coinbase Pro accounts "ahead of trading". Coinbase also invited customers to "sign up" for an account "to start trading." On October 16, 2018, following day, Coinbase launched trading for ZRX on its main retail platform.[235]

297. Accordingly, ZRX constitutes a security because it represents an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial and managerial efforts of others. Coinbase nonetheless offered and sold ZRX to investors through its trading platform without registering the token offering or qualifying for any exemption from the registration requirements.

298. During the Class Period, members of the Class, including Plaintiffs, invested in, among other tokens, 1INCH, AAVE, ABT, ADA, AMP, AVAX, CRO, ENJ, GALA, GODS, LINK, LRC, MATIC, NKN, NU, OGN, PRO, SHIB, and ZRX tokens on the Coinbase Digital Asset Platforms by exchanging money or digital assets for these tokens and paid Coinbase a fee for executing the transactions. Token investors on the Coinbase Digital Asset Platform users expected to earn profits through the appreciation in value of their tokens, which they expected to result predominantly, if not solely, from the efforts of the tokens' creators, developers, and issuers.

### 29. Coinbase Earn Accounts

299. Coinbase Earn accounts ("Earn") are each a Digital Asset Security that was offered and sold on the Coinbase Digital Asset Platforms during the Class Period. Investors in these accounts deposited certain cryptocurrencies (including, but not limited to, BTC, ADA, AVAX, ETH, SOL, NEAR, and DOT) into Coinbase Earn accounts to earn high yield interest rates. These rates advertised by Coinbase were well in excess of the rates concurrently offered on short-term investment-grade fixed income securities or bank savings accounts. After obtaining transfers of

---

[234] *ZRX is now available to trade on Coinbase Pro (Updated)*, COINBASE BLOG (Oct. 11, 2018), https://www.coinbase.com/blog/zrx-is-launching-on-coinbase-pro.

[235] Coinbase (@coinbase), X (Oct. 16, 2018 at 15:12), https://x.com/coinbase/status/1052276216844021760?s=20.

digital assets from retail investors, Defendants then pooled these digital assets together to fund its various income generating activities, including its proprietary trading, new digital asset issuances, and cryptocurrency staking. In exchange for investing in the Coinbase Earn accounts, Defendants promised investors an attractive interest rate that would purportedly be paid regularly in the same type of cryptocurrency as originally invested. The Coinbase website has a devoted page to promoting the Coinbase Earn accounts. For example, on that page, Coinbase defines "staking" as follows:

> Staking a method of verifying and securing transactions on proof-of-stake blockchains, like Ethereum, Solana, Polygon, Polkadot and more. Proof-of-stake blockchains pay crypto asset owners to help verify onchain transactions and keep the network secure.is a cryptocurrency and decentralized computing platform. Its features include proof of stake consensus, formal verification (which lets developers verify the correctness of their code), and the ability to let stakeholders vote on changes to the protocol.[236]

300. During the Class Period, Coinbase advertised that investors could "Earn up to 10% APY on your crypto"[237] and that Coinbase makes it "safe"[238] for retail investors to utilize the Coinbase Earn accounts.

301. During the Class Period, members of the Class invested in Coinbase Earn accounts on the Coinbase Digital Asset Platforms by depositing digital assets in exchange for promised high-yield interest payments. Coinbase Earn account investors expected to earn profits through the disbursement of high yield payments, which they expected to result solely from the efforts of Coinbase.

## II. COINBASE OPERATES AS AN UNREGISTERED BROKER-DEALER

302. Coinbase's activities further meet the definition of a "broker-dealer" under both Florida and California state law. For example, the Cal. Corp. Code, in part, defines a broker as an entity that is "engaged in the business of effecting transactions in securities in this state for the

---

236 *What is staking?*, COINBASE, https://www.coinbase.com/learn/crypto-basics/what-is-staking (last visited Mar. 12, 2026).

237 *Earn up to 14% APY on your crypto with staking*, COINBASE, https://www.coinbase.com/earn (last visited Mar. 12, 2026).

238 *Id.*

account of others[. . . .]" CAL. CORP. §25004(a)s. In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering.

303. Throughout the Class Period, Coinbase operated as a broker by effecting transactions in Digital Asset Securities for Coinbase Platform users by matching buy and sell orders using the Coinbase matching engine as described above. Coinbase also operated as a broker-dealer by facilitating the sale of Digital Asset Securities as part of initial coin offerings ("ICOs").

304. During the Class Period, Coinbase operated as a dealer under both Florida and California state law by, *inter alia*, (1) holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for Digital Asset Securities; (2) maintaining custody over Coinbase Digital Asset Platform customers' Digital Asset Securities; (3) by providing customers services such as allowing purchase of Digital Asset Securities on credit; (4) by having a regular turnover inventory of Digital Asset Securities; (5) by purchasing Digital Asset Securities for accounts in Coinbase's name (often at a discount to the ICO price); and (6) selling the digital assets to investors for profit immediately, or at a later time, after being held in inventory.

305. Coinbase's activities qualify it as a "broker-dealer" since Coinbase has "engaged in the business of effecting transactions in securities in this state for the account of others[. . . .]" *See* CAL. CORP. §25004(a); FLA. STAT. §517.211. Further, Coinbase is not subject to any exemptions for registering as a broker-dealer, which are outlined in FLA. STAT. §517 and CAL. CORP. §25200, respectively.

306. Coinbase admits that it is a "Securities Broker" in the Coinbase User Agreement, stating that that the Digital Assets sold by Coinbase are "financial assets," (*i.e.*, investment contracts or other securities under FLA. STAT. §517.211), that it is a "securities intermediary," (*i.e.*, a clearing corporation or some other person that "maintains securities accounts for others and is

acting in that capacity"), and the Digital Asset Wallets custodially held by Coinbase are "securities account[s]."

307. Like other securities broker/dealers and investment advisors, Coinbase typically acts as a broker (*i.e.*, serving as an agent of both buyer and seller in a securities transaction) in transactions with the customers, but reserves the right to act as a dealer (*i.e.*, buying and selling securities from and for its own account) at its discretion and with no approvals from the customers. In addition, like a trust company or fiduciary, Coinbase retained discretion over most of the related activities.

308. Coinbase solicited every purchase and sale of Digital Asset Securities by means of general solicitations including those on its website and in social media advertising, traditional advertising, and even Super Bowl commercials. At all times, Coinbase was soliciting the customers to invest in the Digital Asset Securities that it offered on its broker platform. No use case other than investing was ever offered by Coinbase to its customers because there is no other use case.

309. In violation of Florida and California state securities laws, Coinbase has promoted, offered, and sold Digital Asset Securities knowing it had not been registered as required by law. As a result, Coinbase is liable to the customers for the full amount of their statutory damages.

310. Additionally, a cryptocurrency exchange such as Coinbase accepts deposits of digital assets, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange, Coinbase then has dominion and control over those assets. Coinbase then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability of the exchange to its customer.

311. Digital assets so deposited in the customer's Coinbase account receive a credit from Coinbase, which the customer could then take and trade for another cryptocurrency or fiat currency, leave as a balance on the exchange account (leaving an open liability of the exchange to the customer), or withdraw.

312. Coinbase customers do not control access to the assets "in" their respective accounts. The customer needs to make a request to Coinbase to be able to access and send those balances. Coinbase then debits the user account and sends the assets. The processing of such requests are entirely dependent on the willingness, ability, and approval of Coinbase.

313. All exchange accounts with any centralized custodial exchange, including the Coinbase accounts at issue here, are custodial in nature. This means that the customer does not control access to the assets "in" their account, Coinbase does. Notably, a Coinbase customer account cannot hold or store cryptocurrency (thus, the digital assets cannot be "in" such an account). Instead, the Coinbase customer account stores a record of a liability or an IOU to the exchange's customer. It is this "IOU" investment that Plaintiffs purchased from Defendants during the Class Period.

314. Had Coinbase registered with the appropriate state regulatory bodies in either Florida or California as required by law, Coinbase would have been further required to register with FINRA and be bound by FINRA regulations, which includes a prohibition against FINRA members seeking to waive class action liability when conducting business as a FINRA member. Particularly, "FINRA rules prohibit firms [like Coinbase] attempting to prevent investors from participating in judicial class actions by adding waiver language to customer agreements."[239]

## III. PLAINTIFFS ARE ENTITLED TO FEES AND DAMAGES

315. Even though the Digital Asset Securities are unregistered securities under both the *Howey* test, as adopted in Florida and California, and statutory definitions for the same under those states' securities laws, and the Coinbase Digital Platforms operate as a broker-dealer under both Florida and California law, Coinbase has not registered the Coinbase Digital Asset Platforms as a broker-dealer in either state, nor has Coinbase registered with FINRA.

---

[239] *Securities Class Action Lawsuits: What Investors Should Know*, FINRA (Jan. 9, 2018), https://www.finra.org/investors/insights/securities-class-action-lawsuits#:~:text=FINRA%20rules%20also%20prohibit%20firms,language%20to%20customer%20account%20agreements.

316. California and Florida state law affords Plaintiffs and the Class the right, which they hereby pursue, to void their purchase or sale agreements with Coinbase and to recover damages, including the fees they have paid under those agreements.

317. Plaintiffs and the Class additionally seek to void their contracts and recover damages with respect to purchases or sales of Digital Asset Securities on the Coinbase Digital Asset Platforms.

## CLASS ALLEGATIONS

318. Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased the Digital Asset Securities (including, but not limited to, 1INCH, ABT, ACH, ADA, AMP, ALGO, AVAX, CRO, DOT, ENJ, FET, LINK, MANA, MATIC, OGN, PRO, SHIB, SOL, XLM, XTZ, ZEN, and ZRX, as well as Coinbase Earn accounts) between January 1, 2017 and the commencement of this action.[240]

319. Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers, and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

320. **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class is unknown at this time, such information being in the sole possession of Coinbase and/or third parties and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that the Class consists of at least hundreds of people. The number of Class members can be determined based on Coinbase's and other third party's records.

[240] Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

321. **Commonality**: Common questions of law and fact exist as to all members of each Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a. whether Defendant Coinbase offered the Digital Asset Securities for sale;

b. whether Defendant Coinbase offered digital assets for sale that constitute securities under the Florida and California state securities laws;

c. whether Defendant Coinbase offered digital assets for sale that constitute investments under the Florida state securities laws;

d. whether Defendant Coinbase operated as a broker-dealer as defined by the state and/or federal securities laws;

e. whether Defendant Coinbase violated the Florida state securities laws;

f. whether Defendant Coinbase violated the California state securities laws;

g. whether Plaintiffs and the members of the Class and Subclass are entitled to damages and the amount and measure thereof;

h. and whether Plaintiffs and members of the Class and Subclass are entitled to declaratory and injunctive relief.

322. **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs and Class members suffered injuries as a result of Defendants' wrongful conduct that is uniform across the Class and Subclass.

323. **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class, and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer and securities class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

324. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual

prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for individual Class members to effectively redress the wrongs done to them. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly-situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

325. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

326. Plaintiffs have satisfied all conditions precedent to having their claims adjudicated on a class-wide basis.

**CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS**

327. California's substantive laws apply to every member of the Class, regardless of where in the United States the Class members reside.

328. California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, U.S. CONST. amend XIV, §1, and the Full Faith and Credit Clause, U.S. CONST. art. IV, §1, of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

329. Coinbase's historical and effective headquarters and principal place of business is located in California. Upon information and belief, Coinbase also owns property and conducts substantial business in California, and therefore California has an interest in regulating Coinbase's conduct under its laws. Coinbase's decision to reside in California and avail itself of California's

laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.

330. The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

**FIRST CAUSE OF ACTION**
**Violations of California Corporate Securities Law of 1968**
**CAL. CORP. §§25110 & 25503**
**(Sale of Unregistered Securities)**
**(Against Coinbase Global and Coinbase, Inc.)**

331. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 330, and further allege as follows:

332. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot are residents of the State of California.

333. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot paid for or purchased Digital Asset Securities in California, including AAVE, ABT, ADA, AVAX, CRO, DOT, GALA, GODS, MANA, MATIC, PRO, SHIB, SOL, and SUKU, and thus the unlawful conduct alleged herein occurred in California.

334. Plaintiffs bring this claim individually and on behalf of the members of the Class against the Coinbase Global and Coinbase, Inc., Defendants.

335. Coinbase Global and Coinbase, Inc., are the primary violators under this cause of action.

336. The Coinbase Digital Asset Securities are securities within the meaning of the California Corporations Code.

337. The Coinbase Digital Asset Securities were and are required to be registered with the Commissioner of Corporations under California law.

338. Section 25110 makes it illegal, in connection with the purchase or sale of any security, for any person, directly or indirectly, to offer or sell a security in California "unless such

security or transaction is exempted or not subject to qualification under Chapter 1 (commencing with Section 25100) of this part." Further, the offer or sale of such a security "in a manner that varies or differs from, exceeds the scope of, or fails to conform with either a material term or material condition of qualification of the offering [. . .] shall be an unqualified offer or sale." CAL. CORP. §25110.

339. Section 25503 establishes a private remedy for damages under Section 25110 of the California Corporations Code. In particular, violators of Section 25110 "shall be liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned." In the event that the plaintiff no longer owns the security, damages "shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorneys' fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." CAL. CORP. §25503.

340. Conversely, Section 25503 provides that, if the consideration given for the security is not capable of being returned then damages shall be equal to the value of that consideration plus interest at the legal rate from the date of purchase, provided the security is tendered, plus reasonable attorneys' fees; and if the plaintiff no longer owns the security, damages in that case shall be equal to the difference between (a) the value of the consideration given for the security plus interest at the legal rate from the date of purchase, plus reasonable attorneys' fees; and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff. *Id.*

341. Under Section 25503, "[a]ny person on whose behalf an offering is made and any underwriter of the offering, whether on a best efforts or a firm commitment basis, shall be jointly and severally liable under this section."

342. The Coinbase Digital Asset Securities have not been registered with the Commissioner, are not exempt from registration, and are not federally covered. No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

343. Coinbase Global and Coinbase, Inc., by engaging in the conduct described above, directly or indirectly, sold and/or offered to sell securities.

344. Plaintiffs purchased Coinbase Digital Asset Securities from Coinbase Global and/or Coinbase, Inc. The Coinbase Digital Asset Securities were provided and/or sold into the various Coinbase Digital Asset Securities liquidity pools by Coinbase Global and Coinbase, Inc. These actions coincided with Plaintiffs and Class members transacting with the liquidity pools as buyers. Thus, by providing Coinbase Digital Asset Securities to the liquidity pool at the time in which Plaintiffs and the members of the Class made their Coinbase Digital Asset Securities purchases from the liquidity pool on Coinbase, privity between Coinbase Global and/or Coinbase, Inc., and Plaintiffs is established even in the absence of a direct contract linking the two parties.

345. Privity also exists between the issuers and suppliers of the liquidity in the pool (*e.g.*, Coinbase Global and/or Coinbase, Inc.) and all those making purchases (*e.g.*, Plaintiffs and the members of the Class) from the Coinbase exchange because these Defendants are receiving the benefit of a variable buying fee and/or a 1.49% selling fee per Coinbase Digital Asset Securities transaction on that exchange.

346. By reason of the foregoing, each of the Coinbase Global and Coinbase, Inc., Defendants have violated Sections 25110 and 25503 of the California Corporations Code.

**SECOND CAUSE OF ACTION**
**Violation of the Florida Securities and Investor Protection Act**
**FLA. STAT. §517.07**
**(Sale of Unregistered Securities)**
**(Against All Defendants)**

347. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 330, and further allege as follows:

348. Plaintiffs Foy and Maggard are residents of the State of Florida.

349. Plaintiffs Foy and Maggard paid for or purchased Coinbase Digital Asset Securities in Florida, including 1INCH, ACH, ALGO, AMP, CRO, ENJ, FET, GALA, KEEP, LINK, LRC, MANA, MATIC, OGN, NKN, NU, XLM, ZRX, and thus the deceptive transactions alleged herein occurred in Florida.

350. Plaintiffs bring this claim individually, and on behalf of the members of the Class, against all Defendants.

351. The Coinbase Digital Asset Securities are "securities" within the meaning of the term as defined by FLA. STAT. §517.021.

352. Defendants, and each of them, by engaging in the conduct described above within Florida, directly or indirectly, sold and offered to sell securities.

353. Plaintiffs Foy and Maggard, and the members of the purported Class, purchased Coinbase Digital Asset Securities from Defendants.

354. Section 517.07(1) of the Florida Statutes provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Florida Statute §517.051, is sold in a transaction exempt under Florida Statute §517.061, is a federally covered security, or is registered pursuant to Chapter 517 of the Florida Statutes.

355. Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security." FLA. STAT. §517.211(1).

356. The Coinbase Digital Asset Securities sold and offered for sale to Plaintiffs and Class members were not:

a. exempt from registration under FLA. STAT. §517.051;

b. a federal covered security;

c. registered with the Office of Financial Regulations ("OFR"); or

d. sold in a transaction exempt under FLA. STAT. §517.061.

357. Coinbase Global and Coinbase, Inc., by engaging in the conduct described above, directly or indirectly, sold and/or offered to sell securities.

358. Plaintiffs purchased Coinbase Digital Asset Securities from Coinbase Global and/or Coinbase, Inc. The Coinbase Digital Asset Securities were provided and/or sold into the various Coinbase Digital Asset Securities liquidity pools by Coinbase Global and Coinbase, Inc. These actions coincided with Plaintiffs and Class members transacting with the liquidity pools as buyers. Thus, by providing Coinbase Digital Asset Securities to the liquidity pool at the time in which Plaintiffs and the members of the Class made their Coinbase Digital Asset Securities purchases from the liquidity pool on Coinbase, privity between Coinbase Global and/or Coinbase, Inc., and Plaintiffs is established even in the absence of a direct contract linking the two parties.

359. Privity also exists between the issuers and suppliers of the liquidity in the pool (*e.g.*, Coinbase Global and/or Coinbase, Inc.) and all those making purchases (*e.g.*, Plaintiffs and the members of the Class) from the Coinbase exchange because these Defendants are receiving the benefit of a variable buying fee and/or a 1.49% selling fee per Coinbase Digital Asset transaction on that exchange.

360. By reason of the foregoing, each of the Defendants have violated Section 517.07 of the Florida Statues.

**<u>THIRD CAUSE OF ACTION</u>**
**Violation of CAL. CORP. §25210**
**(Unlicensed Broker-Dealer)**
**(Against the Coinbase Global and Coinbase, Inc., Defendants)**

361. Plaintiffs hereby re-allege and incorporate all allegations raised in Paragraphs 1 through 330, as though fully set forth herein.

362. This Cause of Action is brought on behalf of Plaintiffs, Class members, and Subclass members who bought or sold Digital Asset Securities on the Coinbase Digital Asset Platforms in California. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot paid for or purchased Digital Asset Securities in California, including AAVE, ABT, ADA, AVAX,

CRO, DOT, GALA, GODS, MANA, MATIC, PRO, SHIB, SOL, and SUKU, and thus the unlawful conduct alleged herein occurred in California.

363. At all relevant times there was in full force and effect the California Corporate Code, CAL. CORP. §25210, which prohibits, *inter alia*, any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law. *See* CAL. CORP. §25210(a) and (b). Any person who offers or sells a security in violation of Section 25210 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. CAL. CORP. §25501.5(a)(1). Upon recission and tender of the Digital Asset Securities, such purchaser is entitled to recover the consideration paid for the Digital Asset Securities plus interest at the legal rate, less the amount of any income received on the Digital Asset Securities. CAL. CORP. §25501.5(a)(2). A purchaser who no longer owns the Digital Asset Securities is entitled to damages in an amount equal to the difference between: (i) the price at which the security was bought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the Digital Asset Securities by the purchaser. CAL. CORP. §25501.5(a)(4).

364. When issued, the Digital Asset Securities were securities within the meaning of the California Securities Act. CAL. CORP. §25019. Coinbase transacted business as a broker-dealer or agent when it offered or sold the Digital Asset Securities to at least one Plaintiff in California. CAL. CORP. §25004. Coinbase transacted business as a broker-dealer or agent in California, including, without limitation, through solicitations directed by Coinbase to California and received in California.

365. Coinbase was not licensed as a broker-dealer or agent in California, nor was it subject to any exemption from licensing.

366. Accordingly, Coinbase has violated the California Securities Act by transacting business as an unlicensed broker-dealer or agent in the sale of securities.

367. Plaintiffs and Class members therefore seek all available and appropriate relief available under the California Securities Act, including damages for consideration and fees paid

in connection with, and a result of, all Digital Asset Securities transactions entered into on the Coinbase Digital Asset Platforms during the Class Period, including applicable costs, attorneys' fees, and interest.

**FOURTH CAUSE OF ACTION**
**Violation of the FLA. STAT. §517.211**
**(Unregistered Dealer)**
**(Against the Coinbase Global and Coinbase, Inc., Defendants)**

368. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 330, and further allege as follows:

369. Plaintiffs Foy and Maggard are residents of the State of Florida.

370. Plaintiffs Foy and Maggard paid for or purchased Coinbase Digital Asset Securities in Florida, including 1INCH, ACH, ALGO, AMP, CRO, ENJ, FET, GALA, KEEP, LINK, LRC, MANA, MATIC, OGN, NKN, NU, XLM, ZRX, and thus the deceptive transactions alleged herein occurred in Florida.

371. Plaintiffs bring this claim individually and on behalf of the members of the Class against the Coinbase Global and Coinbase, Inc., Defendants.

372. At all relevant times there was in full force and effect the Florida Securities and Investor Protection Act (FSIPA), which prohibits, *inter alia*, any person from transacting business as a dealer unless he is registered or exempt from registration under Florida law. *See* FLA. STAT. §517.12(1). Any person who offers or sells a security in violation of Section 517.12(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorneys' fees. FLA. STAT. §517.211.

373. When issued, the Digital Asset Securities were securities within the meaning of the FSIPA. *See* FLA. STAT. §517.021(22). Coinbase transacted business as a dealer when it offered or sold the Digital Asset Securities to Plaintiff Maggard in Florida. FLA. STAT. §517.021(6).

374. Further, FSIPA provides for the registration of "paper" (*i.e.*, securities), at §517.07(1) as follows: It is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state unless the security is exempt under §517.051, is sold in a transaction exempt under §517.061, is a federal covered security, or is registered pursuant to this chapter. FLA. STAT. §517.0. Neither the Digital Asset Securities or the EARN Securities Program were registered in Florida, and neither was exempt from registration. In light of that non-registration, Coinbase is strictly liable to the Customers for recessionary damages as provided in FLA. STAT. §517.211, and those damages are "automatic." *See Skurnick v. Ainsworth*, 591 So. 2d 904, 905 (Fla. 1991).

375. In addition to requiring that the "paper" be registered, FSIPRA also provides at §517.12 for the registration of "people" as follows: "No dealer, associated person, or issuer of securities shall sell or offer for sale any securities in or from offices in this state, or sell securities to persons in this state from offices outside this state, by mail or otherwise, unless the person has been registered with the office pursuant to the provisions of this section." FLA. STAT. §517.12(1).

376. Coinbase transacted business as a dealer in Florida, including without limitation through solicitations directed by Coinbase to Florida and received in Florida.

377. Coinbase was not registered as a dealer in Florida, nor was it subject to any exemption from registration for either the Digital Asset Securities or the EARN Securities Program.

378. Accordingly, Coinbase has violated the Florida Securities and Investor Protection Act by transacting business as an unregistered dealer in the sale of securities.

379. Plaintiffs and Class members therefore seek all available and appropriate relief available under the Florida Investor Securities and Investor Protection Act, including recission or damages for consideration and fees paid in connection with, and a result of, all Digital Asset Securities transactions entered into on the Coinbase Digital Asset Platforms during the Class Period, including applicable costs, attorneys' fees, and interest.

**<u>FIFTH CAUSE OF ACTION</u>**
**Violation of the Fla. Stat. §517.301**
**(Negligence in Connection with the Purchase and Sale of an Investment)**
**(Against All Defendants)**

380. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 330, and further allege as follows:

381. Plaintiffs Foy and Maggard are residents of the State of Florida.

382. Plaintiffs Foy and Maggard paid for or purchased Coinbase Digital Asset Securities in Florida, including 1INCH, ACH, ALGO, AMP, CRO, ENJ, FET, GALA, KEEP, LINK, LRC, MANA, MATIC, OGN, NKN, NU, XLM, ZRX, and thus the deceptive transactions alleged herein occurred in Florida.

383. Plaintiffs bring this claim individually and on behalf of the members of the Class against all Defendants.

384. At all relevant times there was in full force and effect the Florida Securities and Investor Protection Act (FSIPA), which has various provisions that govern the rendering of any investment advice or the offer, sale, or purchase of any investment or security. Here, Coinbase had a duty to disclose to Plaintiffs and the Class that the Digital Asset Securities were not registered under FSIPA.

385. FLA. STAT. §517.301 defines an "investment" as "any commitment of money or property principally induced by a representation that an economic benefit may be derived from such commitment. Coinbase characterizes the purchase of Digital Asset Securities on the Coinbase platform as investments." FLA. STAT. §517.301(2).

386. FLA. STAT. §517.301 makes it unlawful to "employ any device, scheme, or artifice to defraud" and to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person" in "connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly." FLA. STAT.

§517.301(1)(a)(1) & (3). It is also unlawful to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, communication, or broadcast which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received directly or indirectly from an issuer, underwriter, or dealer, or from an agent or employee of an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount of the consideration. FLA. STAT. §517.301(1)(b). Florida law also prohibits knowingly and willfully falsifying, concealing, or covering up "by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation," or making or using a false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry. FLA. STAT. §517.301(1)(c).

387. "The elements of a cause of action under Section 301 are identical to those under Rule 10b–5 of the Exchange Act, 'except that the scienter requirement under Florida law is satisfied by [a] showing of mere negligence.'" *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1286 (S.D. Fla. 2011) (quoting *Grippo v. Perazzo*, 357 F.3d 1218, 1223 (11th Cir. 2004)).

388. As alleged herein, Coinbase directly engaged in a common plan, scheme, and unlawful conduct to promote and sell the Coinbase Digital Asset Securities, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs or their agents.

389. Coinbase also made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and their agents. Indeed, Coinbase relentlessly marketed the Coinbase Digital Asset Securities to investors as being investments that were properly registered with the appropriate state and federal governmental authorities while simultaneously failing to disclose that Coinbase's sales of the Coinbase Digital Asset Securities violated, at the very least, Florida state law.

390. In violation of FLA. STAT. §517.301, Coinbase disseminated weekly newsletters to investors that misrepresented the Coinbase Digital Asset Securities as non-securities. Likewise, the Coinbase User Agreement misstates that Coinbase "does not offer securities services in the United States or to U.S. persons."[241] Further, Coinbase's own website published a blog by Coinbase Chief Legal Officer, Paul Grewal, that unambiguously declared to investors "Coinbase does not list securities. End of story."[242] Grewal also gave the following summation to investors: "TLDR: Coinbase does not list securities on its platform. Period."[243]

391. The purpose and effect of said scheme, plan, and unlawful conduct was, among other things, to conceal Defendants' wrongdoing and obscuring Coinbase's financial interests in the sale of the Coinbase Digital Assets. Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, or participated in the preparation, issuance, and distribution of deceptive and materially misleading statements and omissions to Plaintiffs and their agents.

392. Defendants are jointly and severally liable to Plaintiffs for their participation or aiding in the purchase or sale of unregistered securities in violation of FLA. STAT. §517.301 as discussed herein. *See* FLA. STAT. §517.211(2).

393. Plaintiffs are entitled to recission of securities still owned, or for damages for securities Plaintiffs have sold, as available pursuant to FLA. STAT. §517.301, interests, costs, and attorneys' fees pursuant to FLA. STAT. §517.211.

---

[241] *Coinbase User Agreement*, COINBASE (Feb. 6, 2024), https://www.coinbase.com/legal/user_agreement/united_states#:~:text=Coinbase%20is%20not%20registered%20with,States%20or%20to%20U.S.%20persons.

[242] Paul Grewal, *Coinbase does not list securities. End of story.*, COINBASE (July 21, 2022), https://www.coinbase.com/blog/coinbase-does-not-list-securities-end-of-story.

[243] *Id.*

**SIXTH CAUSE OF ACTION**
**Violation of the Florida's Civil Remedies for Criminal Practices Act, FLA. STAT. §772 (the "Florida RICO Act")**
**(Against All Defendants)**

394. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 330, and further allege as follows:

395. Plaintiffs Foy and Maggard are residents of the State of Florida.

396. Plaintiffs Foy and Maggard paid for or purchased Coinbase Digital Asset Securities in Florida, including 1INCH, ACH, ALGO, AMP, CRO, ENJ, FET, GALA, KEEP, LINK, LRC, MANA, MATIC, OGN, NKN, NU, XLM, ZRX, and thus the deceptive transactions alleged herein occurred in Florida.

397. Plaintiffs bring this claim individually, and on behalf of the members of the purported Class, against all Defendants.

398. This claim is brought on behalf of the Class against Defendants for actual damages, treble damages, and equitable relief under the Florida RICO Act. *See* FLA. STAT. §772.104(1) & (2).

399. Defendants are "person[s]" within the meaning of FLA. STAT. §1.01(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of the Florida RICO Act.

400. Plaintiffs and the members of the Class are each "persons," as that term is defined in FLA. STAT. §1.01(3), who were injured in their business or property as a result of Defendants' wrongful conduct.

401. A RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose. Defendants formed such an association-in-fact enterprise, namely, the Coinbase Digital Asset Enterprise.

402. The Coinbase Digital Asset Enterprise is ongoing and continuing business organizations consisting of "persons" that created and maintained systematic links for a common

purpose: to ensure that Defendants could facilitate the sale of unregistered securities on the Coinbase platform and collect huge fees on the sale of Coinbase Digital Asset Securities to retail investors at artificially inflated prices.

403. To accomplish this purpose, the Coinbase Digital Asset Enterprise periodically and systematically promoted the Coinbase Digital Asset Securities — either affirmatively or through half-truths and omissions — to retail investors, including Plaintiffs and the Class, that the Coinbase Digital Asset Securities had been vetted and approved by state and/or federal regulatory authorities. The Coinbase Digital Asset Enterprise concealed from investors, like Plaintiffs and the Class members, that the Coinbase Digital Asset Securities were not the sound investment that Defendants claimed. This scheme of the Coinbase Digital Asset Enterprise translated into increased volume and more Coinbase Digital Asset investors buying at artificially inflated prices (and therefore, more profits) for the Defendants.

404. The entities engaged in the Coinbase Digital Asset Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by the executive officers and directors at each, respectively. There is regular communication between the Defendants, in which information is shared. Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Defendants share information regarding various timing and content of promotional and/or listing activities for the Coinbase Digital Assets. The Defendants, through their administration, funding, and execution of the scheme to misleadingly market the Coinbase Digital Assets, each functioned as a continuing unit for the purposes of implementing, respectively, the Coinbase Digital Asset Securities pump and dump scheme and, as set forth in the paragraph directly above, when issues arose during the scheme, the scheme's participants agreed to take actions to hide the scheme and continue its existence.

405. During the time that the Coinbase Digital Asset Securities were being launched and first publicly marketed to retail investors, Defendants were knowing and willing participants in various misleading marketing and promotions of the Coinbase Digital Assets, and reaped profits

from that conduct. Defendants knew, but did not disclose, that they were allowing the issuers of the Coinbase Digital Asset Securities to engage in this fraud to the detriment of retail investors.

406. The Defendants participated in the conduct of the Coinbase Digital Asset Enterprise, sharing the common purpose of inflating the price and trading volume of Coinbase Digital Asset Securities in order to generate substantial profits from fees, through a pattern of racketeering activity within the meaning of the Florida RICO Act, which includes multiple instances of violations of FLA. STAT. §517. In the Coinbase Digital Asset Enterprise, the Defendants knowingly made material misstatements and/or omissions to retail investors in furtherance of the fraudulent scheme regarding:

a. the regulatory approval of Coinbase Digital Asset Securities;

b. ownership interests of Defendants in the Coinbase Digital Asset Securities; and

c. the Defendants' intent to promote and facilitate the sale the Coinbase Digital Asset Securities after artificially inflating the price.

407. The Coinbase Digital Asset Enterprise engaged in and affected interstate commerce because, *inter alia*, it created the Coinbase Digital Asset Securities that were paid for by thousands of Class members throughout the United States.

408. The foregoing evidences that the Defendants were each willing participants in the Coinbase Digital Asset Enterprise, that the Coinbase Digital Asset Enterprise had a common purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose coupled with the misleading promotion of the Coinbase Digital Asset Securities.

409. During the Class Period, the Defendants exerted control over the Coinbase Digital Asset Enterprise and participated in the operation or management of the affairs of the Coinbase Digital Asset Enterprise, directly or indirectly, in the following ways:

410. The Defendants were directly responsible for the decision to promote, list, and trade unregistered securities on the Coinbase platform;

411. The Defendants concealed that they were causing the Coinbase Digital Asset Securities price to artificially inflate in order to allow themselves (and other insiders) to collect fees on each trade made on the Coinbase platform and to sell off their respective Coinbase Digital Asset Securities holdings (to the extent they could) at that inflated price; and

412. The Defendants expected and intended that the marketing materials would (and did) get distributed through the U.S. Mail and interstate wire facilities, communications that failed to disclose that the Defendants were pumping up price and trading volume of Coinbase Digital Asset Securities artificially.

413. The scheme had a hierarchical decision-making structure that was headed by the Defendants. They controlled the listing of the Coinbase Digital Asset Securities and directed the Company to misleadingly promote the Coinbase Digital Asset Securities to investors.

414. The scheme devised and implemented by the Defendants amounted to a common course of conduct intended to (a) allow the Defendants to artificially inflate the price of and trading volume for the Coinbase Digital Asset Securities; and (b) collect exorbitant fees therefrom at the expense of Plaintiffs and the Class members.

**Defendants' Pattern of Racketeering Activity**

415. The Defendants conducted and participated in the conduct of the affairs of the Coinbase Digital Asset Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. §1341, relating to mail fraud, and 18 U.S.C. §1343, relating to wire fraud. The pattern of racketeering activity by the Coinbase Digital Asset Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful digital asset solicitation scheme. Each of these fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of the Florida RICO Act. Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of the Florida RICO Act, through which the Defendants intended to defraud Plaintiffs, members of the Class, and other intended victims.

416. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the Class. The Defendants calculated and intentionally crafted the Coinbase Digital Asset Enterprise to ensure their own profits remained high, without regard to the effect such behavior had on Plaintiffs and members of the Class who were buying the Coinbase Digital Asset Securities at artificially inflated prices.

417. By intentionally and artificially inflating the Coinbase Digital Asset Securities prices, and then subsequently failing to disclose such practices to the investors, the Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

418. The pattern of racketeering activity alleged herein was continuing until the present.

**The Defendants' Use of the U.S. Mail and Interstate Wire Facilities**

419. The Coinbase Digital Asset Securities Enterprise engaged in and affected interstate commerce because it transmitted and published false and misleading information concerning the growth potential for Coinbase Digital Asset Securities across state lines.

420. During the Class Period, the Coinbase Digital Asset Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, communications, information, products, and funds by the U.S. Mail and interstate wire facilities.

421. The nature and pervasiveness of the fraudulent token promotion scheme, which was orchestrated by the Company's executives, including Individual Defendant Armstrong, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

422. Many of the precise dates of the Coinbase Digital Asset Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the Defendants. Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy.

However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs describe this below.

423. The Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the fraudulent promotion scheme involved thousands of communications throughout the Class Period including, *inter alia*:

a. Communications on official Coinbase accounts on various social media platforms, including, but not limited to: Twitter, Reddit, Telegram, and Discord to investors, which occurred on a regular basis as investors like Plaintiffs and Class members purchased Coinbase Digital Asset Securities;

b. Written representations and telephone calls between the Defendants and the moderators of the Coinbase social media accounts regarding the promotion of Coinbase Digital Asset Securities and the financial benefits to the Defendants for doing so;

c. Emails between Defendants and their respective directors and officers agreeing to or effectuating the implementation of the Coinbase Digital Asset Securities fraud scheme;

d. Written and oral communications directed to retail investors that fraudulently misrepresented the growth potential for the Coinbase Digital Asset Securities that were designed to conceal the scheme and deter investigations into the Coinbase Digital Asset Enterprise; and

e. Receipts of increased profits sent through the U.S. Mail and interstate wire facilities — the wrongful proceeds of the scheme.

424. In addition to the above-referenced RICO predicate acts, it was foreseeable to the Defendants that their employees and co-Defendants would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, conceal that the Coinbase Digital Asset Securities price was fraudulently inflated.

**Motive and Common Purpose**

425. The Defendants' motive and purpose in creating and conducting the scheme and the Enterprise(s) was to increase the price and trading volume for the Coinbase Digital Asset Securities so that the Company could collect fees on each transaction on the Coinbase platforms, as well as allowing insiders like Individual Defendant CEO Armstrong to sell off allocations from the Coinbase Digital Asset Securities at grossly inflated prices. Each person joined in that common purpose because each person made more money the higher the Coinbase Digital Asset Securities price rose and, as trading volume increased, the Defendants would be able to sell off in the increased liquidity while collecting millions in transactions fees.

**Damages Caused by the Defendants' RICO Activities**

426. The Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and Class members to be financially injured as a result of purchasing the Coinbase Digital Asset Securities.

427. As described above, when the Defendants executed the Coinbase Digital Asset Securities promotional scheme, the result was to flood the market with unregistered securities for sale, which would allow Coinbase to collect significant fees from every transaction as well as allowing Coinbase insiders like Defendant Armstrong to sell various allocations given to Defendants out of the Coinbase Digital Asset Securities. When the Coinbase Digital Asset Securities price and trading volume is artificially inflated, investors like Plaintiffs and the Class overpay due to a fraudulent price and excess fees.

428. Plaintiffs' injuries, and those of the Class members, were proximately caused by the Defendants' racketeering activity. But for the misleading statements and omissions made by the Defendants, Plaintiffs and others similarly situated would have paid less for the Coinbase Digital Asset Securities.

429. Plaintiffs' injuries were directly caused by the Defendants' racketeering activity. The Defendants' racketeering activity inflated the Coinbase Digital Asset Securities price, which was ultimately paid for by Plaintiffs and the other Class members.

430. Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other Plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from the Defendants' fraudulent scheme.

431. By virtue of these violations of the Florida RICO Act, the Defendants are liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## SEVENTH CAUSE OF ACTION
**Violation of the California Unfair Competition Law**
**CAL. BUS. & PROF. CODE §17200**
**(Based on Unlawful Acts and Practices)**
**(Against All Defendants)**

432. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 330, and further allege as follows:

433. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot are residents of the State of California.

434. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot paid for or purchased Digital Asset Securities in California, including AAVE, ABT, ADA, AVAX, CRO, DOT, GALA, GODS, MANA, MATIC, PRO, SHIB, SOL, and SUKU, and thus the unlawful conduct alleged herein occurred in California.

435. Plaintiffs bring this claim individually, and on behalf of the members of the purported Class, against all Defendants.

436. At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

437. "'An act can be alleged to violate any or all of the three prongs of the UCL – unlawful, unfair, or fraudulent.'" *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1149 (N.D. Cal. 2010) (quoting *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007)).

438. The "unlawful" prong of the UCL prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). By proscribing "any unlawful" business practice, the UCL permits injured consumers to "borrow" violations of other laws and treat them as unlawful competition that is independently actionable. In other words, an "unlawful" business practice under the UCL is a practice that violates any other law.

439. Any violation of the Florida and/or California broker-dealer laws or the registration requirements for money transmitters necessarily violates the "unlawful" prong of the UCL.

440. In order to have standing for a UCL claim, a plaintiff must meet the injury-in-fact requirement. This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'" *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). A plaintiff's claims under this California statute are governed by the "reasonable consumer" test. *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (noting that the "'unfair business practices claim must be evaluated from the vantage of a reasonable consumer.'"). Under the reasonable consumer standard, a plaintiff must "show that 'members of the public are likely to be deceived.'" *Id*. (quoting *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1267 (1992)).

441. Defendants engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including, but not limited to, in the following ways:

(a) knowingly and intentionally misrepresenting that the Digital Assets Securities sold on the Coinbase platform were not securities under state or federal law; and

(b) knowingly and intentionally concealing that Coinbase did not, as required by law, register either the Digital Asset Securities it sold on the Coinbase Platform or the Coinbase business itself with the necessary state and federal regulatory entities.

442. Defendants failed to disclose that Coinbase had purposefully avoided registering its business and the Digital Asset Securities products with the necessary state regulatory bodies. Plaintiffs would have found it material to their decisions to purchase Digital Asset Securities to know whether or not the digital assets they purchased were sold in compliance with state and federal securities laws.

443. The facts that the Defendants concealed were material to the decisions of Plaintiffs and the members of the Class about whether to pay for or purchase Digital Asset Securities (at all or for the price they paid), in that they would not have proceeded with their transactions but for the deceptive, fraudulent, and false acts and practices.

444. Upon making statements of fact regarding the registration status of the Digital Asset Securities, this gave rise to a duty to disclose that information, and by failing to disclose that information, Defendants are liable for a UCL fraud by omission claim. *See In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1113-14 (N.D. Cal. 2015) ("Finally, Plaintiffs have alleged that the information regarding the Carrier IQ Software was in the exclusive knowledge of Defendants[.] These allegations are sufficient to plausibly allege that Defendants had exclusive knowledge of a material fact that they had a duty to disclose but chose to omit[]"); *see also In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1303 (S.D. Cal. 2020) (finding that the plaintiffs adequately alleged a fraudulent omission UCL claim where they pled "a duty to disclose based upon [d]efendant's exclusive knowledge of the alleged inadequacy of its security measures").

445. For example, Coinbase's misleading omissions concerning the Digital Asset Securities offered on the Coinbase platform relate to "'the central functionality of the product,'" which is required to plead a fraud by omission claim under the UCL. *See Hall v. SeaWorld Ent., Inc.*, 747 F. App'x 449, 451 (9th Cir. 2018) (citing *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 863 (9th Cir. 2018)).

446. Further, Defendants, collectively and individually, had superior knowledge of information regarding the regulatory status of Coinbase itself or the Digital Asset Securities sold on its platform.

447. Defendants intended for Plaintiffs and the members of the Class to pay for Digital Asset Securities in reliance upon the deceptive and fraudulent acts and practices described herein.

448. Had any of Defendants disclosed the omitted information, Plaintiffs would have been aware of it because they follow, directly or indirectly, the social media accounts of, and news reports on, Coinbase and its CEO, Individual Defendant Armstrong.

449. As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages. Defendants' activities caused Plaintiffs and the Class members to purchase and/or hold the Digital Asset Securities when they otherwise would not have done so.

450. Taken together, Coinbase's omissions contributed to the deceptive marketing tactics as a whole, which were used to induce customers to use the Coinbase platform to purchase the Digital Asset Securities.

451. In the event that Plaintiffs' broker-dealer and money transmitter claims under Florida and California state securities laws are found to be inapplicable to the wrongdoing alleged herein against Defendants, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

452. In addition, Plaintiffs and the Class lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL. *See M.O. Dion & Sons, Inc. v. VP Racing Fuels, Inc.*, No. CV 19-5154, 2022 WL 18281526, at *8 (C.D. Cal. Nov. 2, 2022).

453. The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution under the UCL.

454. Concurrently, "restitution under the [. . .] UCL would be more certain, prompt, or efficient than the legal remedies" available with state securities and consumer law claims. *See*

*Anderson v. Apple Inc*., 500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) (citing *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937)). For example, the price premium damages model will likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their Digital Asset Securities. Restitution would, therefore, be much more prompt and efficient than this remedy at law.

455. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under CAL. BUS. & PROF. CODE §17200.

**EIGHTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law**
**CAL. BUS. & PROF. CODE §17200**
**(Based on Unfair Acts and Practices)**
**(Against All Defendants)**

456. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 330, and further allege as follows:

457. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot are residents of the State of California.

458. Plaintiffs Aceves, Barnes, Carter, Cordi, Fan, Martinez, and Smoot paid for or purchased Digital Asset Securities in California, including AAVE, ABT, ADA, AVAX, CRO, DOT, GALA, GODS, MANA, MATIC, PRO, SHIB, SOL, and SUKU, and thus the unlawful conduct alleged herein occurred in California.

459. Plaintiffs bring this claim individually, and on behalf of the members of the purported Class, against all Defendants.

460. At all relevant times there was in full force and effect the UCL, CAL. BUS. & PROF. CODE §17200 *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

461. "'An act can be alleged to violate any or all of the three prongs of the UCL – unlawful, unfair, or fraudulent.'" *Stearns*, 763 F. Supp. 2d at 1149 (quoting *Berryman*, 152 Cal. App. 4th at 1554).

462. Defendants engaged in business acts and practices deemed "unfair" under the UCL, because of the conduct, statements, and omissions described above. Unfair acts under the UCL have been interpreted using different tests, including: (1) whether the public policy which is a predicate to a consumer unfair competition action under the unfair prong of the UCL is tethered to specific constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided.

463. Defendants have engaged in, and continue to engage in, conduct that violates the legislatively declared policies of: (1) CAL. CIV. CODE §§1572,1573, 1709, 1710, 1711 against committing fraud and deceit; (2) CAL. CIV. CODE §1770 against committing acts and practices intended to deceive consumers regarding the representation of goods in certain particulars; and (3) the Federal Tort Claims Act ("FTCA"), 15 U.S.C. §45(a)(1), against unfair or deceptive practices. Defendants gain an unfair advantage over their competitors, whose practices relating to other similar crypto-related products must comply with these laws.

464. Defendants' affirmative acts in soliciting sales of Digital Asset Securities are unfair within the meaning of the UCL, because they constituted immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers, and provided no benefit to consumers or competition.

465. The gravity of the harm to consumers caused by actions of Defendants far outweighs the utility of their conduct. According to a "Data Spotlight" from the Federal Trade Commission ("FTC") from June 3, 2022 (the "FTC Data Spotlight"), entitled: "Reports show scammers cashing in on crypto craze," "[s]ince the start of 2021, more than 46,000 people have reported losing over $1 billion in crypto to scams – that's about one out of every four dollars

reported lost, more than any other payment method. The median individual reported loss? A whopping $2,600."[244]

466. The FTC Data Spotlight further stated that "[r]eports point to social media and crypto as a combustible combination for fraud. Nearly half the people who reported losing crypto to a scam since 2021 said it started with an ad, post, or message on a social media platform."[245] Furthermore, "[d]uring this period, nearly four out of every ten dollars reported lost to a fraud originating on social media was lost in crypto, far more than any other payment method."[246] Of the reported crypto fraud losses that began on social media, most are investment scams.[247] Indeed, since 2021, $575 million of all crypto fraud losses reported to the FTC were about bogus investment opportunities, far more than any other fraud type. Defendants facilitated similar bogus crypto "investment opportunity" scams related to the Digital Asset Securities that the FTC Data Spotlight reported on as causing hundreds of millions (and rising) of dollars of damage to investors.

467. The conduct of Defendants was and is substantially injurious to consumers. Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have continued with the transactions in question but for the deceptive, fraudulent, false, and unfair acts and practices alleged herein.

468. Consumers have overpaid for Digital Asset Securities and the injury alleged herein is not outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to consumers or competition results from the alleged conduct of Defendants. Since consumers

---

[244] Emma Fletcher, *Data Spotlight: Reports show scammers cashing in on crypto craze*, FED. TRADE COMM'N (June 3, 2022), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze.

[245] *Id.* ("From January 1, 2021 through March 31, 2022, 49% of fraud reports to the FTC indicating cryptocurrency as the payment method specified that the scam started on social media, compared to 37% in 2020, 18% in 2019, and 11% in 2018.").

[246] *Id.* ("From January 1, 2021 through March 31, 2022, $1.1 billion was reported to the FTC as lost to fraud originating on social media.").

[247] *Id.* ("From January 1, 2021 through March 31, 2022, people reported to the FTC that $417 million in cryptocurrency was lost to fraud originating on social media. $273 million of these losses were to fraud categorized as investment related, followed by romance scams ($69 million), and business imposters ($35 million).").

reasonably rely on the representations, and could not have known about the omitted disclosures, and the injury results from ordinary use of their product, consumers could not have reasonably avoided such injury.

469. Defendants willfully and knowingly engaged in the deceptive and unfair acts and practices described above and knew or should have known that those acts and practices were unlawful and thus in violation of CAL. BUS. & PROF. CODE §17200, *et seq.*

470. These particular facts that Coinbase omitted and concealed were material to the decisions of Plaintiffs and the members of the Class about whether to pay for Digital Asset Securities, in that they would not have proceeded with the transaction but for the deceptive and unfair acts and practices.

471. Defendants' conduct harmed competition. While Coinbase cut corners and minimized costs, their competitors spent the time and money necessary to promote financial products and/or digital assets that complied with the applicable state and federal laws. Further, the injuries suffered by Plaintiffs are not outweighed by any countervailing benefits to consumers or competition.

472. In order to have standing for a UCL claim, a plaintiff must meet the injury-in-fact requirement. This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'" *Reid*, 780 F.3d at 958. A plaintiff's claims under this California statute are governed by the "reasonable consumer" test. *Freeman*, 68 F.3d at 289 ("'[T]he false or misleading advertising and unfair business practices claim must be evaluated from the vantage of a reasonable consumer.'"). Under the reasonable consumer standard, a plaintiff must "show that 'members of the public are likely to be deceived.'" *Id*. (quoting *Bank of the West*, 2 Cal. 4th at 1267).

473. To meet the heightened pleading standard of Rule 9(b) for claims that sound in fraud, plaintiffs must plead "'the who, what, when, where, and how'" of the alleged fraud. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th 2003).

474. Defendants engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including, but not limited to, in the following ways:

(a) knowingly and intentionally misrepresenting that the Digital Asset Securities sold on the Coinbase platform were not securities under state or federal law; and

(b) knowingly and intentionally concealing that Coinbase did not, as required by law, register either the Digital Asset Securities it sold on the Coinbase Platform or the Coinbase business itself with the necessary state and federal regulatory entities.

475. Defendants not disclose that Coinbase had purposefully avoided registering its business and the Digital Asset Securities products with the necessary state regulatory bodies. Plaintiffs would have found it material to their decisions to purchase Digital Asset Securities to know whether or not the digital assets they purchased were sold in compliance with state and federal securities laws.

476. The facts that the Defendants concealed were material to the decisions of Plaintiffs Aceves, Cordi, Fan, Martinez, and Smoot and the members of the Class about whether to pay for or purchase Digital Asset Securities (at all or for the price they paid), in that they would not have proceeded with their transactions but for the deceptive, fraudulent, and false acts and practices.

477. Upon making statements of fact regarding the registration status of the Digital Asset Securities, this gave rise to a duty to disclose that information, and by failing to disclose that information, Defendants are liable for a UCL fraud by omission claim. *See Carrier IQ, Inc.*, 78 F. Supp. 3d at 1113-14 ("Finally, Plaintiffs have alleged that the information regarding the Carrier IQ Software was in the exclusive knowledge of Defendants[.] These allegations are sufficient to plausibly allege that Defendants had exclusive knowledge of a material fact that they had a duty to disclose but chose to omit[]"); *see also Solara Med. Supplies, LLC*, 613 F. Supp. 3d at 1303 (finding that the plaintiffs adequately alleged a fraudulent omission UCL claim where they pled "a duty to disclose based upon [d]efendant's exclusive knowledge of the alleged inadequacy of its security measures").

478. For example, Coinbase's misleading omissions concerning the Digital Asset Securities offered on the Coinbase platform relate to "'the central functionality of the product,'" which is required to plead a fraud by omission claim under the UCL. *See Hall*, 747 F. App'x at 451 (citing *Hodsdon*, 891 F.3d at 863).

479. Further, Defendants, collectively and individually, had superior knowledge of information regarding the regulatory status of Coinbase itself or the Digital Asset Securities sold on its platform.

480. Defendants intended for Plaintiffs and the members of the Class to pay for Digital Asset Securities in reliance upon the deceptive and fraudulent acts and practices described herein.

481. Had any of Defendants disclosed the omitted information, Plaintiffs would have been aware of it because they follow, directly or indirectly, the social media accounts of, and news reports on, Coinbase and its CEO, Individual Defendant Armstrong.

482. As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages. Defendants' activities caused Plaintiffs and the Class members to purchase and/or hold the Digital Asset Securities when they otherwise would not have done so.

483. Taken together, Coinbase's omissions contributed to the deceptive marketing tactics as a whole, which were used to induce customers to use the Coinbase platform to purchase the Digital Asset Securities.

484. In the event that Plaintiffs' broker-dealer and money transmitter claims under Florida and California state securities laws are found to be inapplicable to the wrongdoing alleged herein against Defendants, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

485. In addition, Plaintiffs and the Class lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL. *See M.O. Dion & Sons, Inc.*, 2022 WL 18281526, at *8.

486. The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution under the UCL.

487. Concurrently, "restitution under the [. . .] UCL would be more certain, prompt, or efficient than the legal remedies" available with state securities and consumer law claims. *See Anderson*, 500 F. Supp. 3d at 1009 (citing *Am. Life Ins. Co.*, 300 U.S. at 214). For example, the price premium damages model will likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their Digital Asset Securities. Restitution would, therefore, be much more prompt and efficient than this remedy at law.

488. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under CAL. BUS. & PROF. CODE §17200.

**NINTH CAUSE OF ACTION**
**Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA")**
**FLA. STAT. ANN., §501.211(1)**
**(On Behalf of the Florida Subclass)**

489. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 330, and further allege as follows:

490. Plaintiffs Foy and Maggard are residents of the State of Florida.

491. Plaintiffs Foy and Maggard bring this claim individually, and on behalf of the members of the purported Subclass, against the Coinbase Global and Coinbase, Inc., Defendants.

492. Plaintiffs Foy and Maggard and members of the Class conferred a monetary benefit on Coinbase as a result of the fees paid to Coinbase for transactions on the Coinbase Platform.

493. Plaintiffs Foy and Maggard paid for or purchased Coinbase Digital Asset Securities in Florida, including 1INCH, ACH, ALGO, AMP, CRO, ENJ, FET, GALA, KEEP, LINK, LRC, MANA, MATIC, OGN, NKN, NU, XLM, ZRX, and thus the deceptive transactions alleged herein occurred in Florida.

494. FDUTPA, FLA. STAT. §501, is to be liberally construed to protect the consuming public, such as Plaintiffs in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

495. Plaintiffs are "consumers" within the meaning of FLA. STAT. §501.203(7).

496. By soliciting investor funds in the manner in which they did, Defendants engaged in "trade and commerce" within the meaning of FLA. STAT. §501.203(8).

497. The elements comprising a consumer claim for damages under FDUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (citing *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008)).

498. Under FDUTPA, "'deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)). "Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably. That is, '[a] party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.'" *Carriuolo*, 823 F.3d at 984 (quoting *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000)).

499. A plaintiff's claims under FDUPTA are governed by the "reasonable consumer" test. *Piescik v. CVS Pharmacy, Inc.*, 576 F. Supp. 3d 1125, 1132 n.2 (S.D. Fla. 2021) ("This case was brought under California's consumer protection laws, which apply the same 'reasonable consumer' test for deception as applied in interpreting FDUTPA.").

500. Plaintiffs Foy and Maggard reasonably relied on the misleading solicitations and omissions alleged herein when deciding to purchase various Coinbase Digital Asset Securities.

501. To establish an unfair practice, the plaintiff must show that it is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098

(11th Cir. 2021) (quoting *PNR*, 842 So. 2d at 777); *see also CMR Constr. & Roofing, LLC v. UCMS, LLC*, No. 21-11183, 2022 WL 3012298, at *4 (11th Cir. July 29, 2022).

502. Defendants engaged in business acts and practices deemed "deceptive" because of the conduct, statements, and omissions described above, including, but not limited to, failing to disclose that the Coinbase Digital Asset Securities were, in fact, unregistered securities subject to regulation by various federal and state regulatory agencies.

503. These acts and omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiffs, into investing in the Coinbase Digital Asset Securities to their collective financial detriment. Such conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

504. Had Defendants disclosed the omitted information, Plaintiffs Foy and Maggard would have been aware of it because (a) they saw the actual promotions by these Defendants and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) because they follow, directly or indirectly, the social media accounts of, and news reports on, the Company and its CEO, Individual Defendant Armstrong.

505. As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs Foy and Maggard and the members of the purported Class, suffered damages. The activities of the Defendants caused Plaintiffs Foy and Maggard and the members of the Class to purchase and/or hold the Coinbase Digital Asset Securities when they otherwise would not have done so.

506. The materially false statements and omissions as described above, and the fact that this was a misleading investment, were unfair, unconscionable, and deceptive practices perpetrated on Plaintiffs Foy and Maggard and the members of the Class, which would have likely deceived a reasonable person under the circumstances.

507. Defendants were on notice at all relevant times that the false representations of material facts described above were being communicated to prospective investors (such as Plaintiffs Foy and Maggard) by their authorized agents.

508. As a result of the false representations and violations of the laws described above, Plaintiffs Foy and Maggard and the Class have been damaged by, among other things, overpaying for the Coinbase Digital Asset Securities that were artificially inflated by Defendants as well as paying transactions fees associated with their trades on the Coinbase platform.

509. Taken together, the misleading statements and omissions of Defendants contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of Coinbase Digital Asset Securities.

510. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Florida law.

511. Pursuant to FLA. STAT. §§501.211(1) and 501.2105, Plaintiffs are entitled to recover from Defendants the reasonable amount of attorneys' fees Plaintiffs have had to incur in representing their interests in this matter.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B. Appoint Plaintiffs as the representatives of the Class and their counsel as Lead Class counsel;

C. Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

D. Award post-judgment interest on such monetary relief;

E. Award reasonable attorneys' fees and costs; and

F. Grant such further relief that this Court deems appropriate.

**JURY DEMAND**

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

DATED: March 12, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ *John T. Jasnoch*
John T. Jasnoch (*pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
Email: jjasnoch@scott-scott.com

**THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen
Ryan C. Hedrick
275 Madison Avenue, 40th Floor
New York, NY 10016-1101
Telephone: 212-686-1060
Facsimile: 212-202-3827
Email: lrosen@rosenlegal.com
Email: rhedrick@rosenlegal.com

Joshua Evan Baker
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: 212-600-2817
Facsimile: 212-202-3827
Email: jbaker@rosenlegal.com

*Counsel for Plaintiffs*